IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:17-cv-4214 |
| | ) | |
| AN EASEMENT TO CONSTRUCT, | ) | |
| OPERATE AND MAINTAIN A 42-INCH | ) | |
| GAS TRANSMISSION LINE ACROSS | ) | |
| PROPERTIES IN THE COUNTIES OF | ) | |
| NICHOLAS, GREENBRIER, MONROE, | ) | |
| SUMMERS, BRAXTON, HARRISON, | ) | |
| LEWIS, WEBSTER, AND WETZEL, WEST | ) | |
| VIRGINIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS ORUS ASHBY BERKLEY, REINHARD BOUMAN, ASHOFTEH
BOUMAN, TAMMY CAPALDO, ROBERT M. JARRELL, JEFFREY D. OSBORNE,
KIRANASA SWAMI, RONALD TOBEY, ELISABETH TOBEY, AND HEIRS OF AZEL
FORD ZICKAFOOSE (HEREINAFTER, COLLECTIVELY, "LANDOWNERS")
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR PARTIAL
SUMMARY JUDGMENT AND IMMEDIATE POSSESSION**

DEREK O. TEANEY (W. Va. Bar No. 10223)
JOSEPH M. LOVETT (W. Va. Bar No. 6926)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
PO Box 507
Lewisburg, WV 24901
Phone: (304) 793-9007
Fax:    (304) 645-9008
Email: dteaney@appalmad.org

*Counsel for Orus Ashby Berkley,
Tammy Capaldo, Robert M. Jarrell,
Ronald Tobey, and Elisabeth Tobey.*

ISAK J. HOWELL (W. Va. Bar No. 11558)
LAW OFFICE OF ISAK HOWELL
119 Norfolk Ave. SW # 330
Roanoke, VA 24011
Phone: (540) 998-7744
Fax:    (304) 645-9008
Emai:  isak@howell-lawoffice.com

*Counsel for Orus Ashby Berkley, Reinhard
Bouman, Ashofteh Bouman, Tammy
Capaldo, Robert M. Jarrell, Jeffrey D.
Osborne, Kiranasa Swami, Ronald Tobey,
and Elisabeth Tobey.*

Landowners, identified above, respectfully submit this response in opposition to the Motion for Partial Summary Judgment and Immediate Access to and Possession of the Easements for Construction of MVP Project (ECF # 6) filed by Mountain Valley Pipeline, LLC ("MVP"). MVP has filed two motions—and must win both—to gain immediate access to Landowners' property and cut their trees, blast rock, dig a ten foot deep trench, and lay pipeline, all before courts have the opportunity to review MVP's FERC Certificate or other permits and before courts have reviewed Landowners' statutory and constitutional arguments challenging MVP's power to take their property.

MVP's motions for summary judgment and immediate entry should be denied because MVP has not shown it would suffer irreparable harm if denied immediate possession. In contrast, Landowners would indisputably suffer significant injury from this invasion. MVP also failed to establish that it is likely to prevail on the merits or that immediate possession would serve the public interest. Immediate possession is, therefore, unwarranted.

## PART 1: ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT

### I. MVP Has Not Established Its Right to Take Because Its "Conditional" Certificate Does Not Currently Confer Condemnation Power.

MVP argues that its conditional certificate of convenience and necessity from FERC gives it the power to take Landowners' property as a matter of law. MVP is wrong. Congress did not intend "conditional" certificates like MVP's to invest pipeline companies with immediate condemnation power. Indeed, to reach the contrary conclusion would ignore what the FERC Certificate and the Natural Gas Act ("NGA") actually say and would allow MVP to engage in unconstitutional takings.

This analysis turns on two statutes as well as the Fifth Amendment:

- 15 U.S.C. §717f(e) allows FERC to issue both (1) certificates that include no

conditions and (2) certificates that include "such reasonable terms and conditions as the public convenience and necessity may require."

- 15 U.S.C. §717f(h) allows "any holder of a certificate of public convenience and necessity" to acquire private property by eminent domain.

- The Fifth Amendments forbids takings unless they are for a "public use" (U.S. CONST. amend. V), which in turn requires that every taking serve both a "public purpose" and a "public necessity."

MVP argues that it can take Landowners' property solely because it is a "holder of a certificate of public convenience and necessity" under 15 U.S.C. §717f(h) (ECF # 7 at 9), but ignores the other two requirements for any taking under the NGA to be lawful.

Here, pursuant to 15 U.S.C. §717f(e), FERC actually exercised its power to impose on MVP's certificate "such reasonable terms and conditions as the public convenience and necessity . . . require." MVP has not satisfied those conditions, including obtaining erosion and sediment control approvals from the Commonwealth of Virginia, completing consultations under Section 106 of the National Historic Preservation Act, and obtaining certain surveys related to threatened and endangered species. Ex. 1 at 3–4. Those requirements involve compliance with substantive standards that cannot be presumed by FERC's grant of a certificate. Plaintiff must actually obtain those regulatory approvals before it can commence operations. ECF # 1-2, FERC Certificate at 129. In total, MVP concedes that, to date, it has failed to satisfy seven of the conditions in Appendix C to its FERC Certificate. Ex. 2 at 2–3. And although MVP claims it has satisfied Condition 9, as explained in Section II.D.3 of Part II of this brief, FERC has not accepted that assertion and Landowners dispute it.

Perhaps some "terms and conditions" in a FERC certificate could be satisfied *after* the taking of a landowner's property, but it makes no sense to read the FERC Certificate or the NGA that way here. The "conditions" imposed by a FERC certificate can be either *limitations* on how

an applicant operates or *prerequisites* that the applicant must satisfy before commencing pipeline activity.[1] In MVP's case, FERC imposed conditions "require[d]" by "public convenience and necessity" that obligate MVP to obtain an erosion-and-sediment-control permit, obtain surveys related to threatened and endangered species, and complete the National Historic Preservation Act process. It is unreasonable to suppose that MVP can cut trees, trench lines, and perform blasting *first*—and then see to erosion, threatened and endangered species, and historic preservation *later*, after it has already cut, trenched, and blasted.

MVP continually asks the Court to defer to the FERC Certificate. The Landowners here ask the same. Nothing in the certificate authorizes early entry. Instead, FERC expressly

---

[1] Critically, Congress never intended to authorize the latter; rather, it intended "conditions" to mean only "conditions *on the terms of the proposed service itself*"—i.e., *limitations*, not prerequisites. *N. Nat. Gas Co., Div. of InterNorth, Inc. v. F.E.R.C.*, 827 F.2d 779, 782 (D.C. Cir. 1987) (emphasis added). It is important to bear in mind that all of the cases considering §717f(e) "conditioning power" concerned "rates and contractual provisions for the services to be certificated," and not whether property may be taken via condemnation before the conditions are removed from a permit. *Panhandle E. Pipe Line Co. v. F.E.R.C.*, 613 F.2d 1120, 1131-32 (D.C. Cir. 1979). The Supreme Court observed that the "conditions" clause in "Section 7(e) vests in the Commission control over the conditions *under which gas may be initially dedicated to interstate use*" so that "the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act." *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 389, 392 (1959) (emphasis added). "Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate." *Id.* at 392. This purpose of Section 7 is to impose *limitations* on pipeline activity, not to allow pipelines to take property and commence operations before they are fully permitted. Despite those limitations, several district courts have issued orders apparently concluding that pipeline developers may take property pursuant to "conditional" prerequisite certificates. *See, e.g.*, *Transcon. Gas Pipe Line Co., LLC v. Permanent Easement for 2.14 Acres*, No. CV 17-1725, 2017 WL 3624250, at *6 (E.D. Pa. Aug. 23, 2017); *Constitution Pipeline Co., LLC v. Permanent Easement for 0.42 Acres*, No. 114-CV-2057, 2015 WL 12556145, at *2 (N.D.N.Y. Apr. 17, 2015). The Court should not follow those decisions for two reasons. First, none of those opinions considered the statutory argument made here—namely, that Congress intended "conditions" in §717f(e) to mean "limitations" rather than "prerequisites" and that the canon of constitutional avoidance prohibits allowing conditional certificate holders to exercise the power of eminent domain. Rather, those courts only considered the argument that pipelines companies could not commence eminent-domain activities until certain conditions (prerequisites) were met. Second, the opinions and orders came from district courts outside this Circuit, not appellate courts, and were unreported. They are not binding and not persuasive, especially when considered in light of Landowners' Fifth Amendment rights.

conditioned the certificate on MVP's completing certain prerequisites before there would ever be a "public necessity" for the pipeline. Unless and until MVP satisfies those conditions, there is no public necessity. Given the conditions that FERC imposed pursuant to 15 U.S.C. §717f(e), this is the right way to read MVP's certificate.

Because there is no "public necessity" for the pipeline until MVP satisfies FERC's prerequisite conditions, it would be unconstitutional to allow MVP to start taking property. To the extent MVP argues that the FERC authorizes early entry, the Court should reject such an argument for two reasons.

First, the FERC Certificate is silent on early entry. It does not allow or mention early entry, nor does it indicate that cutting trees is allowed before MVP satisfies the conditions cited above. In fact, the FERC Certificate allows MVP three years to construct the pipeline, indicating that FERC did not contemplate authorizing early entry. ECF # 1-2, FERC Certificate at 108.

Second, MVP's reading of the FERC certificate would raise serious constitutional concerns about any subsequent takings. Takings necessarily implicate constitutional rights. The Court must analyze MVP's "conditional" certificate in light of the NGA and the Fifth Amendment before allowing MVP's "take" and determine whether holding a *conditional* certificate is sufficient for purposes of 15 U.S.C. §717f(h). Congress is the only branch of the federal government that can authorize the taking of property for public use by the power of eminent domain. It is necessary, then, to look at the statute that delegates the takings power— here, the NGA. Under the NGA, Congress delegates to FERC the power to impose "conditions" on a pipeline company's ability to exercise eminent domain—and it does so by expressly stating that "conditions" imposed under 15 U.S.C. §717f(e) are "require[d]" by (*i.e.*, are requirements of) "public convenience and necessity." If those conditions are not satisfied, then there is no

"public necessity" for the taking. It is black letter law, of course, that every taking must have both a public purpose and a public necessity; otherwise, the taking is unconstitutional.

The Court should reject MVP's facile reading of the NGA. When determining whether MVP may exercise eminent domain as a "holder of a certificate of public convenience and necessity" pursuant to 15 U.S.C. §717f(h), the Court should read the NGA as a whole—and in light of constitutional considerations. MVP has failed to satisfy conditions that are expressly tied to public necessity. The Court can reject MVP's claim to immediate condemnation power simply by reading the FERC certificate, which does not expressly grant it. Next, looking at the NGA itself and Congress's intent, the Court can rule that MVP must satisfy prerequisite conditions before MVP can exercise eminent domain. Finally, the Court must apply the canon of constitutional avoidance to interpret the NGA in such a way as to prevent unconstitutional takings in this case. *See Gonzales v. Carhart*, 550 U.S. 124, 153 (2007); *SEC v. Pirate Investor, LLC*, 580 F.3d 233, 253 (4th Cir. 2009).

FERC's conditions are foundational to whether there is a public necessity for this taking. That being the case, there is no current public necessity. MVP may never obtain those additional permits or satisfy the outstanding conditions of its certificate. And if MVP ultimately fails to secure the necessary permits and satisfy other conditions, any takings would be unconstitutional. MVP's motion for partial summary judgment on its right to condemn is, therefore, premature.

## II. MVP Has Not Established Its Right to Take Because MVP Has Not Proven It Can Pay Just Compensation to All Landowners.

The Takings Clause of the Fifth Amendment requires the payment of "just compensation" when private property is taken for public use. U.S. CONST. amend. V. Any act granting condemnation power "must provide for compensation" with absolute certainty. *Sweet v. Rechel*, 159 U.S. 380, 400-01 (1895) (citation omitted). It is not enough for a taker simply to say

that just compensation will be paid. Rather, "the owner is entitled to reasonable, certain, and adequate provision *before* his occupancy is disturbed." *Id*. at 403 (emphasis added). Proving "adequate provision" requires showing that "the means for securing indemnity [are] such that the owner will be put to no risk or unreasonable delay." *Id.* at 401 (citation omitted). A statute or order that "attempts to authorize the appropriation of private property for public uses, without making adequate provision for compensation, is unconstitutional and void and does not justify an entry on the land of the owner without his consent." *Id.* at 402 (citation omitted). Here, MVP has provided no such "adequate provision" and therefore cannot justify early entry. *Id.*

A private entity that wishes to take private property must do more than just promise payment; it must show that it owns "very substantial assets" such that "just compensation is, to a virtual certainty, guaranteed." *Wash. Metro. Area Transit Auth. v. One Parcel of Land in Montgomery County*, 706 F.2d 1312, 1320-21 (4th Cir. 1983); *see also E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 824 (4th Cir. 2004) (finding adequate assurance based on $1.17 billion in revenue by taker's division in year before taking).

MVP has not met that test. Defendants know of no evidence before this Court or anywhere else[2] showing that MVP has the financial capability to pay just compensation to Landowners after the taking has occurred.[3] Moreover, there is cause for concern. MVP's owner-

---

[2] FERC did not consider the question of whether MVP has sufficient resources to pay for all of the property at issue.

[3] Landowners requested this information in discovery. MVP objected and refused to provide it. Ex. 4 at 2 (response to Interrogatory No. 1). The Court's expedited schedule has not permitted Landowners to pursue the issue, which is an independent reason to deny MVP's summary judgment motion. *See McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483-84 (4th Cir. 2014).

Landowners further note that Exhibit 4, cited in this footnote, as well as Exhibits 6, 7, 8, and 9 include information marked "Confidential" by MVP subject to this Court's December 27, 2017 Protective Order. ECF # 140. Prior to filing those exhibits, counsel for Landowners conferred

operator has already admitted that MVP "has insufficient equity to finance its activities during the construction stage of the project." EQT Midstream Partners, LP 2016 Annual Report, at 78. As the FERC Certificate recognizes, MVP "does not currently own or operate any interstate pipeline facilities" and has "no existing customers." ECF # 1-2, FERC Certificate at 2, 13. As the FERC Certificate further recognizes, "greenfield pipelines undertaken by a new entrant in the market" like MVP "face higher business risks than existing pipelines proposing incremental expansion projects." *Id.* at 34. Greenfield status aside, MVP is inherently at risk of insolvency because it is a private company. Given all this, the landowners facing condemnation by this fledgling venture do not have "adequate provision" or an "adequate fund" to ensure that "just compensation is, to a virtual certainty, guaranteed." *Wash. Metro.*, 706 F.2d at 1320–21.[4]

MVP cannot assure just compensation by posting bonds before taking Landowners' property because its proposed bonds are insufficient and self-serving estimates of just compensation, not an evaluation by any neutral factfinder. The true measure of just compensation will likely prove to be much greater than the security MVP proposes. MVP has not shown it will be able to pay all Landowners the full measure of just compensation ultimately determined by a factfinder, which is a Constitutional requirement. *Sweet*, 159 U.S. at 400–02.

---

with counsel for MVP, and MVP agreed to lift the restrictions on the documents attached as Exhibits 4, 6, 7, 8, and 9 for purposes of this briefing.

[4] MVP may try to argue that FERC already considered its financial status in deciding to issue a certificate, but that is not true. FERC determined that MVP is "prepared to financially support the project without relying on subsidization from its existing customers," but FERC reached that conclusion *because MVP has no existing customers*—not because MVP is financially solid. ECF # 1-2, FERC Certificate at 12–13. Nothing in MVP certificate suggests MVP has adequate resources to pay just compensation to all affected Landowners. In all events, the Court would not be bound by any determination FERC might have made regarding MVP's financial status. *See Columbia Gas Transmission, LLC v. An Easement to Construct*, Civ. No. 16-1243, 2017 WL 544596, at *5 (W.D. Pa. Feb. 9, 2017) (holding that FERC's findings on a pipeline developer's financials are not binding on a federal district court in an eminent domain action).

### III.     Constitutional Separation-of-Powers Doctrine Bars Allowing the Judiciary to Bless a "Quick Take" That Congress Has Not Authorized.

MVP is not just seeking summary judgment on its right to take; it is also seeking to essentially take the property through a "quick-take" process. (*i.e.*, it is seeking an injunction for immediate possession before it pays and even before the true value of the property has been determined). But the NGA does not provide for "quick takes." Only Congress can delegate the power of eminent domain and, specifically, the power of quick take. *Berman v. Parker*, 348 U.S. 26, 32 (1954). Congress has not done so in the NGA. Allowing quick-take condemnation—an awesome power that Congress did not delegate—would violate separation-of-powers principles.[5]

### PART 2: RESPONSE IN OPPOSITION TO MOTION FOR IMMEDIATE POSSESSION

#### INTRODUCTION

MVP seeks to permanently and summarily dispossess Landowners of their property through motions practice—before the Court has decided whether MVP has the right to take Landowners' property, before a neutral factfinder has had an opportunity to determine the proper amount of just compensation, and before MVP has established it is able to pay that amount. Importantly, no court has yet had the opportunity to review the merits of MVP's FERC Certificate or decided whether MVP has the right to take Landowners' property.

MVP is not entitled to an injunction because it has not satisfied the four injunction factors. MVP (1) fails to show it will suffer any injury, let alone any legally cognizable "irreparable injury," if denied immediate possession of Landowners' property. That failure alone requires denying MVP's motion. Additionally, MVP (2) grossly understates the harm Landowners will suffer if their property is immediately taken and pipeline construction activities begin; (3) overstates MVP's likelihood of success on the merits; and (4) misconstrues the public

---

[5] To the extent *Sage* and its progeny actually considered this argument, they were wrongly decided, and Landowners wish to preserve this issue for potential appeal.

interest. For those reasons, the Court should deny MVP's motion for immediate possession.

ARGUMENT

## I.    MVP's Request for Immediate Possession Is Highly Disfavored Because It Would Irrevocably Upend the Status Quo.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). To succeed, a plaintiff must:

1.    make a "clear showing" that it will "likely" suffer irreparable harm absent the preliminary injunction;

2.    "clearly demonstrate" that it will "likely" prevail on the merits;

3.    demonstrate that the equities weigh in its favor; and

4.    demonstrate that granting the injunction serves the public interest.

*The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346-47 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20). "[A]ll four factors must be independently satisfied"; "no matter how likely the irreparable injury absent an injunction, a plaintiff can obtain a preliminary injunction only if he [also] demonstrates a clear likelihood of success on the merits, *and* the balance of equities favors him, *and* the injunction is in the public interest." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 250 (4th Cir. 2014). The standard from *The Real Truth About Obama* is far more exacting than the one applied in *Sage* (which predated *Winter*) and relied on by MVP (*see* ECF # 7 at 12); that standard did not require a *clear* showing of *likely* irreparable harm, instead requiring only a *basic* showing of *possible* irreparable harm. Moreover, it allowed a strong showing of one factor to displace other factors. *See Sage*, 361 F.3d at 828 (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193–96 (4th Cir.1977)).[6]

Additionally, preliminary injunctions that seek to alter the status quo rather than maintain

---

[6] *The Real Truth About Obama* expressly overruled *Blackwelder*—and, by extension, aspects of *Sage*, which relied on *Blackwelder*—holding that its standard was too lax in light of *Winter*. *See* 575 F.3d at 346-47.

9

it are *especially* disfavored. *See In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003) ("Our application of this exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature."); *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored and warranted only in the most extraordinary circumstances.").[7] Accordingly, MVP must show that "the facts and law clearly favor" the issuance of the injunction it seeks. *Faulkner v. Jones*, 10 F.3d 226, 238 (4th Cir. 1993) (citation omitted). It fails to do so.

## II.    The Four Injunction Factors Do Not Weigh in Favor of MVP.

### A.    MVP Does Not Clearly Show It Will Suffer Irreparable Harm Without Immediate Possession.

A plaintiff seeking a preliminary injunction "must make a clear showing of irreparable harm . . . , and the irreparable harm must be neither remote nor speculative, but actual and imminent." *Cornwell v. Sachs*, 99 F.Supp.2d 695, 702 (E.D. Va. 2000) (punctuation and citations omitted). This means "[t]he movant must provide proof . . . that the harm is certain to occur in the near future"; "bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Bloodgood v. Garraghty*, 783 F.2d 470, 475-76 (4th Cir. 1986) (punctuation and citations omitted). *See also Direx Israel, Ltd. v. Breakthrough Med.*

---

[7] *See also Communist Party of Ind. v. Whitcomb*, 409 U.S. 1235 (1972) (Rehnquist, J., opinion in chambers) ("While a Circuit Justice of this Court apparently has authority under Supreme Court Rule 51 to grant...a mandatory injunction, usage and practice suggest that this extraordinary remedy be employed only in the most unusual case. In order that it be available, the applicants' right to relief must be indisputably clear."); *Transwestern Pipeline Co. v. 17.19 Acres of Prop.*, 550 F.3d 770, 776 (9th Cir. 2008) (holding in an NGA condemnation action that mandatory preliminary injunctions are "particularly disfavored in the law"); *Citizens Concerned for Separation of Church and State v. Denver*, 628 F.3d 1289, 1299 (10th Cir. 1980) ("It is fundamental that mandatory injunctive relief should be granted only under compelling circumstances as it is a harsh remedial process not favored by the courts."); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendent lite*, is particularly disfavored.").

*Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (holding that irreparable harm must be "'neither remote nor speculative, but actual and imminent'" (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989))). Moreover, where, as here, a plaintiff seeks mandatory relief, the clear showing of irreparable injury must be "strong" because "changing the status quo is not favored." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F.Supp.3d 556, 566 (E.D. Va. 2016). Indeed, an unreported opinion of the Fourth Circuit suggests that "the appropriate standard" on the irreparable harm prong for a mandatory injunction is "clear and convincing" evidence. *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232, 1992 WL 67358 at *11 (4th Cir. Apr. 6, 1992) (unpublished). If the plaintiff fails to make a strong, clear showing of actual, imminent, irreparable harm, the preliminary-injunction analysis "never proceeds further." *Cornwell*, 99 F.Supp.2d at 702.

MVP fails to meet that standard. Its argument boils down to a single claim: that without possession by February 1, 2018, it may suffer financial losses and construction delays. *See* ECF # 7 at 12–13. That argument fails for multiple, independent reasons.

### 1.    Even if MVP Would Suffer Injury Without Immediate Possession, That Injury Will Not Be *Irreparable*.

All of MVP's alleged irreparable injuries, even if real, would be economic in nature. ECF # 7 at 12–13. But "'purely economic injury and economic loss alone, however substantial, does not constitute irreparable harm.'" *Mylan Pharm., Inc. v. U.S.F.D.A.*, 23 F.Supp.3d 631, 646 (N.D. W. Va. 2014) (quoting *Mylan Pharms., Inc. v. Thompson*, 207 F.Supp.2d 476, 485 (N.D. W. Va. 2001)); *see also Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("It is . . . well settled that economic loss does not in and of itself, constitute irreparable harm."). "[M]onetary loss is not irreparable unless it threatens a business's existence." *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F.Supp.3d 672, 690 (E.D. Va. 2017); *see also Wisc.*

*Gas Co.*, 758 F.2d at 674. MVP has not even claimed, much less clearly shown, that the alleged monetary losses arising from delayed possession of Landowners' properties would threaten its existence. In fact, its corporate representative admitted that MVP would likely survive to build its pipeline even if it has to wait until November 15, 2018 to begin construction. Ex. 3, Tr. at 209:21–23.[8]

It has long been the law in the Fourth Circuit that "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [equitable relief], are not enough" to support equitable relief. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970). Notwithstanding those clear holdings, MVP asserts that *Sage* stands for the proposition that financial harm to a pipeline developer is sufficient to establish irreparable harm. ECF # 7 at 13 (citing *Sage*, 361 F.3d at 828). For that to be so, however, *Sage* would have had to abrogate *Long*, which it did not purport to do. As explained below, *Long* and *Sage* are not in conflict, but if there were a conflict between the two, *Long* would control as the prior opinion on the matter. The Fourth Circuit holds that, "[w]hen published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting *en banc* or the Supreme Court." *McMellon v. U.S.*, 387 F.3d 329, 332 (4th Cir. 2004) (*en banc*). Consequently, *Sage,* not an *en banc* ruling, could not overrule *Long*.

In all events, MVP misunderstands the import of *Sage*—an opinion issued under the now-rejected *Blackwelder* standard. *Sage*, 361 F.3d at 828 (citing *Blackwelder*). Under *Blackwelder*, a lesser showing of irreparable harm could support an injunction if a particularly strong showing of likelihood of success on the merits was made. 550 F.2d at 195. The Fourth Circuit abandoned

---

[8] The transcript excerpt attached as Exhibit 3 is the transcript of the testimony of MVP's declarant, Robert J. Cooper, on Day 1 of the injunction hearing held in the Roanoke Division of the U.S. District Court for the Western District of Virginia on January 12 and 13, 2018.

that sliding scale in *The Real Truth About Obama*, recognizing that *Blackwelder*'s allowance for the mere demonstration of a possibility of irreparable injury upon a strong showing on the probability of success was "explicitly rejected [by the Supreme Court] in *Winter*[.]" 575 F.3d at 347. After *The Real Truth About Obama*, a party seeking an injunction must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Id.*

In *Sage*, the Fourth Circuit was not merely persuaded that the pipeline developer had a likelihood of success on the merits, it was certain that "[s]uccess on the merits for ETNG is . . . apparent." 361 F.3d at 829–30. Indeed, the landowners in *Sage* conceded as much. *Id.* Because the pipeline developer was *guaranteed* success on the merits, under the applicable *Blackwelder* standard, a *de minimis* showing of *possible* irreparable harm by the pipeline developer would have supported an injunction. *Sage* must be read with that key point in mind. In other words, because the pipeline developer was guaranteed success on the merits, the Fourth Circuit did not have to conclude that economic loss constituted irreparable harm.

That is particularly clear in light of *Sage*'s discussion of irreparable harm, in which it noted that the pipeline developer was "under an order from FERC to complete construction and have the pipeline in operation by January 1, 2005. It would not be possible to meet FERC's deadline without a preliminary injunction." *Sage*, 361 F.3d at 829. To the extent that there was irreparable harm present in *Sage*, it was the potential that the pipeline developer would miss the FERC-imposed completion deadline without early possession—not potential economic harm.[9]

After *The Real Truth About Obama* and *Winter*, pipeline developers must make a stronger showing of irreparable harm to obtain injunctive relief, no matter their likelihood of

---

[9] As discussed further below, the injunction sought by MVP is not necessary to comply with the FERC completion deadline in this case, distinguishing the facts here from *Sage*, where the condemnor faced an expiring FERC certificate. Here, in contrast, MVP can comply with the FERC deadline even if it does not obtain possession by February 1, 2018. MVP does not even allege that it could not meet the FERC deadline if the preliminary injunction were not issued.

success on the merits. Because the analysis changed as a result of the Supreme Court's ruling in *Winter*, *Sage* cannot be applied to this case without a necessary modification. *McMellon v. United States*, 387 F.3d at 332. Specifically, MVP must clearly establish irreparable injury. Because, under Fourth Circuit precedent, monetary losses do not constitute irreparable injury, MVP falls short of carrying its burden.

Additionally, MVP claims that construction delays will render it "unable to meet its contractual requirements" and suggests that *Sage* found "inability to meet contractual obligations to be" an independent form of "irreparable harm." ECF # 7 at 12–13. But that gloss on *Sage* is misleading. *Sage* found inability to meet contractual obligations to be irreparable harm because the plaintiff's "inability to satisfy these commitments would have negative impacts on its customers and the consumers they serve." *Sage*, 361 F.3d at 829. That is not the case here, as MVP has no customers that are not its own corporate affiliates. ECF # 1-2, FERC Certificate at 5–6 & nn. 12–16.

### 2. MVP Has No Evidence It Will Suffer Irreparable Injury (Even Economic Injury) Without Immediate Possession.

MVP's motion provides no details about the financial harm MVP will allegedly suffer without immediate possession. ECF # 7. MVP attempted to supply the missing information in discovery, alleging three forms of injury, but its efforts fall far short of a clear, strong showing.

Critically, evidence presented at the recent hearing in the related Virginia condemnation action establishes that MVP's claimed harms are an unrealistic maximum projection—not actual, concrete, imminent threats. Ex. 3, Tr. at 197:2–4. That necessarily defeats MVP's preliminary-injunction request, and the Court need not proceed further. *See Winter*, 555 U.S. at 20–21 (holding irreparable harm to support an injunction must be likely, not merely possible). Even leaving this aside, all of MVP's claims of alleged harm still fail.

14

###### a.   MVP's claim that it will lose revenue does not withstand scrutiny.

MVP alleges it will lose $40 million to $50 million in revenue for every month the in-service date of the proposed pipeline is delayed. Ex. 4 at 10–11.[10] As a threshold matter, "lost revenue" is not the same as "lost profits," and MVP has not even attempted to show that delayed possession will cause the latter. That is, although MVP has identified its claimed gross revenue from operating the pipeline, it has not offered evidence of its monthly operation and maintenance costs for the pipeline, which are needed to determine the true net loss to MVP of a month's delay. The costs to operate and maintain a 303-mile long, 42" natural gas pipeline with four compressor stations are substantial. Without evidence of operation, maintenance, and other costs, MVP's gross revenue numbers are meaningless.

Moreover, MVP's alleged sources of revenue are all from its corporate affiliates. MVP bases its claims of lost revenue on the revenue it would generate from shipping natural gas once the pipeline is in-service. MVP has precedent agreements with five "shippers"—all of whom have a corporate familial relationship with the members of Mountain Valley Pipeline, LLC. ECF # 1-2, FERC Certificate at 5–6 & nn. 12–16. As a result, to the extent that MVP "loses" revenue each month that its pipeline is not in-service, its members or their corporate affiliates *retain that same amount of money*. On this matter, a disadvantage to one member of the corporate family—lost revenue—is an advantage to another member of the same family—reduced shipping costs. In other words, it is a wash. Because MVP has not been able to find end-users to buy the gas it would transport, MVP's owners will not actually "lose" anything with delays; their books will simply fail to reflect a transfer of money from one affiliated company to another.

---

[10] Plaintiff has redacted the shipping rates from the contracts under which it claims a right to a seven-figure monthly revenue, leaving its numbers unsupported and falling short of a clear and convincing evidence standard.

Even leaving all that aside, there are still other reasons to reject MVP's claim that delayed possession will reduce its revenues. First, the MVP Project as a whole is premised on a 20-year transportation agreement that does not start to run until service begins. *See, e.g.*, Ex. 5 at 5 (example precedent agreement showing 20-year term from Service Commencement Date (¶ 5(d)(ii))). MVP's "lost revenue" is, at worst, merely "delayed revenue." MVP will have 20 years of revenue from the pipeline, regardless of whether the pipeline is placed in service on its target date of December 2018, or at some later time. It will earn the delayed revenue on the back-end of the shipping contracts. Because, as MVP's project manager testified at the Virginia hearing, the shipping rates under MVP's contracts turn, in part, on gas commodity prices (Ex. 3, Tr. at 170:14–25), a delayed beginning to the agreed 20-year transportation period could actually *benefit* MVP if gas prices rise over time, so MVP cannot demonstrate that delayed possession will ultimately decrease its revenues. Any such alleged harm is purely speculative.

MVP claims no contractual penalties under its shipping contracts; indeed it cannot. Those contracts expressly provide that MVP "shall not be liable in any manner to [its] Shipper[s] due to [its] failure to complete the construction of the Project within the timeframe contemplated herein." Ex. 5 at 8. Moreover, its shipping contracts expressly allow it until June 1, 2020, to place the pipeline in service and trigger the "Service Commencement Date." *Id.* at 9.[11] As discussed below, MVP has contemplated alternative schedules under which it begins tree felling and clearing in November 15, 2018, and still places its pipeline in service by November or December 2019. Ex. 6; Ex. 7. In short, the terms of MVP's shipping contracts would not impose any harm on MVP—economic or otherwise—if MVP does not obtain the injunction that it seeks.

Finally, to the extent that MVP may attempt to claim that delays in possession will cause

---

[11] That allowance for a later date establishes that the MVP corporate family was content to assume the risk that the pipeline may not be in service by December 2018 as hoped.

it to lose the "time value of money" from its delayed revenues, that effort fails to establish clear irreparable harm. MVP has provided no evidence to support such claims in discovery, and its sole harm witness in the related Virginia proceeding admitted that he was not qualified to calculate such a figure and was not offering one. Ex. 3, Tr. at 176:13–23.

Merely suggesting that there is a concept known as the time-value-of-money is far cry from providing "clear" and "strong" evidence of how much it will lose if its revenue stream is delayed. Moreover, whether such loss would occur—and the amount of such potential loss—is too speculative and uncertain to support an injunction. *Bloodgood*, 784 F.2d at 476. Further, as explained above, the "revenue" MVP could start "earning" absent delays is actually money possessed by its affiliates. ECF # 1-2, FERC Certificate at 5–6 & nn. 12–16. If that money is not sitting in MVP's coffers, it will sit in its affiliates' coffers, and MVP's ultimate owners can earn interest on it either way. In all events, gas prices may rise in the future, which may more than offset the (unquantified) time value of money that MVP may claim it will lose if its revenue stream is delayed. MVP has put on no evidence either way, making it wholly speculative for MVP to complain that delayed possession will cause it net losses, let alone substantial net losses.

     **b.**  **MVP's claim that it will have to pay "contractor penalties" cannot support an injunction.**

MVP claims that construction delays may force it to pay up to $200 million in "construction delay and cancellation fees" to its contractors. Ex. 4 at 11. Those delay charges and cancellation fees are included in the terms of the purchase orders issued under MVP's contracts with its three main contractors on the pipeline. MVP contends that the terms of those contracts and purchase orders allow MVP's contractors to collect incremental and cumulative charges based on delays in starting work on the project. Ex. 8. The evidence shows that MVP wildly exaggerates the amount of delay and cancellation charges it would actually pay, however.

As a threshold matter, MVP's alleged contractual penalties do not directly stem from lack of access to Landowner's property. Rather, they are self-inflicted by MVP's entry into construction contracts, and issuing purchase orders under them, that include the penalty provisions about which MVP now complains. MVP voluntarily entered into the contracts without coercion. Ex. 3, Tr. at 191:16–17. MVP executed one of the contracts, and issued multiple purchase orders thereunder, *before* it even received its FERC Certificate. *See, e.g.*, Ex. 9 at 1; Ex. 8 at 1. In all events, all of the contracts were executed and purchase orders issued *before* MVP obtained access to all of the properties along the pipeline route. By doing so, MVP assumed the risk that the delay charges and cancellation penalties might kick in. Ex. 3, Tr. at 227:13–18. A party should not be permitted to enter prematurely into third-party contracts and then use those contracts as justification to seek a court-ordered alteration of the *status quo* to avoid penalties under those contracts. That is, equity does not demand that Landowners bear the burden of MVP's poor contractual choices and it does not allow MVP to force entry by strategically entering into contracts that it intends to use as justification for early entry.

This case is like *Davis v. Mineta*, in which the Tenth Circuit, in the preliminary injunction context, rejected claims of financial penalties from delay as "self-inflicted" because the parties prematurely entered into "contractual obligations that anticipated a *pro forma* result." 302 F.3d 1104, 1116 (10th Cir. 2002). Because the parties in question were "largely responsible for their own harm," such harm could not tip the balance of equities in their favor. *Id.* In *Long v. Robinson*, the Fourth Circuit held that "a party may not claim equity in his own defaults" when the claimed injury "is of their own making." 432 F.2d 977, 981 (4th Cir. 1970). Likewise, the Eighth and Third Circuits discount self-inflicted harm in the preliminary injunction analysis. *Sierra Club v. U.S.A.C.O.E.*, 645 F.2d 978, 997 (8th Cir. 2011); *Pappan Enters., Inc. v. Hardee's*

*Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998).

Although the Fourth Circuit considered "self-made harm" in its injunction analysis in a false-advertising case, the harm that it considered was *harm to the non-moving party*. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). It reasoned that giving less weight to self-made harm to a defendant in a false advertising case would essentially always tilt the balance of the harms to the plaintiff. *Id.* Its entire analysis was driven by the fact that the self-inflicted harm was the non-movant's harm. *Id.* at 284–85. In all events, the Court ultimately concluded that the harm to the non-movant was minimal, rendering its statements regarding the relevance of self-made harm dicta. *Id.* at 285.

Unlike in *Scotts Co.*, characterizing MVP's freely-bargained-for contractual liabilities as threats of irreparable injury invites real moral hazard. Doing so would allow firms to benefit from entering into premature contracts and from a failure to mitigate damages or to insulate themselves from liability. Those concerns are especially acute where—also unlike *Scotts Co.*— the party claiming irreparable injury does so offensively rather than defensively. That is, rather than *resisting* an injunction on the basis of self-made harm, like the defendant in *Scotts Co.*, here MVP, as plaintiff, seeks to alter the *status quo* through a mandatory injunction. Moreover, that same moral hazard did not present itself in the false advertising claim in *Scotts Co.* Accordingly, courts considering requests for preliminary injunctions in light of traditional principles of equity agree that self-inflicted injuries should be appropriately discounted. *See, e.g.*, *Sierra Club*, 645 F.3d at 997 (Clean Water Act permit); *Salt Lake Tribune Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (breach of contract); *San Francisco Real Estate Investors v. Real Estate Investment Future of Amer.*, 692 F.2d 814, 818 (1st Cir. 1982) (transfer of securities). To hold otherwise would allow parties to contractually obligate themselves to extraordinary

penalties and then use those penalties to justify injunctive relief against innocent third parties.

Moreover, MVP's contractual penalties are highly unlikely to reach the $200 million mark, if they occur at all, rendering them legally irrelevant. *Winter*, 555 U.S. at 20 (alleged irreparable harm must be "likely"); *Bloodgood*, 783 F.2d at 475–76 ("bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur"). MVP's project manager admitted in his testimony that the $200 million is an absolute maximum and that he had multiple ways to mitigate the contractual penalties MVP might incur. Ex. 3, Tr. at 196:23–25, 197:1–4, 198:3–6. Indeed, he admitted that he would be unlikely to retain his job if he allowed the contractual penalties to reach the $200-million mark. *Id.* at 197:21–25, 198:1–2.

According to the testimony of its project manager, MVP has voluntarily obtained access to approximately 85% of the parcels needed to construct the pipeline. *Id.* at 112:8–16. MVP's project manager further testified that he could direct MVP's contractors to work on those parcels and substantially mitigate the delay charges that it would face under the purchase orders. *Id.* at 196:20–25; 197:1. MVP's construction contracts also contemplate "Move Around Events" in which its contractors have to relocate their labor and equipment because of MVP's inability to obtain access to a particular site. Ex. 9 at 10. Move Around Events do not entitle MVP's contractors to any time extensions, although they do allow the contractor to increase certain contract pricing. *Id.* at 18. Accordingly, MVP could also mitigate its delay penalties by directing its contractors to work on parcels out of sequence.

MVP's construction contracts also contemplate suspension of obligations on the basis of "Force Majeure Events," which are events and circumstance that are unavoidable or that could not be prevented or overcome by the reasonable efforts and due diligence of the Party claiming the event. Ex. 9 at 9. If, despite its reasonable efforts and due diligence, MVP were unable to

obtain early possession of the properties at issue in this action, it could invoke the Force Majeure event provisions of its contracts in Section 5.8 (*id.* at 20–21) and/or issue a Change Order to modify the penalties in its purchase orders under Section 4.6. *Id.* at 18. Consequently, the Force Majeure provisions of MVP's contracts may allow it to eliminate any delay charges imposed by its prematurely issued purchase orders.

Moreover, MVP's construction contracts allow it to terminate the agreements "or any part thereof" "for its convenience and without cause, at any time" on 48 hours' notice. *Id.* at 23. At the hearing in the related Virginia proceeding, MVP's project manager could not identify anything in the purchase orders that would not allow MVP to exercise its option to terminate its contracts and purchase orders without penalty. Ex. 3, Tr. at 194:7–10. Thus, MVP could cancel its improvidently issued Purchase Orders and greatly mitigate its delay charges. Even if the purchase orders themselves carry *cancellation* charges, timely acceptance by MVP of those charges would avoid cumulative *delay* charges and substantially reduce MVP's proffered $200-million penalty figure. MVP need not cancel the entire construction contract and could retain its contractors under Section 6.3.  Even if it were forced to cancel the entire contract, MVP's project manager testified that it was possible he could retain other contractors or enter into a new agreement with the parties to any cancelled contracts. *Id.* at 274:11–17.

Finally, even if the "worst-case-scenario" were accurate, in the context of this massive project, $200 million is a small percentage of the total cost of the project and nearly within the contingency amount projected by MVP. MVP's management has approved capital expenditures in the amount of $3.7 billion for the construction of the pipeline. Ex. 4 at 5. In the related Virginia proceeding, MVP's project manager testified that the $3.7 billion figure included approximately $180 million dollars in contingencies, and MVP's claimed $200 million in

additional contract charges for delays is substantially similar to that approximately 5% contingency. Ex. 3, Tr. at 165:23–25, 166:1–24. In the scale of the $3.7 billion approved budget, the contractual penalties are the same size as the built-in contingency. Mr. Cooper further admitted that a 5 percent increase in projected construction costs is not unusual. *Id.* at 198:12–14. Even large monetary losses must be compared to the project's overall costs. For example, in *Air Transport Association of America, Inc. v. Export-Import Bank of the U.S.*, the district court held that "an extreme hypothetical" was not sufficient to constitute irreparable harm for preliminary-injunction purposes because it represented "less than 7% of [the movant's] business, a figure that hardly seems ruinous." 840 F. Supp. 2d 327, 338 (D.D.C. 2012). Even MVP's claimed penalties of approximately 5% in a $3.7 billion budget are likewise not ruinous, especially considering that MVP's project manager has testified that MVP will likely construct the project even if it does not obtain the injunction it seeks from this Court. Ex. 3, Tr. at 209:21–23.

**c.      MVP's claim that it will have to pay excessive "administrative costs" does not withstand scrutiny.**

MVP's final category of claimed irreparable injury are "project administration" costs of approximately $41.2 million. Ex. 10. MVP's claims are exaggerated and do not support a finding of irreparable injury.

As with MVP's contractual penalties, its administrative costs are self-inflicted and therefore should be excluded from the irreparable harm analysis under *Long*, 432 F.2d at 981, and the other cases cited above. MVP's project manager testified that these costs are the carrying costs that MVP would incur to maintain the project in stasis until entry is allowed. Those costs do not stem from lack of access to Landowners' properties, but rather they result from MVP's self-imposed schedule. FERC did not mandate that MVP start tree-cutting in the winter of 2017-2018. MVP decided to buy the materials that it needed for its preferred schedule of its own

volition and it accepted the risk that it would not have early property access. Ex. 3, Tr. at 227:13–18. MVP's business decision to purchase materials early may not now be used to justify preliminary relief to which it would otherwise not be entitled.

Moreover, MVP provided no documents in discovery to support its claims regarding its administrative costs, notwithstanding that such documents would have been responsive to Landowners' discovery requests. For that reason, the Court should exclude MVP's claims of administrative costs under FRCP 37. Alternatively, the Court should not give any weight to MVP's unsupported claims.

Rather than supplementing its discovery with actual documents to support its claim of $41.2 million in administrative costs, MVP's counsel emailed to Landowners' counsel a photograph of a very general description of the claimed $41.2 million. Ex. 10. MVP summarily claims that the $41.2 million figure is the aggregate of costs for retaining project staff, holding needed construction equipment, leasing warehouses and storage yards, capitalized property taxes, legal fees, "compression fees," protecting its purchased pipes from the elements, and retaining inspection staff. *Id.* More than half of the $41.2 million is allocated to salary and benefits for retaining project staff during the delay, *id.*, but MVP's project manager testified that MVP could receive services from its retained staff for activities other than caretaking services. Ex. 3, Tr. at 208:12–25, 209:1–3. In short, MVP's claimed administrative costs are just the cost of remaining a going enterprise—or, according to MVP's project manager, are costs for personnel who could work on other issues for MVP or its affiliates. *Id.* Importantly, such administrative costs are in fact costs only to MVP's corporate affiliates; the project manager and other "staff" are the employees of corporate affiliates, not of MVP, LLC. *Id.* at 174:16–17.

In any event, MVP's claimed $41.2 million in administrative costs are approximately

1.1% of its approved \$3.7 billion capital budget. Ex. 4 at 5. Even if they were legitimate, they would be a small percentage of the overall project costs. Indeed, MVP's project manager admitted in his testimony that he would certainly advise his supervisors to proceed with a project based on a 1% increase in cost. Ex. 3, Tr. at 209:9–12. Further, MVP admits that it can mitigate its claimed administrative costs (*id.* at 209:25, 210:1–9), undermining MVP's assertion that those costs constitute irreparable harm. *Cf. HCI Techs., Inc. v. Avaya, Inc.*, 446 F.Supp.2d 518, 521 (E.D. Va. 2006) (preliminary-injunction movant's "ability to mitigate its losses" undercuts claim of irreparable harm). Accordingly, MVP's claimed additional administrative costs are not clear evidence of likely irreparable harm.

### 3. MVP Has Not Shown that Denial of Early Entry Would Be the *Cause* Its Alleged Injuries.

If a preliminary-injunction movant "will suffer the same harm with or without an injunction, th[at] "undermin[es] the need for injunctive relief in the first place." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013). *See also Wisc. Gas*, 758 F.2d at 674 (holding that "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin."). That principle defeats MVP's argument for a preliminary injunction.

MVP's corporate representative admitted in his testimony that delayed entry onto Landowners' properties is but one of many events that could equally delay the Project and financially harm MVP: for example, (1) FERC could deny or delay the Notices to Proceed that MVP needs to proceed with construction or even tree-cutting;[12] (2) MVP has not yet even requested, let alone obtained, all the necessary permissions to proceed with construction or even

---

[12] Ex. 3, Tr. at 183:5–8, 184:8–11, 185:1–5, 207:21–25, 208:1–6. Landowners request that the Court take judicial notice of the FERC docket and the absence of the needed approvals in that docket.

tree-cutting on the properties it seeks to condemn;[13] (3) MVP has not yet received a Virginia permit for erosion and sediment control;[14] (4) the end users of the vast majority of the gas that would flow through the proposed pipeline are currently unknown;[15] and (5) MVP has not yet completed the §106 certification process under the National Historical Preservation Act.[16] MVP cannot pretend, therefore, that land acquisition via an injunction is the bottleneck that threatens its February 1, 2018 start date. Accordingly, MVP cannot show that a preliminary injunction will prevent its alleged irreparable harm, making the issuance of an injunction pointless. *Apple*, 735 F.3d at 1363; *Wisc. Gas*, 758 F.2d at 674. Indeed, MVP's project manager testified that there were many potential causes for delay and, fatal to this injunction request, that there was "nothing unique" about a potential delay from a denial of early entry onto Landowners' properties. Ex. 3, Tr. at 207:21–25, 208:1–10. Denial of early entry is just one of many potential causes for delay, precluding the causation finding necessary to support MVP's request for equitable relief. *Apple*, 735 F.3d at 1363; *Wisc. Gas*, 758 F.2d at 674.

Indeed, these facts undermine MVP's credibility. Mr. Cooper's declaration in support of MVP's motion for preliminary injunction avers that "if MVP is unable to begin the tree clearing and construction activities of the MVP Project on the Landowners' properties by February 1, 2018, it will be unable to complete work according to its construction schedule, and it will incur additional delay fees and contractor costs." ECF # 6-1 at ¶ 24. But, as of January 19, 2018, *MVP*

---

[13] Ex. 3, Tr. at 183:14–25, 184:1–11.  Landowners request that the Court take judicial notice of the FERC docket and the absence of MVP's requests for notices to proceed (except for three limited requests not applicable to the properties that MVP seeks to condemn) in that docket.

[14] Ex. 1 at 4; Ex. 3, Tr. at 190:16–25, 191:1.

[15] ECF # 1-2 at 101 n. 286.

[16] Ex. 4 at 3–4.

*has not even requested from FERC the permission that it needs to conduct tree cutting on any property that it seeks to condemn.*[17] February 1, 2018, is just 13 days away and MVP has not even submitted the paperwork—which FERC will take time to approve—that would allow it to begin tree-cutting and construction on condemnation proceeding properties. Even if this Court were to grant MVP the injunction that it seeks, MVP will likely find itself lacking the necessary approvals from FERC to do the tree-cutting it insists that it must begin, due to the time it takes FERC to approve notices to proceed. Ex. 3, Tr. at 183:5 to 185:5. FERC still has not approved the limited notice to proceed that MVP requested on January 5, 2018. Accordingly, it is unlikely that MVP can obtain the necessary approvals in the time remaining before February 1, 2018, particularly since it has not even requested those approvals from FERC. It is not access to Landowner's properties that jeopardizes MVP's schedule, it is its own failure to navigate the FERC process.

> ### 4. MVP's Alleged Injuries Are Not "Imminent," and MVP Can Complete Its Pipeline in Compliance with Its FERC Certificate and Shipping Agreements Even if Access to Landowners' Properties Were Delayed Until November 15, 2018 or Later.

MVP's FERC-imposed project-completion deadline is October 13, 2020—still roughly 33 months away. ECF # 1-2, FERC Certificate at 108. That takes this case beyond the purview of *Sage*, where harm was imminent because the pipeline company had just nine months to complete construction and would miss that FERC-imposed deadline without immediate possession. 361 F.3d at 829. MVP's contingency plans and ability to mitigate delays (discussed above) further underscore the remoteness of its alleged harm.

MVP emphasizes that it must complete tree clearing by March 31, 2018 to comply with

---

[17] Ex. 3, Tr. at 180:3–6, 183:14–17. Landowners request that the Court take judicial notice of the FERC docket and the absence of MVP's requests for notices to proceed (except for three limited requests not applicable to the properties that MVP seeks to condemn) in that docket.

United States Fish and Wildlife Service regulations (*see* ECF # 7 at 12), but the tree-clearing window will re-open on November 15, 2018. Ex. 3, Tr. 122:25, 123:1. Thus, if MVP is unable to complete tree clearing by March 31, 2018, it can resume that activity on November 15, 2018—a delay of less than eight months. MVP has told FERC that it can complete the entire Project, including reclamation activities, by October 31, 2019. *See* Ex. 11 at 1–2. Thus, even if there were a 9-month delay in tree-clearing, MVP could still complete all activities on pipeline construction and reclamation long before FERC's project-completion deadline of October 13, 2020. Accordingly, MVP's assertion that land-acquisition delays will impact its ability to meet project deadlines is untrue.

The only MVP project deadline that is not self-imposed is FERC's project-completion date of October 13, 2020. ECF # 1-2, FERC Certificate at 108. That deadline is not jeopardized by denying preliminary relief. As a result, MVP is not facing the same kind of irreparable harm that the Fourth Circuit recognized in *Sage*, where delays threatened the pipeline developer's ability to meet its FERC deadline. 361 F.3d at 829. The schedule that MVP describes in its declaration supporting its motion for a preliminary injunction is MVP's preferred schedule, self-imposed, and not mandated by any governmental agency.

Evidence produced in discovery and presented in the hearing in the related Virginia action establishes that if MVP were to begin tree-cutting when the species window reopens in November 2018, it would place its project in-service by late 2019, and complete reclamation before October 2020. Ex. 3, Tr. at 215:14–17, 218:11–13; Ex. 6; Ex. 7. Mr. Cooper testified that, in the summer of 2017, MVP created at least two alternative schedules for implementation in the event that it was unable to timber the pipeline route during the winter of 2017-2018. Ex. 3, Tr. at 210:25, 211:1–11. Under one of those schedules, MVP would conduct construction activities on

its compressor stations (where it owns the property that it needs) during 2018, conduct tree-cutting on the pipeline route beginning November 15, 2018, and achieve an in-service (or "turn in line") date of November 28, 2019. Ex. 6. Under the other schedule, MVP could delay *all* activities on pipeline construction until commencing tree-cutting on November 15, 2018, and still achieve an in-service date of December 7, 2019. Ex. 7. In the hearing in the related Virginia action, MVP's project manager testified that, under either of those schedules, MVP would complete reclamation prior to October 2020, and neither of those schedules jeopardized either FERC's October 13, 2020 deadline or the June 1, 2020 in-service date deadline in MVP's shipping agreements. Ex. 3, Tr. at 214:13–25, 215:1–17, 218:11–15. MVP's project manager also admitted in his testimony that MVP would most likely build the pipeline under one of those schedules in the event that it could not gain access to all properties in time to cut trees in the winter of 2018. *Id.* at 209:13–23.

In short, the emergency claimed by MVP is a false-alarm. MVP can comply with all species-protection restrictions and meet the FERC-imposed completion date even if it does not obtain access to Landowners' properties this winter. The only "deadline" that it will miss is its self-imposed in-service date of late 2018. But MVP voluntarily assumed that risk when it designed its preferred schedule—with full knowledge that that schedule might be unworkable at least as early as the summer of 2017. Landowners do not deny that MVP might find immediate possession convenient. Convenience, however, is not the legal standard for the extraordinary equitable relief of a mandatory preliminary injunction. Instead, MVP must carry the heavy burden of showing it needs an injunction to prevent imminent, non-speculative, irreparable harm. *Dickson v. Morrison*, 187 F.3d 629 (4th Cir. 1999). It has failed to do so.

## B.     Plaintiff Grossly Underestimates the Significant Burden on Defendants.

As discussed above, MVP's alleged harm is purely economic and speculative. Landowners' potential harms, in contrast, *are* irreparable because they include irreversible environmental damage. Further, any harm that would befall MVP stems directly from the fact that MVP entered into contracts and shipping agreements in anticipation of a FERC certificate to which it had no guarantee. Accordingly, from the beginning of this venture, MVP voluntarily assumed risk to its time and capital. Nothing in its FERC Certificate (or any other source of law) requires the schedule that MVP is urging. Landowners, in contrast, stand to suffer irreversible environmental and property injuries if early entry is allowed and MVP subsequently fails to obtain authorization to complete construction. *See Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng's*, 528 F. Supp. 2d 625, 632 (S.D. W. Va. 2007) ("Money can be earned, lost, and earned again; a valley once filled is gone").[18]

Unlike MVP's purely monetary losses, courts have routinely recognized that environmental harm, such as timber removal, constitutes irreparable harm. *See Amoco Prods. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration,

---

[18] *See also League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (finding that temporary delay of one year resulting in economic harm to ski resort developer was not so substantial as to outweigh irreparable environmental harm faced by plaintiffs); *Sierra Club*, 645 F.3d at 996–97 (finding that harm to an endangered mussel outweighed the possibility that a power company would incur $11 million per month in economic loss if an injunction issued); *Alaska Ctr. for the Env't v. West*, 31 F. Supp. 2d 714, 723 (D. Alaska 1998) (longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment"); *Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, Civ. No. 95-1702 (GK), 1995 WL 748246 at *11 (D.D.C. Dec. 8, 1995) (potential loss of revenue, jobs, and monetary investment that would be caused by project delay did not outweigh "permanent destruction of environmental values that, once lost, may never again be replicated").

*i.e.*, irreparable.").[19] Large-scale timber removal changes the landscape and alters forests, waterways, viewsheds, and ecosystems. Early entry to timber removal would profoundly damage many Landowners' properties. For example, pipeline construction would result in the clearing of many mature trees from core forests on the property of Landowner Orus Ashby Berkley. Ex. 12 at ¶ 2 (Berkley Declaration).[20] The Berkley property would lose crucial shade trees as well as habitat for species such as the Indiana bat, foxes, and water birds. *Id.* at ¶ 7. The property is the site of prayer ceremonies and a unique copyrighted outdoor art exhibit. *Id.* at ¶ 6. Those activities are extremely dependent on the current setting and the damaged setting cannot be readily replaced or reduced to compensation. The environmental services cannot be replaced on a relevant time scale.

Landowner Robert M. Jarrell would lose similarly aged forests on his property. Ex. 13 at ¶ 2. (Robert M. Jarrell Declaration). The forest covers most of the Jarrell property and is a key reason that Mr. Jarrell purchased the property. *Id.* at ¶ 3. The proposed easement will destroy old growth trees, and will run along a narrow, steep-sided ridge, exposing the watershed to erosion damage. *Id.* at ¶ 6. The proposed easement would irreversibly alter the forest and habitat that drew Mr. Jarrell to the property in the first place. Landowner Jeffrey D. Osborne faces similar

---

[19] *See also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding timbering and loss of use of enjoyment of forested areas to constitute irreparable harm); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 445 (7th Cir. 1990) (recognizing timbering as an irreparable harm); *Environmental Defense Fund v. Tenn. Valley Authority*, 468 F.2d 1164, 1183–84 (6th Cir. 1972) (holding that cutting and burning of timber is the type of "permanent defacing [of] the natural environment" to constitute irreparable harm supporting an injunction); *Sierra Club v. Bosworth*, Civ. No. C-04-02588-CRB, 2005 WL 3096149 at *11 (N.D. Cal. Nov. 14, 2005) ("Timber cutting that has an environmental impact always has a strong potential of causing irreparable harm justifying preliminary relief.").

[20] Landowner Berkley also faces harm to the value of rental cabin sites and shaded campground sites that generate income. Ex. 12 at ¶ 5 (Berkley Declaration).

harms to the trees at his Greenbrier County property. Ex. 14 at ¶ 3 (Osborne Declaration).[21] He intentionally left large trees to line his existing road, but MVP's proposed 40-foot vehicular right of way would eradicate those mature trees. *Id.* at ¶ 3. Landowner Tammy Capaldo owns riverfront property along the Greenbrier River in Summers County, West Virginia.  Ex. 16 at ¶¶ 1, 2 (Capaldo Declaration). The proposed pipeline route emerges from its crossing of the Greenbrier River on a beach on her property. ECF # 1-11 at 9. Although the pipeline right-of-way only crosses small portion of Ms. Capaldo's property, it is the portion that is the most important to her and the focus of her recreational use of the property—beach access to the Greenbrier River. Ex. 16 at ¶ 2. Finally, Landowners Ronald and Elisabeth Tobey confront irreparable harm to their Greenbrier County property, which they purchased specifically for its forest setting and lack of intrusive rights-of-way. Ex. 16 at ¶ 2 (Elizabeth Tobey Declaration). The Tobeys rely on several ponds to water their cattle, but effects to water quality in those ponds will force the Tobeys to move the cattle elsewhere. *Id.* at ¶ 3. The Tobey property is largely contiguous forest, and the proposed right of way would cut through highly erodible soils in the heart of the forest. *Id.* at ¶¶ 4, 8. The proposed swath of cleared easement area is near and uphill from all of the property's water sources, including a well, a stream, and three ponds. *Id.* at ¶ 7. The Tobeys have also invested in a trail system for horseback riding and a rental cabin site that is within the easement area. *Id.* at ¶ 12. Those assets would be damaged or lost entirely due to the proposed easement. All the Landowners' practically irreplaceable features would be lost if MVP were allowed early possession of their property. Even if they could be replaced, it will take decades or even generations to do so, and for each landowner, a year with intact forest and habitat is itself an invaluable asset. The loss of those assets is irreparable.

---

[21] Landowner Osborne also faces harm to his wildlife habitat. *See generally* Ex. 14 (Osborne Declaration).

Because MVP's FERC certificate and other environmental approvals are subject to multiple petitions for judicial review in the United States Courts of Appeals for the Fourth Circuit and the District of Columbia Circuit, and because several regulatory agencies have not rendered final determinations about whether they will issue necessary approvals to MVP, this Court may not assume, as MVP would have it do, that the only question for the Court is whether the pipeline should be built now or later. Even MVP concedes that its FERC Certificate and other regulatory approvals could be vacated or modified on judicial review. Ex. 3, Tr. at 275:8–12. If early possession is allowed, and judicial review confirms deficiencies in MVP's regulatory approvals or if an agency denies a necessary approval, then harms to Landowners and their treasured environmental resources will have occurred unnecessarily. In that way too, this case is different from *Sage*, where there was no indication that any of the approvals for the pipeline at issue were subject to judicial review. 361 F.3d at 808. Accordingly, the question of harm to Landowners is not "simply a timing argument" as it was in *Sage* because construction of the pipeline is far from certain.

Completion of the pipeline is also in doubt because MVP refuses to provide evidence even attempting to establish that it has sufficient financial resources to complete the Project. If MVP runs out of money before completing the project, Landowners will be left with cleared rights-of-way, blasting damage, potential water loss and a useless pipeline on their properties. The risk of such harm to Landowners outweighs MVP's claimed injuries.

Finally, the conditional nature of MVP's FERC certificate also threatens to work irreparable harm to Landowners if MVP is awarded a mandatory preliminary injunction. A recent NGA condemnation action highlights how important it is for the Court to consider the conditional nature of MVP's FERC certificate before allowing early possession. In *Constitution*

*Pipeline Co., LLC v. A Permanent Easement for 1.77 Acres*, a landowner argued that an NGA condemnation action against her was premature because the pipeline developer's FERC certificate was conditioned on an approval under Section 401 of the Clean Water Act from the State of New York that had not yet been issued. Civ. No. 3:14-cv-2094, 2015 WL 1638370 at *1–*2 (N.D.N.Y. Mar. 16, 2015). The district court rejected that argument and allowed the pipeline developer early possession of the landowners' property. *Id.* One landowner in particular was especially harmed by the project, as the pipeline developer's contractors "cut down a large swath of maple trees" on her property that she used for the production of maple syrup. Marie Cusick, *Conflicting Decisions on Pipelines Frustrate Industry, Landowners*, STATEIMPACT PENNSYLVANIA, Sept. 18, 2017, *available at* https://stateimpact.npr.org/pennsylvania/2017/09/18/conflicting-decisions-on-pipelines-frustrate-industry-landowners/ (last visited Dec. 4, 2017) (hereinafter, "*Conflicting Decisions*").

The State of New York subsequently denied the required Section 401 approval, and the Second Circuit upheld that denial. *Constitution Pipeline Co., LLC v. New York State Dep't of Envtl. Conservation*, 868 F.3d 87, 90–91 (2d Cir. 2017). The Constitution Pipeline project is essentially stalled and the affected landowner is "left with heaps of rotting maple trees strewn across her property." *See Conflicting Decisions*.

The saga of the Constitution Pipeline underscores the harm to landowners that can result from allowing early possession under a conditional FERC certificate. If the Court allows early possession in this uncertain environment, it risks allowing MVP to irreparably damage the environmental values of Landowners' properties without any guarantee that MVP will complete its project. Additionally, those harms outweigh MVP's claimed irreparable injuries—which, as explained above, are unlikely to materialize and are, in any event, not "irreparable."

**C.     Plaintiff Fails to Show It Is Likely to Succeed on the Merits.**

To obtain an injunction, MVP must make a "clear showing that it is likely to succeed on the merits." *The Real Truth About Obama*, 575 F.3d at 351. Because MVP's ultimate purpose is to permanently acquire Landowners' property via eminent domain, "success on the merits" in this context means MVP must show it will eventually obtain a final judgment awarding it permanent possession. *Cf. In re Baldwin-United Corp.*, 57 B.R. 759, 767 (S.D. Ohio 1985) ("[S]uccess on the merits means simply that the party seeking the preliminary injunction will ultimately be successful in obtaining a permanent injunction.").[22] Under this standard, MVP has failed to establish it is likely to succeed on the merits. As explained above in Landowners' response to MVP's motion for partial summary judgment, MVP is not entitled to judgment as a matter of law on the question of its right to condemn. Accordingly, it has not established that it is likely to succeed on the merits.

**D.     The Public Interest Weighs Against Granting Plaintiff's Application for Injunctive Relief.**

**1.     MVP's FERC Certificate Does Not Establish That Immediate Possession Serves the Public Interest.**

MVP seems to suggest that it conclusively carries its burden of proof on the public-interest prong merely by possessing a FERC certificate. *See* ECF # 7 at 11. If possessing a FERC Certificate were sufficient, though, the public-interest prong would effectively drop out of every

---

[22] The Seventh Circuit approached this issue differently, holding that a pipeline company could not demonstrate likelihood of success on the merits because it did not "present an argument grounded in substantive law establishing a preexisting entitlement to the property." *N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 472 (7th Cir. 1998). The Seventh Circuit took "preexisting entitlement" to be a prerequisite to obtaining immediate possession in a property dispute, and held that no such entitlement exists for pipeline companies seeking to acquire property via eminent domain under the NGA. *Id.* at 471. MVP does not claim "a substantive entitlement to the defendants' land *right now*," nor could it in good faith. Thus, the Seventh Circuit's logic dictates that MVP is not likely to succeed on the merits and is not entitled to a preliminary injunction, notwithstanding *Sage*'s effort to reconcile its reasoning with that of the Seventh Circuit.

NGA pipeline case. Injunctions are not automatic or awarded as of right. *Winter*, 555 U.S. at 24; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Consequently, the Court should reject MVP's efforts to limit the public-interest analysis to whether or not it has a FERC certificate.

Even if FERC's issuance of a certificate to MVP were to indicate public interest, nothing in the FERC certificate suggests that immediate access to Landowners' properties is necessary to serve that interest. In fact, MVP's FERC certificate suggests that any public interest the Mountain Valley Pipeline will serve will be met so long as the pipeline is completed by October 13, 2020. *See* ECF # 1-2, FERC Certificate at 108 (conditioning the certificate on the pipeline being made available for service within three years of the issuance of the FERC Certificate). If FERC thought that the public need for the Project was so urgent that construction needed to immediately commence, it surely would not have given MVP three years to complete the Project when MVP admits that it can construct the pipeline in less than one year. As shown by the testimony of Mr. Cooper, and by the alternative schedules produced by MVP, tree-felling and clearing can be delayed until November 15, 2018, with no impact on compliance with the FERC Certificate. Ex. 3, Tr. at 214:13–25, 215:1–17, 218:11–15; Ex. 6; Ex. 7. That alone shows that there is no public interest in immediate possession based on MVP's FERC certificate.

Moreover, the Court should not treat MVP's FERC Certificate as conclusive on the question of whether the Project serves the public interest. This is an "affiliate pipeline," as there is common ownership of the members of Mountain Valley Pipeline, LLC, and the entities that will ship gas on the pipeline. ECF # 1-2, FERC Certificate at 5–6 & nn. 12–15. MVP still has not found end users for 87% of the pipeline capacity. *Id.* at 101 n. 286.[23] In that way, this case is distinguishable from *Sage*, where the project would "bring natural gas to portions of southwest

---

[23] The remaining 13% of the capacity could be used by customers of Roanoke Gas Company (0.5%) and customers of Consolidated Edison (12.5%). ECF # 1-2 at 5–6, 101 n. 286.

Virginia for the first time[, which will] make gas available to consumers, and it will help in the efforts of local communities to attract much-needed new business." 361 F.3d at 830. Here, in contrast, MVP has proven no such benefits, instead generally alleging that its gas will be sold somewhere—wherever supply and demand dictate—without yet finding the necessary end-users of the gas. ECF # 6-1 at ¶ 6. *Sage* simply does not help MVP's public interest argument.

### 2. Constitutional Concerns Weigh Against Granting Immediate Possession.

As the Fourth Circuit recently observed, "upholding the Constitution undeniably promotes the public interest." *International Refugee Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *vacated on other grounds*, 138 S.Ct. 353 (2017).[24] It is clear that this case implicates Landowners' rights to private property protected by the Fifth Amendment to the United States Constitution. Even if the public were to experience some inchoate, marginal benefit from having MVP's pipeline come on line a few months earlier than contemplated by FERC, such a benefit—which MVP has not even attempted to quantify—would pale in comparison to the weight of public interests on the other side: the risk that the Court will wrongfully bless the invasion of Landowners' property and the cutting of their trees in violation of the NGA, the Constitution, and other federal law.

### 3. Environmental Concerns Weigh Against Granting Immediate Possession.

Here, MVP has yet to show that its project will comply with all federal laws designed by Congress to protect the environment, and because denying an injunction would prevent

---

[24] *See also Giovanni Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest."). There is always a "strong public interest in preserving constitutional rights." *Doe v. LaDue*, 514 F.Supp.2d 1131, 1138 (D. Minn. 2007); *see also G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

permanent environmental damage, the public interest weighs heavily in favor of denying MVP's requested extraordinary relief. MVP has yet to obtain requisite approvals for its erosion and sediment controls from the Virginia Department of Environmental Quality. Ex. 1 at 4. Obtaining those approvals is a condition of MVP's Section 401 Water Quality Certificate under the Clean Water Act, and, as a result, is now a condition of its FERC Certificate. Ex. 17 at 8; 33 U.S.C. §1341(d) (providing that conditions of Section 401 certifications become conditions of the federal licenses to which they relate). Preventing harm to the environment that would result from allowing early possession and construction is in the public interest. *See Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 279 (D.D.C. 1985). The public "has a strong interest in maintaining the balance Congress sought to establish between economic gain and environmental protection." *Ohio Valley Envtl. Coalition*, 528 F.Supp.2d at 633. Because outstanding regulatory approvals under federal law remain, the public has an interest is maintaining the status quo to ensure that congressional mandates are fulfilled.

### 4. Historical and Cultural Concerns Weigh Against Granting Immediate Possession.

Additionally, the public interest is served by the protection of historical and cultural resources, as indicated by the enactment of the National Historic Preservation Act of 1966 ("NHPA"), 16 U.S.C. § 470 *et seq.* Under Section 106 of the NHPA, FERC must consult with the Advisory Council on Historic Preservation before allowing activity to proceed under a FERC certificate. 16 U.S.C. § 470f. MVP concedes that it must demonstrate compliance with Section 106 prior to construction under Condition 9 to its FERC Certificate, as demonstrated in its status reports to FERC regarding satisfaction of Condition 9. Ex. 1 at 3–4. Those consultations are not complete. Although MVP asserted to FERC that it has executed a Programmatic Agreement under Section 106, it admits that it is awaiting concurrences on a number of issues from the

37

historical resource agencies in West Virginia and Virginia. *Id.* Section 106 consultation is not complete just because a Programmatic Agreement has been executed. *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F.Supp.2d 1104, 1109 (S.D. Cal. 2010). Rather, under the applicable federal regulations, compliance with the procedures set out in the programmatic agreement is what results in satisfaction of an agency's section 106 responsibilities. 36 C.F.R. § 800.14(b)(2)(iii). Because of the outstanding concurrences that MVP needs under Section 106, the procedures set out in the December 15, 2017 Programmatic Agreement have not been satisfied, leaving FERC Certificate Condition 9 itself unsatisfied.

Even if MVP were to take the position that the Programmatic Agreement is sufficient to satisfy Condition 9, there is no indication in the record, or in FERC's publicly available docket, that FERC agrees that Condition 9 has been satisfied. Moreover, FERC Certificate Condition 15 also relates to historic and cultural resources and also remains unsatisfied, by MVP's own admission. Ex. 2 at 2. MVP cannot predict when that condition will be met. Ex. 3, Tr. at 190:4– 12, 16–25, 191:1. On December 26, 2017, FERC requested further information from MVP on the State of West Virginia's review of nine cultural and historic resource issues, and asked MVP to advise FERC of projected filing dates for West Virginia's concurrences. Ex. 19 at 1, 6–8. In its response to FERC on January 5, 2018, MVP informed FERC that seven of the nine issues remained outstanding, and that it had only sought West Virginia's concurrence on those issues on December 22, 2017. Ex. 18 at 24. MVP failed to advise FERC of projected concurrence dates, notwithstanding FERC's instruction to MVP to do so. *Id.*

By enacting the NHPA, Congress acknowledged the public interest in protecting historic and cultural resources. *Johnson v. U.S.D.A.*, 734 F.2d 774, 788 (11th Cir. 1984) (congressional intent and purpose establish public interest). The record establishes that MVP has not resolved

all outstanding issues related to historic and cultural resources along the pipeline's route. Even MVP's project manager conceded that, once MVP starts construction in areas with historical and cultural resources, the areas would be irreparably altered. Ex. 3, Tr. at 243:21–25, 244:1–2. The public interest favors protecting those resources until the federal and state regulators conclude their review of the effects of the project on those resources. That too weighs against issuing the injunction sought by MVP.

### 5. Due-Process Concerns Weigh Against Granting Immediate Possession.

Finally, denying immediate possession is in the public interest in light of FERC's abuse of so-called "tolling orders" on requests for rehearing, which FERC maintains preclude judicial review. The NGA provides that, before seeking judicial review, a party must first request rehearing by FERC. 15 U.S.C. § 717r(a). Although the NGA gives FERC 30 days to act on a request for rehearing, FERC insists that certificates are not final for purposes of judicial review until it has ruled on the merits of such a request. *Moreau v. FERC*, 982 F.2d 556, 559–62 (D.C. Cir. 1993). FERC has purported to delegate authority to its Secretary to "toll the time for action on requests for rehearing." 18 C.F.R. § 375.502(v). Seventy-four out of 75 times that it has been presented with a request for rehearing on a pipeline certificate since 2009, FERC has purported to toll its time to act on the request, with an average tolling delay of 194 days. *See Petition for a Writ Staying the FERC Order* at 6–8 & Ex. G, Doc. # 1712017, *In re Appalachian Voices*, No. 18-1006 (D.C. Cir. Jan. 8, 2018).

FERC issued a tolling order on requests for rehearing related to MVP's FERC Certificate on December 13, 2017. ECF # 119-1. If this Court allows MVP early possession of Landowners' property while those requests are in administrative purgatory, then Landowners may be deprived of due process with no way to meaningfully exercise their statutory right to judicial review of the

very certificate on which MVP relies to assert that it has the authority to condemn Landowners' property. To treat Plaintiff's conditional certificate as final for one purpose—allowing it early possession—yet treat it as not final for others—including for purposes of judicial review— violates the public's interest in the fair and equitable administration of the law.

The inequitable and illogical asymmetry of allowing MVP to take immediate possession of private property under its conditional certificate, but attempting to bar affected landowners from challenging the substance of that conditional certificate, does not serve the public interest. Landowners respectfully submit that the protection of fundamental private property rights, the environment, and historical and cultural resources serve far more important public interests that the immediate distribution of fossil fuels to already served markets. Accordingly, this Court should preserve the status quo to protect the Landowners' constitutional rights and the environment, cultural, and historical resources along the pipeline route by denying the mandatory injunction sought by MVP.

## CONCLUSION

For the foregoing reasons, Landowners respectfully request that the Court deny MVP's Motion for Partial Summary Judgment and Immediate Access to and Possession of The Easements Condemned for Construction of MVP Project (ECF # 6).

Respectfully submitted,

/s/ Derek O. Teaney
DEREK O. TEANEY (W. Va. Bar No. 10223)
JOSEPH M. LOVETT (W. Va. Bar No. 6926)
Appalachian Mountain Advocates
PO Box 507
Lewisburg, WV 24901
Phone: (304) 793-9007
Fax:    (304) 645-9008
Email: dteaney@appalmad.org
*Counsel for Orus Ashby Berkley, Tammy Capaldo,*

*Robert M. Jarrell, Ronald Tobey, and Elisabeth Tobey.*

**/s/ Isak Howell**
ISAK J. HOWELL (W. Va. Bar No. 11558)
119 Norfolk Ave. SW # 330
Roanoke, VA 24011
Phone: (540) 998-7744
Email:  isak@howell-lawoffice.com
*Counsel for Orus Ashby Berkley, Reinhard Bouman,*
*Ashofteh Bouman, Tammy Capaldo, Robert M.*
*Jarrell, Jeffrey D. Osborne, Kiranasa Swami,*
*Ronald Tobey, and Elisabeth Tobey.*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| MOUNTAIN VALLEY PIPELINE, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:17-cv-4214 |
| | ) | |
| AN EASEMENT TO CONSTRUCT, | ) | |
| OPERATE AND MAINTAIN A 42-INCH | ) | |
| GAS TRANSMISSION LINE ACROSS | ) | |
| PROPERTIES IN THE COUNTIES OF | ) | |
| NICHOLAS, GREENBRIER, MONROE, | ) | |
| SUMMERS, BRAXTON, HARRISON, | ) | |
| LEWIS, WEBSTER, AND WETZEL, WEST | ) | |
| VIRGINIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Certificate of Service**

I hereby certify that, on January 19, 2018, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to the

following counsel of record:

Nicolle S. Bagnell
REED SMITH
Suite 1200
225 Fifth Avenue
Pittsburgh, PA 15222
nbagnell@reedsmith.com
*Counsel for Plaintiff*

Nicholas Preservati
Spilman Thomas & Battle
P.O. Box 273
Charleston, WV 25321
npreservati@spilmanlaw.com
*Counsel for ICG Eastern, LLC*

Wayne S. Stonestreet
Katz Kantor & Perkins
P.O. Box 727
Bluefield, WV 24701
wstonestreet@kksblaw.com
*Counsel for Lacy H. Toney*

Patrick C. Timony
Kenneth E. Webb Jr.
Bowles Rice
P.O. Box 1386
Charleston, WV 25325
ptimony@bowlesrice.com
*Counsel for Kincheloe Mitigation Holdings,
LLC*

Thomas H. Ewing
Kay Casto & Chaney
P.O. Box 2031
Charleston, WV 25327
tewing@kaycasto.com
*Counsel for Paco Land, Inc.*

C. Joseph Stevens
William J. Stevens II
The Law Firm of C. Joseph Stevens
P.O. Box 635
Hamlin, WV 25523
joe@jstevenslaw.com
Jackie@jstevenslaw.com
*Counsel for Adam L. Matheny, Addison Dunlap
Dobbs, Arthur C. Roberts, Bonnie K. Barberie,
Bonnie Larew Walsh, Brent Fairbanks, Carl E.
Mann, Carla D. Fountain, Chloda Crosier,
Clarence Frank Sills, Jr., Cynthia A. Broyles
Morris, David Fairbanks, David Allen Johnson,
Dennis F. Fountain, Donald E. Mann, Edward
Charles Smith, II, Everett Johnson, Jr., Gladys
Larew Carter, Glenn D. Matheny, II, Hannah G.
Mann, James O. Gore, James Tully Larew, Janet
Larew Haag, Jean M. Mann, Jeremy Collins, John
White, II, Joyce A. Reese, Judy D. Roberts, Kelley
Anne Sandell Sills, Larry W. Mann, Lee Filmore
Dobbs, III, Lisa B. Meadows, Lucy G. Booth,
Marjorie Boothe, Maury W. Johnson, Melanie J.
Miller, Nancy L. Phillips, Norvel P. Mann, Oscar
D. Darago, Patricia J. Williams, Petrie Dobbs
Brown, Rebecca H. Crabtree, Rodger L. Boothe,
Roger D. Crabtree, Roy P. Reese, Thomas B.
Mann, Travis Eastham, Virginia B. Broyles,
Wayne Johnson, William Townsend Bright,
William S. Broyles, William H. Mann, Zane R.
Lawhorn, Cheryl L. Boone, and Kerry N. Boone*

W. Howard Sammons, II
The Law Office of Howard Sammons II
206 Capitol Street, Suite 1
Charleston, WV
howard@sammonslawfirmwv.com
*Counsel for Gregory L. Berry*

Charles Malcolm Lollar, Jr.
Lollar Law
109 East Main Street
Norfolk, VA 23510
chip@lollarlaw.com
*Counsel for Adam L. Matheny, Addison
Dunlap Dobbs, Arthur C. Roberts, Barry G.
Meadows, Bonnie K. Barberie, Bonnie
Larew Walsh, Brent Fairbanks, Carl E.
Mann, Carla D. Fountain, Chloda Crosier,
Clarence Frank Sills, Jr., Cynthia A. Broyles
Morris, David Fairbanks, David Allen
Johnson, Dennis F. Fountain, Donald E.
Mann, Edward Charles Smith, II, Everett
Johnson, Jr., Gladys Larew Carter, Glenn
D. Matheny, II, Hannah G. Mann, Harry L.
Mann, James O. Gore, James Tully Larew,
Janet Larew Haag, Jean M. Mann, Jeremy
Collins, John White, II, Joyce A. Reese, Judy
D. Roberts, Kelley Anne Sandell Sills, Larry
W. Mann, Lee Filmore Dobbs, III, Lisa B.
Meadows, Lucy G. Booth, Marjorie Boothe,
Maury W. Johnson, Melanie J. Miller,
Nancy L. Phillips, Norvel P. Mann, Oscar
D. Darago, Patricia J. Williams, Petrie
Dobbs Brown, Rebecca H. Crabtree, Rodger
L. Boothe, Roger D. Crabtree, Roy P. Reese,
Thomas B. Mann, Travis Eastham, Virginia
B. Broyles, Wayne Johnson, William
Townsend Bright, William S. Broyles,
William H. Mann, Zane R. Lawhorn, Cheryl
L. Boone, and Kerry N. Boone*

///

///

///

Countey Anne Kirtley
Kay Casto & Chaney
103 Fayette Ave.
Fayetteville, WV 25840
ckirtley@kaycasto.com
*Counsel for Paco Land, Inc.*

Anna Ziegler
David Ziegler
Elise Keaton
Ziegler & Ziegler
110 James Street
Hinton, WV 25951
anna.ziegler@zieglerandziegler.com
*Counsel for Anne M. Berkley, Elora C.*
*McKenzie, James Robert Persinger,*
*Landcey Ragland, Lillian Sue Persinger,*
*Monte G. McKenzie, and Richard Berkley*

**/s/ Derek O. Teaney**
DEREK O. TEANEY (W. Va. Bar No. 10223)