```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       AT CHARLESTON

 3      _____x
                                       :
 4      MOUNTAIN VALLEY PIPELINE, L.L.C.:
                                       :
 5                     Plaintiff,      :  CIVIL ACTION NO.
                                       :  2:17-cv-04214
 6               -vs-                   :
                                       :
 7      AN EASEMENT TO CONSTRUCT,      :
        OPERATE AND MAINTAIN A 42-INCH :
 8      GAS TRANSMISSION LINE ACROSS   :
        PROPERTIES IN THE COUNTIES OF  :
 9      NICHOLAS, GREENBRIER, MONROE,  :
        SUMMERS, BRAXTON, HARRISON,    :
10      LEWIS, WEBSTER, AND WETZEL,    :
        WEST VIRGINIA, et. al.,        :
11                                     :
                       Defendants.     :
12      _____x

13           TRANSCRIPT OF PREHEARING CONFERENCE
        BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
14             UNITED STATES DISTRICT JUDGE
                    FEBRUARY 2, 2018
15
        APPEARANCES:
16      FOR THE PLAINTIFF:        NICOLLE R. SNYDER BAGNELL, ESQ.
                                  Reed Smith LLP
17                                Reed Smith Centre
                                  225 Fifth Avenue
18                                Pittsburgh, PA 15222

19


20      FOR THE DEFENDANTS:       DEREK O. TEANEY, ESQ.
                                  Appalachian Mountain Advocates
21                                P.O. Box 507
                                  Lewisburg, WV  24901
22


23      FOR THE DEFENDANTS:       ISAK JORDAN HOWELL, ESQ.
                                  117 East Washington Street
24                                Suite 1
                                  Lewisburg, WV  24901
25
```

```
 1     CONTINUED APPEARANCES:

 2     FOR THE DEFENDANTS:          WAYNE S. STONESTREET, ESQ.
                                    Katz, Kantor & Perkins
 3                                  P.O. Box 727
                                    Bluefield, WV 24701-0727
 4

 5

 6     FOR THE DEFENDANTS:          C. JOSEPH STEVENS, ESQ.
                                    Stevens & Stevens
 7                                  P.O. Box 635
                                    8137 Court Avenue
 8                                  Hamlin, WV 25523

 9

10     FOR THE DEFENDANTS:          HOWARD M. PERSINGER, III, ESQ.
                                    Persinger & Persinger
11                                  237 Capitol Street
                                    Charleston, WV 25301
12

13

14     FOR THE DEFENDANTS:          COURTNEY A. KIRTLEY, ESQ.
                                    Kay Casto & Chaney
15                                  103 Fayette Avenue
                                    Fayetteville, WV 25840
16

17

18     FOR THE DEFENDANTS:          GEORGE A. PATTERSON, III, ESQ.
                                    Bowles Rice
19                                  600 Quarrier Street
                                    Charleston, WV 25301
20

21

22

23

24

25
```

1     **CONTINUED APPEARANCES:**

2     **FOR THE DEFENDANTS:**          **MITCHELL B. TUGGLE, ESQ.**
                                       Flaherty Sensabaugh & Bonasso
3                                      P.O. Box 3843
                                       200 Capitol Street
4                                      Charleston, WV 25338-3843

5

6     **FOR THE DEFENDANTS:**          **STEPHEN J. CLARKE, ESQ.**
                                       Waldo & Lyle
7                                      301 West Freemason Street
                                       Norfolk, VA 25338-3843

8

9

10

11

12

13

14

15

16

17

18

19

20          Proceedings recorded by mechanical stenography,
      transcript produced by computer.

21

22                   _____
                     CATHERINE SCHUTTE-STANT, RDR, CRR
23                        Federal Official Court Reporter
                     300 Virginia Street, East, Room 6009
24                             Charleston, WV 25301

25

```
 1              P-R-O-C-E-E-D-I-N-G-S              11:45 a.m.
 2              THE CLERK:  All rise.
 3              THE COURT:  Good morning, please be seated.
 4    It turns out that we have just two or three too many to
 5    squeeze into the Court's conference room, so we'll conduct
 6    in here.
 7         And then I hope that maybe by the time we finish this
 8    conference, there won't be quite so many the next time.
 9    We'll see what happens.
10         And I'm going to ask that the clerk call the case, and
11    if you'll note your appearances, please.
12              THE CLERK:  The case before the Court is Mountain
13    Valley Pipeline, LLC, versus an easement to construct,
14    operate, and maintain a 42-inch gas transmission line across
15    properties in the counties of Nicholas, Greenbrier, Monroe,
16    and Summers, West Virginia, et. al, Civil Action Number
17    2:17-cv-04214.
18         Will counsel please state appearances for the record.
19              MS. BAGNELL:  Nicolle Bagnell on behalf of
20    Mountain Valley Pipeline, and I have with me today Steve
21    Hastings from Mountain Valley.
22              MR. TEANEY:  Good morning.  I'm Derek Teaney with
23    Appalachian Mountain Advocates, appearing on behalf of
24    defendants:  Orus Ashby Berkley, Tammy Calpado, Robert M.
25    Jarrell, Ronald Tobey and Elizabeth Tobey.
```

```
 1                THE COURT:  Thank you.

 2                MR. HOWELL:  Good morning, Your Honor.  Isak

 3    Howell for those landowners, as well as for Mr. Osborne, Mr.

 4    Swami, and certain Zickafoose heirs.

 5                THE COURT:  Very good.

 6                MR. HOWELL:  And, I'm sorry, I forgot one family.

 7    And the Boumans.

 8                THE COURT:  Thank you.

 9                MR. CLARKE:  Your Honor, Stephen Clarke of

10    Waldo & Lyle, and with me Mitch Tuggle, on behalf of

11    Mountain Lair, LLC.

12                THE COURT:  Thank you.

13                MS. KIRTLEY:  Courtney Kirtley on behalf of Paco

14    Landing.

15                THE COURT:  Thank you.

16                MR. PERSINGER:  Howard M. Persinger, III, for Rex

17    Coal Land Company, Inc., and Warrior Energy, LLC.

18                MR. STEVENS:  Joe Stevens, Your Honor,

19    representing Jim Gore and Norvel Mann, Maury Johnson, a

20    total of about 25 landowners.

21                THE COURT:  Thank you.

22                MR. PATTERSON:  May it please the Court, I'm

23    George Patterson, and I'm appearing on behalf of Western

24    Pocahontas Properties Limited Partnership.

25                THE COURT:  Thank you.
```

```
1              MR. STONESTREET:  Wayne Stonestreet, Your Honor,

2   appearing on behalf of Monte and Elora -- I can't pronounce

3   her name -- Elora McKenzie, Thomas Keener, and the Lacy H.

4   Toney Farm Trust.

5              THE COURT:  Thank you.

6        Let me ask first, Ms. Bagnell, how many of these

7   landowners or how many parcels are there for whom you've not

8   received an agreement to settle?  I had understood something

9   that indicated that there were only about 10 percent that

10  remained at issue, but when you sent this list in, I was

11  surprised to see how many parcels, as well as how many

12  individuals there are.  And I wonder if you could go over

13  that for me.  It looks like, particularly, in Monroe County,

14  there are quite a number.

15             MS. BAGNELL:  Yes, Your Honor.  We have 69 parcels

16  remaining.  We started with 141 in the condemnation action.

17  The -- our brief did reference that we had settled with over

18  90 percent of the landowners in West Virginia.  That

19  includes both landowners in the Northern District and the

20  Southern District and before we filed --

21             THE COURT:  Well, if you could just concentrate on

22  the four counties in the Southern District, that's all I'm

23  interested in.

24             MS. BAGNELL:  69.

25             THE COURT:  And they are 69, what?  Parcels?
```

```
1              MS. BAGNELL:  Yes, Your Honor.

2              THE COURT:  And those 69 parcels then have the

3    number of landowners that you've set forth in the chart that

4    you just furnished here a day or so ago?

5              MS. BAGNELL:  Yes, Your Honor.  97.

6              THE COURT:  And thank you for getting that out to

7    us quickly.  So you've got quite a number of outstanding

8    parcels and individuals to deal with.  And it looks to me

9    like that has to be a whole lot more than 10 percent?

10             MS. BAGNELL:  Yes, Your Honor.  Again, my

11   intention in saying the amount we had settled was from prior

12   to the litigation to today.

13             THE COURT:  And so it looks as though there is

14   quite a bit of work yet to do.  When you referred to the

15   number a moment ago, was it 67?

16             MS. BAGNELL:  69 parcels.

17             THE COURT:  69.  And how many were there

18   originally in those four counties?

19             MS. BAGNELL:  Originally, in those four counties,

20   there were 102.

21             THE COURT:  So 102 that you're that -- that

22   constitutes all of the lands over which those four counties

23   you need easements?

24             MS. BAGNELL:  No, Your Honor.  Originally -- I

25   don't know the number in the four counties.  But, initially,
```

```
1     when MVP started this process, it needed over a thousand --
2     it needed access across the pipeline to over a thousand
3     properties.  And it's gained all access to all of them in
4     West Virginia, except for these 69 in the Southern District,
5     and then also a few in some -- about 15 in the Northern
6     District.
7               THE COURT:  As I understand it, with all the rest,
8     you have reached an agreed settlement?
9               MS. BAGNELL:  That's correct, Your Honor.
10              THE COURT:  You have written contracts with them?
11              MS. BAGNELL:  Yes, Your Honor.
12              THE COURT:  And it is to purchase the easement for
13    so many dollars that are specified there.  And are those
14    contracts then still in executory fashion, that is, the
15    money is still to be paid?
16              MS. BAGNELL:  For the vast majority of those, the
17    money has been paid, Your Honor.  It's paid generally when
18    the agreement is entered into.
19              THE COURT:  And so with respect to these that
20    remain, do you have an estimate of about how many of them
21    are represented here today?
22              MS. BAGNELL:  Yes, Your Honor.  Of the 97, Mr.
23    Howell and Mr. Teaney represent about 13 landowners.
24              THE COURT:  When you say of the 97 --
25              MS. BAGNELL:  Individuals.
```

```
 1            THE COURT:  All right.

 2            MS. BAGNELL:  I counted this by the individuals,

 3    not the parcels.  So Mr. Stonestreet, who also is

 4    representing Ms. Ziegler's clients, represents four.  Mr.

 5    Persinger, Ms. Kirtley, Mr. Patterson, and Mr. Clarke each

 6    represent one, and there are 30 unrepresented individuals.

 7            THE COURT:  Thank you.  I think that covers that

 8    part.  I want to ask a question or two about individual

 9    matters, the first of which is Mountain Lair.  I had gotten

10    the impression from something that there was a concern over

11    the location of the easement on the Mountain Lair property,

12    and thought that it had been worked out.  Obviously, it

13    hasn't been or you wouldn't be here today.

14      So what's the status of that?

15            MR. CLARKE:  Your Honor, Stephen Clarke for

16    Mountain Lair.  There was surveying that was done with my

17    client's permission, I believe in November and December of

18    last year, and at the time of that surveying, the MVP

19    representatives indicated that they were -- they believed

20    they needed to do a reroute across my client's property.

21    But since that date, we haven't had any future

22    communications from MVP as to a reroute.  I don't know if

23    one is going to be forthcoming or not.

24            THE COURT:  So what, in your view, needs to be

25    done?
```

1            MR. CLARKE:  I'd like to know from MVP, either

2      whether they're proceeding along the route that they filed

3      under or if they have a proposed new route; I'd like to get

4      a copy of the plat showing that.

5            MS. BAGNELL:  We're proceeding under the route

6      that was originally included in the FERC Certificate.

7            THE COURT:  Well, if then MVP does just that, is

8      there an issue?

9            MR. CLARKE:  I mean, if they're going to do that,

10     that's what they're going to do, Your Honor.  I think my

11     client's concern, as was expressed in our brief and in his

12     declaration, relates to some physical features on his

13     property.  But if MVP is saying they're going to cross the

14     sinkholes, then they're going to cross those sinkholes.

15            THE COURT:  Is that the understanding?

16            MS. BAGNELL:  Yes, Your Honor.  My understanding

17     was, after the surveying, the construction and projects team

18     met to see if construction on the FERC designated route was

19     viable, and they determined that it was, and a reroute would

20     not be needed.

21            THE COURT:  And so, apparently, then they're going

22     forward on that basis.  And does that leave you then in a

23     posture simply of determining what just compensation would

24     be?

25            MR. CLARKE:  I mean, I think my client still has

1      defenses, and we've opposed MVP's motions for a number of

2      grounds that are set forth in our brief.  But, ultimately, I

3      don't think that the routing issue is going to be one of

4      those grounds, if that's what MVP is saying today.

5                   THE COURT:  Very good.  Thank you.

6                   MR. CLARKE:  Thank you, Your Honor.

7                   THE COURT:  With respect to Rex and Warrior, what

8      is the status of that now insofar as your client is

9      concerned, Mr. Persinger?

10                  MR. PERSINGER:  Your Honor, we have filed and

11     fully briefed a motion for Warrior to intervene, which is

12     currently pending before the Court.  I've been engaging in

13     conversations with Mr. Hastings over the last week that have

14     really just kind of restarted, and we're attempting to work

15     a deal out at this point, I think it's fair to say.  So

16     hopefully that will bear fruit.

17                  THE COURT:  Well, are you making progress?

18                  MR. PERSINGER:  I feel like we are, but we're

19     pretty early in the stage.  I should know a lot more by next

20     week, I think.  One of the big issues has been whether or

21     not we're going to negotiate at all.  And there seems to be

22     interest with respect to some negotiation with respect to

23     the coal at this point.  So we'll be working on that today,

24     I'm sure.

25                  THE COURT:  Let me ask Ms. Bagnell or Mr. Hastings

1    about that, whichever of you wishes to respond.  Does it

2    look to you as though there is a reasonable avenue for

3    working the matter out?

4             MR. HASTINGS:  Your Honor, I would let Ms. Bagnell

5    give our legal position on what is involved in the

6    condemnation.  I'm happy to answer the Court's ultimate

7    question, subject to what I believe she will say when she

8    talks, is I think we are engaged in discussions for

9    parameters for an agreement.  Whether we get there or not, I

10   don't know.  But I feel comfortable to say there's a good

11   chance we can work it out with Mr. Persinger's client,

12   irrespective of what the Court would ultimately rule on the

13   legal issues for the condemnation.

14      Is that fair?

15            MR. PERSINGER:  Yes.  I agree with that.

16            THE COURT:  If it is workable, do you have a

17   prediction as to time?

18            MR. PERSINGER:  I think we should know pretty

19   quickly whether we're going to be able to work it out.  I

20   would say within a week.  We had engaged in negotiations

21   back in the spring and so there is a framework that already

22   exists, and if we're both willing to buy into the framework,

23   I think we'll know pretty quickly.

24            THE COURT:  Well, suppose we leave it at this, if

25   that sounds reasonable to you, that the Court will withhold

```
 1    ruling on the motion to intervene for another week, and
 2    let's see whether or not you get --
 3              MR. PERSINGER:  I think that's a good idea, Your
 4    Honor.
 5              THE COURT:  -- if you can get the matter worked
 6    out.
 7              MR. HASTINGS:  I have no issue with that, Your
 8    Honor.
 9              THE COURT:  Does that sound reasonable to you?
10              MR. HASTINGS:  Yes, sure.
11              MR. PERSINGER:  Yes.
12              THE COURT:  I think, ultimately, though, you're
13    calling upon Ms. Bagnell to make the decision, and does that
14    seem reasonable to you?
15              MS. BAGNELL:  Yes, Your Honor.
16              THE COURT:  Very good.  We'll handle it that way.
17    And, Mr. Patterson, with respect to your client, what
18    contact, if any, have you had with MVP about that matter?
19              MR. PATTERSON:  Your Honor, Mr. Hastings sent me
20    an e-mail, I think, yesterday, asking for a meeting.  So
21    that's the first contact we've had on the issue.  And, you
22    know, obviously, we'll -- we responded that we'd set up a
23    meeting as soon as we could.  And when would depend on what
24    days the Court -- if the Court is going to set the hearing
25    next week, whether we're working for the hearing or working
```

1    for the meeting.

2            THE COURT:  Well, does it look as though that

3    matter is one where it is worth pursuing, as well?

4            MR. HASTINGS:  Candidly, Your Honor, I think we

5    are a lot farther apart from the starting process -- I think

6    Mr. Patterson would probably agree -- than we are with Rex

7    and Warrior.  I think the issue we have and he has is we

8    don't believe the coal is part of the condemnations, and

9    that's the legal issue, setting aside what is or is not in

10   the condemnation.  Our parameters with the coal companies,

11   quite frankly, we're going to treat them all the same.  If

12   we can come to some arrangement on how -- if we would impact

13   coal, how we would address that.

14       We're open to the Court, and I can represent Mr.

15   Patterson, I mentioned to him briefly, about five till 11:00

16   this morning, to Mr. Patterson and said, hey, this is kind

17   of how we're thinking about structuring something.  Can you

18   talk to your folks in advance of our meeting to do that.

19       We're happy to be open to have those discussions.  But

20   right now, they have a lot of properties that they have

21   concerns about.  I've dealt with Mr. Patterson on their

22   clients before, and it's been a struggle, at times, for us

23   to come to an agreement.  I'm not casting stones as to whose

24   fault that may have been, but it historically has been a

25   process.

1          I don't think it will be fair to say that we're going

2     to resolve that issue in the next week or two, Your Honor.

3               THE COURT:  Are there multiple properties involved

4     in this matter, Mr. Patterson?

5               MR. PATTERSON:  Yes, Your Honor, there are.  There

6     are numerous tracts, both in the north and the south, more

7     than a hundred, is my recollection.

8               MS. BAGNELL:  Your Honor.  Three parcels have been

9     condemned that are owned by Western Pocahontas Properties in

10    the Southern District, and one in the Northern District.

11              THE COURT:  And so let me ask what you're speaking

12    about, Mr. Patterson, if MVP thinks there is only four, of

13    what are you speaking?

14              MR. PATTERSON:  Well, Your Honor, her position, as

15    I understand it, is they're not taking any coal.  And so my

16    client owns some surface.  So she's speaking only of the

17    surface.  My client also owns numerous parcels of coal,

18    which our position is, in some of them, we actually have the

19    right to keep the pipeline from being built, and others,

20    coal will be damaged, and ultimately coal will be sterilized

21    as a result of the pipeline.

22         So those issues we have briefed on both in terms of

23    response to her -- their summary judgment motion, as well as

24    a motion to dismiss or deny their injunction, because they

25    have not joined these tracts and other owners who own coal.

```
 1              THE COURT:  Thank you.  Let me ask what the

 2    plaintiff's response is to that?

 3              MS. BAGNELL:  Well, Your Honor, as the Fourth

 4    Circuit made clear in U.S. versus 21.54 acres, it's the

 5    condemnor who defines and has the sole power to determine

 6    the extent of the taking.

 7         MVP has identified the parcels where it is taking

 8    surface.  It has not condemned the right to coal or the

 9    right to subjacent support in this action.

10         If, after the -- after the pipeline is constructed,

11    Western Pocahontas believes that its coal has been impacted,

12    it can, of course, file its own inverse condemnation action

13    or otherwise seek damages.

14         But in terms of this litigation that we're here for

15    today, those other properties are not part of this case.

16              THE COURT:  Let me ask whether or not there is any

17    road to resolving the issues raised by Mr. Patterson in this

18    matter?

19              MR. HASTINGS:  Your Honor, setting the surface

20    issue aside, because I think Mr. Patterson's real issue is

21    with the coal, the discussions that I mentioned we're

22    talking about with Mr. Patterson and his client involve all

23    of the hundred properties or whatever it would be.  So we're

24    not limiting our discussions that we want to have on the

25    three surface tracts, if that's the Court's question.
```

```
 1        So what I said earlier about engaging in discussions,

 2   it would cover all of their concerns.

 3        THE COURT:  Very good.  Thank you.

 4        Well, the Court will hear from you further, in the

 5   event you've been able to explore the matter further, at the

 6   time we have the hearing in this matter.

 7        And so make that a target and see if in the meantime

 8   you can speed along the discussions.  And you may soon have

 9   a better grip on whether or not there is really any prospect

10   of working anything out.

11        MS. BAGNELL:  Yes, Your Honor.

12        THE COURT:  And so let me ask then, is it the case

13   that otherwise, that is, except I think perhaps for Mr.

14   Patterson and except for Mr. Persinger, this is a matter

15   that all of those present will have an interest in at

16   hearing on the motion for which we're appearing now.

17        Is that correct from your standpoint, Mr. Patterson,

18   and, Mr. Persinger, for that matter?

19        MR. PERSINGER:  Yes, Your Honor.  That's my

20   understanding.

21        THE COURT:  Very good.

22        MR. PATTERSON:  Your Honor, I'm not sure I

23   understand the Court's question.  Obviously, my client has

24   some surface tracts and a great number of coal tracts.

25        THE COURT:  And so you have, what, three tracts in
```

1       the Southern District, and one in the Northern District, I

2       think is what was said?

3                   MS. BAGNELL:  Yes.

4                   THE COURT:  And you have a specific interest in

5       those?

6                   MR. PATTERSON:  Yes.

7                   THE COURT:  And there is no agreement with regard

8       to any of them?

9                   MR. PATTERSON:  No, there is not.

10                  THE COURT:  Let's go back to those four alone for

11      the moment.  Is there some prospect that you're going to

12      work that out independently of the hundred properties you're

13      talking about, or is it all going to have to be in the same

14      ball of wax?

15                  MR. PATTERSON:  We haven't broached that issue at

16      all.

17                  MR. HASTINGS:  I'm sorry --

18                  THE COURT:  Go ahead.

19                  MR. HASTINGS:  My understanding, Your Honor, is

20      till now, until recently, MVP hasn't been willing to talk

21      about the coal value.  We have not made them any offers on

22      the coal.  I think that's fair.  And Mr. Patterson's client

23      hasn't wanted to talk about the surface without the coal.

24      We're certainly willing to separate those issues.

25                  THE COURT:  Very good.  Well, it's understood, so

```
1    it's really up to you, Mr. Patterson, to decide whether or
2    not you wish to proceed on that basis.
3          MR. PATTERSON:  Well, Your Honor, I'd have to
4    speak to my client about that.
5          THE COURT:  Sure.
6          MR. PATTERSON:  And I'm not -- so, I'm sorry, but
7    I cannot respond at this point.  I mean, the pipeline itself
8    will cross through our -- through coal owned by, in the
9    Southern District, WPP, LLC, which is not a party to this
10   case at this point.
11         So our position is, they'll essentially be mining our
12   coal in places.  And so our position is that certainly they
13   should have joined WPP, LLC to the case.  And because -- if
14   the Court grants the injunction, they may have rights with
15   respect to the surface, but they still don't have the rights
16   they need to build the pipeline, because they have no right
17   to dig our coal, is the simplest analysis.
18         And then, additionally, it's going to cause coal that
19   could be mined by surface mineable methods, as well as deep
20   mineable methods, to be impacted and reserves sterilized .
21         So, in our view, it's not much different than an
22   analysis of the surface.  If you're going to use somebody's
23   property to build a pipeline, you should join them in this
24   case.
25         So that's our position, Your Honor.
```

```
 1              THE COURT:  Thank you.  And so with that -- and
 2     I'll ask whether there is any further response by anyone?
 3              MS. BAGNELL:  No, Your Honor.  I just would rely
 4     on what I said before and on our briefing on their motion to
 5     dismiss.
 6              THE COURT:  Thank you.  I think what we should
 7     turn to now is the scope of the hearing that's to take place
 8     with respect to the motion at issue.  And I would ask the
 9     parties, having already had the experience of going through
10     this in some depth or at least as much depth as these
11     matters seem to involve in Virginia, what can be done to
12     expedite the hearing in this case?  And what evidence do you
13     contemplate needs to be presented; what length of time do
14     you think it's going to take?
15          Who wishes to address it first?
16              MS. BAGNELL:  I'm happy to address it from our
17     perspective, Your Honor.
18              THE COURT:  Go ahead.
19              MS. BAGNELL:  As you know, evidence has already
20     been presented in both Virginia and in the Northern District
21     of West Virginia.  We don't anticipate the evidence here
22     being much different or different at all from either of
23     those hearings.  So I think Your Honor could rely on both
24     the transcripts, if you so chose to, and the declarations
25     that have already been submitted in this case.
```

1          If Your Honor would choose to have a hearing, I think

2     MVP will call two, perhaps three witnesses; Mr. Cooper, our

3     appraiser, and Mr. Wagner.

4          Based on the two previous hearings, I would say that

5     our, at least, our direct testimony would take about half a

6     day.

7               THE COURT:  That is, for, what, two witnesses?

8               MS. BAGNELL:  Yes.

9               THE COURT:  And that would be Cooper and Wagner?

10              MS. BAGNELL:  Cooper and the appraiser.

11              THE COURT:  Well, who is Wagner?

12              MS. BAGNELL:  Wagner is the head of land for MVP.

13    He's another MVP employee that we may choose to call.  We

14    don't anticipate calling him at this time.

15              THE COURT:  I see.  So it's Cooper and the

16    appraiser?

17              MS. BAGNELL:  Yes.

18              THE COURT:  And the appraiser have a name yet?

19              MS. BAGNELL:  Mr. Goldman, Todd.

20              THE COURT:  Here in Charleston?

21              MS. BAGNELL:  Yes.

22              THE COURT:  And so you expect to use Cooper and

23    Goldman?

24              MS. BAGNELL:  Yes.

25              THE COURT:  And half a day.  And what will be

1     their testimony, to what will it relate?

2             MS. BAGNELL:  Well, Mr. Cooper's testimony will be

3     with regard to the project as a whole and with regard to the

4     irreparable harm that MVP will incur should it not be given

5     access in time to complete tree clearing by the March 31st

6     deadline.

7         And Mr. Goldman will submit evidence with regard to the

8     bond -- the bond, should an injunction be issued.

9             THE COURT:  I see.  And so with that, that will be

10    what you anticipate the sum total of Mountain Valley's

11    evidence to be?

12            MS. BAGNELL:  Yes, Your Honor.

13            THE COURT:  With respect to the bond, do you know

14    what Mr. Goldman's testimony will cover?

15            MS. BAGNELL:  Yes.  Mr. Goldman has done -- looked

16    at comparable sales and done appraisal work to estimate a

17    value of the diminution in the -- in the value of the

18    properties as a result of the taking.  And I don't know the

19    exact number figure that he has come to, but if Your Honor

20    -- I believe it was around $450,000 for all of the remaining

21    parcels.

22            THE COURT:  Now, you're saying a bond, for what

23    sum?

24            MS. BAGNELL:  Well, Your Honor, the appraisal

25    report amount for purposes of the bond hearing is roughly

```
1    $450,000 -- $412,000.  Mr. Hastings is correcting me.

2              THE COURT:  So $412,000 is the appraised value of

3    the 69 properties?

4              MS. BAGNELL:  It is a -- yes, it's based on Mr.

5    Goldman's opinion of the value, based on the work that he's

6    done.

7              THE COURT:  And the value that he's done, the work

8    that he's done, is that of an appraiser for those

9    properties?

10             MS. BAGNELL:  Yes.  Although his testimony will be

11   that he did not actually walk on the properties.  So, though

12   he's done comparable values and looked at comparable values

13   and he's been to each of the properties, his report is

14   restricted in that manner.

15             THE COURT:  You say he's been to the properties,

16   but he hasn't been on them?

17             MS. BAGNELL:  That's right.

18             THE COURT:  So he's observed the properties?

19             MS. BAGNELL:  Yes, Your Honor.

20             THE COURT:  To which the easement is running?  But

21   he hasn't seen all of that over which the easement runs?

22             MS. BAGNELL:  That's correct, Your Honor.

23             THE COURT:  And he's drawn down comparables?

24             MS. BAGNELL:  Yes.

25             THE COURT:  That will have him testifying that the
```

1    total of the 69 parcels is of a value of $412,000?

2              MS. BAGNELL:  Yes, Your Honor.  Not the parcels as

3    a whole, but just the value of the taking.

4              THE COURT:  Yes, of what's taken.  So that would

5    be that which is taking and any damage to the residue all

6    included?

7              MS. BAGNELL:  That's his diminution in value

8    number, yes, Your Honor.

9              THE COURT:  And so he's strictly going to testify

10   as to a diminution in value; that is, without the pipeline

11   the property is worth X; with the pipeline, it's worth Y?

12             MS. BAGNELL:  Correct, Your Honor.

13             THE COURT:  And the difference is $412,000?

14             MS. BAGNELL:  Yes.

15             THE COURT:  And is it the case that there is any

16   property being taken among these 69 parcels that is of a

17   value of less than $3,000?

18             MS. BAGNELL:  I do not know the answer to that off

19   the top of my head, Your Honor.

20        (An of-the-record discussion was held between Attorney

21   Bagnell and Mr. Hastings.)

22             MS. BAGNELL:  Some of the appraised values are

23   less than $3,000.  There is no property for which the

24   landowners argue that the value is less than $3,000,

25   however.

```
 1              THE COURT:  But his assessment is less than

 2     $3,000?

 3              MS. BAGNELL:  For some parcels.

 4              THE COURT:  Yes.  And I believe then that covers

 5     what I wanted to inquire of you about.  And if you have

 6     anything to add, I'd be pleased to hear it.

 7              MS. BAGNELL:  No, Your Honor.  Thank you.

 8              THE COURT:  Thank you.

 9         Mr. Teaney, do you mind to speak to the evidence to be

10     presented at this hearing.  And, first of all, you might

11     refer to that which Ms. Bagnell has just stated.

12              MR. TEANEY:  Certainly.  I believe that Ms.

13     Bagnell has accurately characterized what we would

14     anticipate their case to be, about a half a day, with two

15     witnesses; Mr. Cooper going to harm, and then Mr. Goldman on

16     the appraisal.

17         We would cross-examine Mr. Cooper, because we believe

18     that the evidence will show that MVP will not be able to

19     carry its burden on the irreparable harm prong of the

20     injunctive analysis.

21         In defendant's case, several of the firms, the clients

22     represented by Mr. Stevens, by Mr. Clarke, by Mr. Howell and

23     myself, have retained an appraiser who would testify as an

24     expert in rebuttal to Mr. Goldman about his methodology in

25     conducting the appraisals.
```

1          The bond amount in this case is not a typical

2     preliminary injunction bond.  It's not just required by the

3     rules, it's required by the Fifth Amendment to the

4     Constitution.  And so we believe that important that the

5     bond be based on reliable evidence such that reasonable,

6     certain and adequate assurance of just compensation can be

7     presented.

8          So for that purpose, we've retained an expert appraiser

9     to rebut Mr. Goldman's testimony and we would like to put

10    him on as an expert.  I believe that testimony could be

11    presented in a half hour or so.

12         Additionally, we would like to call an expert

13    hydrogeologist to testify about this project's impact on

14    Karst topography, specifically in Summers and Monroe County,

15    and on the landowners who are affected.  We believe that

16    goes to the balance of harm or to the harms of the

17    defendants' element of the injunctive analysis.

18         In addition, the Appalachian Mountain Advocates and

19    Howell law office clients would call -- we intend to put

20    forth the testimony of four.  I'll let Mr. Howell address

21    this.

22              MR. HOWELL:  Yes.  We'd like to put on four

23    landowners to speak to the harm to their properties.  And we

24    anticipate that that would be 15 minutes per landowner.  But

25    we'd like to call Mr. Berkley, Ms. Tobey, Mr. Jarrell, and

1    Ms. Calpado for that purpose.

2              THE COURT:  And to what are they going to testify?

3    Saying the harm to their property.  What do you mean by

4    that?

5              MR. HOWELL:  Harm to water resources, harm to

6    forests on the property, harm to unique features on the

7    property, such as river crossings, and harm to improvements

8    on the property, such as homes.

9              THE COURT:  Very good.  And with that, let me go

10   back to Mr. Teaney.  I think you said a hydrologist would be

11   offered, and whom else?  An appraiser?

12             MR. TEANEY:  An appraiser.  Yes, we foresee two

13   experts, an expert appraiser, an expert hydrogeologist, and

14   then the four landowners that Mr. Howell discussed.

15             THE COURT:  So those two, from your standpoint,

16   plus the four landowners, correct?

17             MR. TEANEY:  That would be our evidentiary

18   presentation, yes, Your Honor.

19             THE COURT:  Let me respond to -- have you respond

20   to that, Ms. Bagnell.

21             MS. BAGNELL:  Yes, Your Honor.  We believe that

22   the testimony presented by all of these witnesses would

23   be -- would not be relevant in this context, because it

24   would simply amount to collateral attacks on the FERC

25   Certificate, particularly the hydrogeologist testifying

```
1    about Karst.  And the impacts on the landowners from the

2    pipeline was specifically addressed by the FERC, and a

3    determination was made in their order.  And, likewise, the

4    testimony by the landowners, again, would be either

5    collateral attacks or simply talking about damages that

6    would occur whenever the pipeline is put into place, which

7    is not the purpose of the hearing on immediate access, Your

8    Honor.

9              THE COURT:  And so you take exception to the

10   offering of any of the testimony that has been suggested,

11   except for appraisal?

12             MS. BAGNELL:  Yes, Your Honor.

13             THE COURT:  Thank you.  Anything further on that

14   point?

15             MR. TEANEY:  If I may respond to Ms. Bagnell's

16   argument?  The position that MVP takes would essentially

17   render an injunction automatic.  This argument attempts to

18   deprive the landowners, the defendants in this action, of

19   the opportunity to present evidence on a very important

20   prong of the injunctive analysis, which is harm to the

21   nonmoving party.

22      If the FERC Certificate is conclusive on that, then

23   that renders injunction essentially automatic in these

24   cases, and that is contrary to all of the Supreme Court law

25   in the reporters.  And so, for those reasons, we believe it
```

1    is appropriate for the landowners to testify to the harm

2    that will occur to them.

3         We believe that it is more than just a question of

4    timing of harm for two reasons:  The first is, this pipeline

5    certificate is subject to challenge in other courts, so this

6    pipeline may not be built if those other proceedings result

7    in a vacation of the FERC Certificate.  But, also, we

8    believe that there is a time value of having environmental

9    resources on your property, of having a standing forest, of

10   having an intact stream, of enjoying your resources that

11   should be part of the balance of the equities in an

12   injunction case.

13        You know, the argument that the FERC Certificate is

14   conclusive and is not subject to collateral attack may be

15   true in the legal proceedings under Section 7 of the Natural

16   Gas Act, but the Natural Gas Act doesn't contemplate a

17   quick-take or an early possession.

18        So in order to do that, MVP has already veered off

19   of -- out of the Congressional statutory scheme and into the

20   Rules of Civil Procedure and of judicial authority.  They've

21   invoked this Court as a chancellor.

22        We believe that as chancellor, you can hear all the

23   evidence on all of the prongs of the injunctive analysis.

24             THE COURT:  It seems to me as though Ms. Bagnell

25   is correct that FERC has made the decision and if you're

1     going to get relief from it, you need to either get it from

2     FERC or from one of the appellate courts to which you can

3     appeal.

4          With respect to the landowner testimony, the Court is

5     satisfied to hear one of them, if they wish to come in, and

6     it may be an exemplar for others.  And if that testimony is

7     offered, the Court will receive it.

8          The Court will also, of course, receive the testimony

9     of the appraisers.  But beyond that, it seems to me that the

10    offer goes beyond the purpose of the hearing.

11               MR. TEANEY:  Understood, Your Honor.  For point of

12    clarity, do I understand that the ruling is we may present

13    the appraiser.  The Court will not allow the testimony of

14    the hydrogeologist.  And we may present one example

15    landowner of the four that we named?

16               THE COURT:  That's correct.

17               MR. TEANEY:  Thank you.  If I may note an

18    objection for the record.

19               THE COURT:  Sure.

20               MR. TEANEY:  We'll proceed accordingly.  Thank

21    you.

22               THE COURT:  And then let me ask who next wishes to

23    offer evidence, if at all, at the hearing?

24               MR. PATTERSON:  Your Honor, Western Pocahontas has

25    two witnesses, one of which will testify regarding the

```
1    damage to the coal; another one will testify as negotiations

2    prior to the hearing.  Mr. Hastings told the Court earlier

3    that no offer had been made with respect to the coal.  If

4    they're willing to stipulate to that, then we'd need

5    probably one witness.

6              THE COURT:  With respect to the three tracts in

7    the Southern District, the surface of which is being taken,

8    do I understand that they're not offering any evidence as to

9    them, but, rather, you're offering evidence as to coal

10   property that is not being taken?

11             MR. PATTERSON:  Your Honor, I think that -- we do

12   have some evidence with respect to the tracts that the

13   surface of which has been named in this proceeding.  The

14   majority of the evidence would be with respect to the fact

15   that WPP, LLC has rights within the surface to prevent

16   pipeline from being drilled, and because -- because it would

17   damage our coal, we'd like to present that evidence.

18        So with respect to the surface tracts, we do have some

19   evidence but that would not be the thrust of what -- of what

20   we would be presenting.

21             THE COURT:  If you -- well, go ahead, Mr.

22   Persinger.

23             MR. PERSINGER:  I was just going to say that Rex

24   and possibly Warrior's evidence would be along the same

25   lines as Mr. Patterson's.  We would have one expert who
```

1    would testify regarding the impact of the construction on

2    the coal reserve, and what -- and then would give valuation

3    evidence regarding the value of the coal that would be

4    sterilized that goes to the issue of the bond.  And then

5    probably another -- well, definitely another witness that

6    would talk about the, the mining operation, where the -- the

7    state of the permit, and how soon mining would occur, and

8    give the evidence regarding negotiation, as well.

9              THE COURT:  Well, let me note, in both those

10   instances, the Court does not expect to hear evidence on

11   properties that are not being taken.  And I go back to the

12   question that was posed earlier.

13       Is there any evidence with respect to the surface

14   tracts, being the three in number in the Southern District,

15   that is being taken by Mountain Valley as to your client,

16   Mr. Patterson?

17             MR. PATTERSON:  No, Your Honor.  But we'd like to

18   -- if we would -- we would like to make some record.  And if

19   an objection does it, it does it, but --

20             THE COURT:  Well, you can make your objection now

21   and I'll be happy to have that recorded.  What I'm after now

22   is finding out what is the evidence going to be at this

23   coming hearing?  And so far, I haven't heard any basis for

24   it.

25             MR. PATTERSON:  Yes, Your Honor.  For example,

```
 1    there is a deed to WPP, LLC from the surface owner of a very
 2    large tract, thousands of acres.  This deed provides that
 3    their surface rights are subject to mining rights, full and
 4    mining rights, whatever is necessary and convenient,
 5    together with the rights of buildings things, to strip mine,
 6    auger mine, in pits, to build extraction plants, treatment
 7    processing facilities.  In other words, the full right to
 8    use the surface for whatever purposes that is needed for the
 9    coal.
10              THE COURT:  Well, I understand that encumbers the
11    surface.  But the question is whether or not you have any
12    evidence with respect to the surface?  And the fact that it
13    is burdened with these other factors is not a part of this
14    proceeding.
15              MR. PATTERSON:  Thank you, Your Honor.  May I just
16    make one more little point?  I understand what you've said.
17    I'd just like to go on and say --
18              THE COURT:  Go ahead.
19              MR. PATTERSON:  -- that this deed says that the
20    surface rights won't unreasonably interfere with the coal
21    rights.  In other words, the coal owner has the primary
22    rights to the surface.  This is a coal-mining tract where
23    the coal rights as to the surface exceed the rights of the
24    surface owners.  And I've already made my point with respect
25    to actual physical damage to the coal.
```

```
 1              THE COURT:  Thank you.
 2         And, Mr. Stevens.
 3              MR. STEVENS:  Your Honor, on behalf of my clients,
 4    I had wanted to offer the testimony of landowners, Jim Gore,
 5    Norvel Mann, and Maury Johnson.  I understand the Court's
 6    ruling in Mr. Teaney's cases, and I'm not sure the Court is
 7    going to want me to offer those.
 8              THE COURT:  Well, you want to choose one of those
 9    landowners to appear?
10              MR. STEVENS:  Yes, Your Honor.  I would choose
11    Norvel Mann.  Thank you.
12              THE COURT:  Very good.
13         And, Ms. Kirtley, what is your situation?
14              MS. KIRTLEY:  As far as the hearing on summary
15    judgment, I don't anticipate calling any witnesses.  I may
16    have questions for plaintiff's witnesses.
17              THE COURT:  Thank you.
18         And, Mr. Clarke, do you and Mr. Tuggle have anything
19    further on Mountain Lair?
20              MR. CLARKE:  Your Honor, I think -- I talked
21    briefly with Ms. Bagnell and Mr. Hastings about this before.
22    If the Court would allow my client to just submit a
23    declaration in lieu of testifying, I think that would
24    expedite things.  And it would really just be about the harm
25    to its property from allowing entry immediately as opposed
```

1    to at some later point in time with regard to his ability to

2    adjust his property fencing and that kind of thing.

3          THE COURT:  What do you then anticipate that

4    declaration to say?

5          MR. CLARKE:  I think it would essentially say that

6    he's been told by MVP representatives that he won't have

7    access across the construction area during times of actual

8    construction, which will essentially kind of sever a large

9    portion of his property that's not subject to the taking,

10   not within the easements taken, but it will sever his access

11   to a large portion of his property and will require him to

12   take some necessary steps to relocate some of his livestock,

13   maybe bring in some additional feed for the cattle that will

14   remain on the property that he can access, depending upon

15   when the construction takes place.

16         THE COURT:  And so is that a concern only during

17   the period of construction on the Mountain Lair property?

18         MR. CLARKE:  That's -- I mean, that's, you know,

19   that's where the biggest impact that I've just talked about

20   would occur, yes.

21         THE COURT:  How lengthy is the declaration?

22         MR. CLARKE:  I would guess it would be a page and

23   a half, two pages.  Fairly brief, Your Honor.

24         THE COURT:  Well, if you would submit that.

25         MR. CLARKE:  Absolutely.  I'd be happy to.

1          THE COURT:  And I would ask whether or not the

2     declaration could be under affidavit, and, if so, whether or

3     not Mountain Valley would accept it for admission in the

4     case?

5          MS. BAGNELL:  Your Honor, I would like to see the

6     contents of the affidavit before we agree to it being

7     submitted, simply because what I've heard to date sounds

8     like this would just be damages that would occur whenever

9     the pipeline is constructed and so would not be relevant as

10    to immediate access.  But subject to that objection, Your

11    Honor, I'm certainly willing to review it.

12         THE COURT:  Well, it may be that the easiest

13    solution to this is to prepare the declaration, furnish a

14    copy of it in advance, and then you could furnish it again

15    at the hearing and the Court will hear any objection to it

16    at that time.

17         MR. CLARKE:  That sounds fine.  Thank you, Judge.

18         THE COURT:  And, Mr. Stonestreet.

19         MR. STONESTREET:  Thank you, Your Honor.

20       I am appearing on behalf of the McKenzies, the Keeners,

21    and the Lacy H. Toney Farm Trust.  Each of those landowners

22    would like to make a statement.  There is three on behalf of

23    the Farm Trust.  And my understanding, the Court wants to

24    limit that to one.  I can't pick the one at this point.  The

25    two that I represent both work.  Depending on the date of

1      the hearing that is set, I don't know which one would be

2      available to testify.

3              THE COURT:  You don't need to designate the

4      individual right now.

5              MR. STONESTREET:  Thank you, Your Honor.  And for

6      Mr. Keener, and for the McKenzies, Your Honor, we would

7      offer similar testimony from landowners and will attempt to

8      elicit from one, as you requested.  Also, we would seek to

9      enter some expert evidence with regard to the value of the

10     land being impacted by an early intervention pursuant to the

11     request by MVP.

12         I don't know the extent and I don't know who -- I'm

13     representing Anna Ziegler here and two of her clients here

14     today, Your Honor.  And it's my understanding that they

15     would like to reserve the right to call expert witnesses in

16     rebuttal to what's offered by MVP and any other witnesses

17     that the other parties would identify.

18         And in lieu of them being present, we would also like

19     to make a declaration as previous counsel has made under the

20     same auspices, giving MVP the right to review it and make a

21     statement as to whether they're willing to accept it.

22             THE COURT:  With respect to the landowners, if you

23     want to select one of your clients to testify, the Court

24     will hear that testimony.  If you have an expert appraiser

25     that you wish to present, you may do that as well.  And

1    beyond that, it seems to me that that covers the group that

2    you've referred to.

3              MR. STONESTREET:  Yes, Your Honor.  It would be

4    along the same issues as these gentlemen in front of me are

5    offering with regard to the impact on their property, their

6    forest, their lands, their farming activities and different

7    activities that are taking place.  Plus, the crossing is

8    upstream from where the residence is.  And their residence

9    has a couple springs that provide water to the residence.

10   And I don't know, they may want to offer testimony as to the

11   potential impact immediate access would have on their

12   springs, I don't know.  So there may be some testimony along

13   those lines.

14             THE COURT:  Excuse me.  Let me ask Ms. Bagnell if

15   you'd respond.

16             MS. BAGNELL:  Yes, Your Honor.  With regard to

17   impacts on streams and springs; likewise, that would be a

18   collateral attack on the FERC Certificate.  And I think, as

19   regard to the other damages, we would argue for the same

20   bases I've already stated that that would be irrelevant.

21        I do have a question about the appraiser, Your Honor.

22   I'm not aware that Ms. Ziegler has identified any appraiser

23   on behalf of her clients.  We did request that information

24   during the expedited discovery process.  And my

25   recollection, although it may not be perfect, Your Honor, is

1    that no one was disclosed.

2        Are you aware who?

3        MR. STONESTREET:  I do not recall the name.  I saw

4    a response to discovery requests where individual names were

5    listed, and I did not bring that.  It should be in the

6    discovery.  Okay.

7        MS. BAGNELL:  Okay.  Thank you.

8        THE COURT:  Well, so far as the appraiser is

9    concerned, see if you can work out an understanding with Ms.

10   Bagnell who that individual --

11       MR. STONESTREET:  Yes, Your Honor.  Plus there is

12   ongoing negotiations, Your Honor.

13       THE COURT:  Pardon?

14       MR. STONESTREET:  These parties are still

15   negotiating with MVP.  And if those come to fruition, then

16   it would be a moot issue, Your Honor.

17       THE COURT:  Well, I think it would please everyone

18   in the room if you have that worked out by the time we have

19   the hearing.

20       MR. STONESTREET:  Thank you, Your Honor.  I think

21   you're right.

22       THE COURT:  And so we're still left with your

23   selection of the single landowner, and to speak to the value

24   of the land, and an appraiser, who would cover how many

25   properties generally you have in mind.  But there seems to

1    be some rub on the appraiser, and I think you need to clear

2    that with Ms. Bagnell first.  She indicates that this was

3    the first she's heard of it.  But I think she said that

4    she'd be pleased to speak to you about it.

5              MR. STONESTREET:  Certainly.

6              THE COURT:  So see if you can work that out.

7              MR. STONESTREET:  Certainly, Your Honor.

8              MS. BAGNELL:  Yes, Your Honor.

9              THE COURT:  And beyond that, I would ask whether

10   or not any of you have anything further to suggest that

11   would have to do with either the timing of or the content of

12   the hearing?

13             MR. TEANEY:  May it please the Court.  Two issues

14   on that.  It occurred to me after I heard Mr. Clarke that

15   perhaps I should ask for permission to submit declarations

16   on behalf of the non-testifying landowners.  I believe some

17   of them submitted declarations in support of the motion.

18   We'd be happy to follow the same procedures if the Court

19   would entertain those declarations.

20             THE COURT:  And so let me ask, Ms. Bagnell, what

21   response you have to that.

22             MS. BAGNELL:  Yes, Your Honor.  Again, I would ask

23   that we be able to review the declarations that Mr. Teaney

24   is speaking of and then, pending that review, perhaps make

25   objections.  But that procedure is fine.

```
 1              THE COURT:  In that matter, the Court's already

 2    noted that you propose to furnish an appraiser.

 3              MR. TEANEY:  That's correct.

 4              THE COURT:  And also one landowner.

 5              MR. TEANEY:  Yes, Your Honor.

 6              THE COURT:  As between the two of you.  And it

 7    seems to me that that should cover it.  If you want to

 8    prepare a single declaration and furnish it in addition to

 9    that to Ms. Bagnell for her review, and then perhaps on to

10    the Court, even though it may be under objection, you may do

11    so.

12              MR. TEANEY:  Thank you, Your Honor.

13              THE COURT:  Now then, let me ask you this, you

14    prepare that single declaration, what length do you

15    contemplate?

16              MR. TEANEY:  The declarations that we have

17    previously submitted or prepared in cases like this run from

18    2 to 5 pages, I believe.  We will certainly strive to keep

19    it, you know, as succinct as possible.

20              THE COURT:  Well, if you would hold it within that

21    range.

22              MR. TEANEY:  Certainly.

23              THE COURT:  Anything else?

24              MR. TEANEY:  There is, Your Honor.  Your Honor, I

25    believe, inquired about issues regarding the timing of the
```

```
 1    hearing.  When the Court directed the parties to appear for

 2    this hearing on Wednesday --

 3              THE COURT:  And I apologize for two things,

 4    really; one, the relative briefness of the notice, the

 5    limited time, but I thought you were probably eager to get

 6    going with this, and I was hoping that you would be amenable

 7    to it.  And I expect you probably had to juggle your

 8    schedules to get here, and I appreciate your doing it.

 9    Again, I apologize for such short notice.

10        The other thing I wanted to apologize to you for is

11    being so late this morning.  I was in a pretrial conference

12    and it just went on and on and on.  And so it just took a

13    lot of time, and I'm sorry that you were delayed.

14        Please go ahead.

15              MR. TEANEY:  Certainly, Your Honor, and there are

16    no apologies necessary.  But I wanted to note that as soon

17    as we received word that the Court wanted to have this

18    conference and to possibly schedule a hearing next week, we

19    contacted Mr. Rice, our expert appraiser, who informed us

20    that next week he's entirely booked, involving family health

21    issues and previous commitments that he cannot get out of.

22        He has confirmed for me that he is available the week

23    of February 12th through the 16th and can make himself

24    available any day that week.  Unfortunately, he's not

25    available next week.
```

1          So we would respectfully request, because of the

2     importance of the bond issue and the constitutional nature

3     of it, that we be allowed to present the expert we

4     previously retained and engaged to review this and present

5     evidence on our behalf.

6               THE COURT:  Has he testified in any of the other

7     proceedings for you?

8               MR. TEANEY:  He testified in our behalf in the

9     Northern District proceedings on January 23rd.  You know,

10    there are specific issues within the appraisal such that I

11    do not believe that his testimony as to the appraisals that

12    were submitted in that that case by a different appraiser,

13    not Mr. Goldman, would be -- I don't believe they would be

14    equally applicable to Mr. Goldman's testimony.

15              THE COURT:  It would have been my hope that we

16    could have this hearing by next Friday.

17              MR. TEANEY:  Understood, Your Honor.  And I regret

18    to report this news to you.

19              THE COURT:  Is there just no way he could be made

20    available for that day?

21              MR. TEANEY:  I've asked him that question several

22    times, and he tells me that it cannot happen.

23              THE COURT:  Thank you.

24              MS. BAGNELL:  Your Honor, if I might, just as a

25    suggestion.  We have not spoken about this previously, but

1     it's my understanding from Mr. Rice's testimony at the

2     previous hearing, that he does not have any opinions of

3     value as to the taking.  He is simply going to provide

4     testimony with regard to our appraiser.

5         So perhaps this is something that could be dealt with

6     in an affidavit or -- and then, perhaps, be subject to the

7     cross-examination from the Northern District.  I'm not sure

8     exactly how we could work it out.  But given the very

9     limited scope of the testimony of this appraiser, it seems

10    like we might be able to do something.

11            MR. TEANEY:  Ms. Bagnell is correct that Mr. Rice

12    will not be offering independent opinions of values of the

13    property; instead, he will be testifying about the

14    methodology used by Mr. Goldman.

15        I suppose we could endeavor to present an affidavit,

16    but, again, with his schedule next week being what it is, I

17    don't know what kind of time frame we would be able to

18    generate that affidavit, whether it would be in advance of

19    hearing or after.  You know, we are open to creative

20    solutions.  But I would note that, you know, because of the

21    constitutional importance of the bond, the -- if this Court

22    were to issue an injunction, the bond must be based on

23    reliable evidence, and so we think it crucial that we have

24    the opportunity to present that evidence.

25            THE COURT:  What is the prospect that you could

 1    prepare what you believe to be a counter-affidavit, and then

 2    once Mr. Goldman has testified, have your witness on the

 3    following Monday to modify it, and then to submit it if you

 4    can gain the agreement of Ms. Bagnell to receive it?

 5            MR. TEANEY:  Let me make sure I understand the

 6    proposal.  It would be that we prepare a counter-affidavit

 7    during the time between now and the hearing.  We provide

 8    then, after Mr. Goldman testifies, he modify that affidavit

 9    and then submit it the following Monday?

10            THE COURT:  Yes.  Prepare the affidavit, and you

11    could present what you have to Ms. Bagnell, and then go

12    ahead with the hearing, perhaps, on Friday, and then on the

13    following Monday, he could modify that to the extent he

14    needs, and we'll just have to hope that it doesn't bring in

15    any new matter that Ms. Bagnell has to respond to, in which

16    event she may have to use the same mechanism to respond to

17    it.  Of course, the Court would rather have the witness

18    present testifying.  It may be that we can make an exception

19    in this case to that limited extent.  But I do want to hear

20    from both of you on it.

21            MR. TEANEY:  Certainly.  I think my concern would

22    be the logistical challenges of having Mr. Rice have the

23    ability to read or hear Mr. Goldman's testimony.  I'm not

24    sure how rapidly a transcript could be generated and, you

25    know, it would be based on attorney's notes, absent a

1    transcript.  And so I think there is a logistical challenge

2    there with a Monday deadline.  I don't know how quickly a

3    transcript could be generated such that Mr. Rice would have

4    the ability to review it.

5             MS. BAGNELL:  Perhaps, Your Honor, we could just

6    hear from Mr. Rice the following week and have him appear

7    live, because perhaps it would be too difficult to do this

8    by declaration, but if we limit the testimony only to Mr.

9    Rice and have the remainder of the hearing this coming week.

10            THE COURT:  Let me ask whether or not it is the

11   case that you've already heard this witness once?

12            MS. BAGNELL:  Yes, Your Honor.

13            THE COURT:  And so to whom was that witness

14   responding or countering?  Was it Mr. Goldman or someone

15   else?

16            MS. BAGNELL:  It was the appraiser that we used in

17   the Northern District.

18            THE COURT:  A different person?

19            MS. BAGNELL:  It was a different person, yes, Your

20   Honor, but the reports are substantively the same.

21            THE COURT:  Well, it may be that --

22            MS. BAGNELL:  And, Your Honor, I'm sorry to

23   interrupt.  But I would say that the majority of the opinion

24   that was presented by Mr. Rice was stricken by, by Judge

25   Keeley in the Northern District.

```
 1              MR. TEANEY:  If I may respond to that?  While it
 2    is true that Judge Keeley struck portions of Mr. Rice's
 3    opinions, I don't think it's fair to characterize it as the
 4    majority.  Mr. Rice was qualified as an expert appraiser.
 5    He is an instructor under the Uniform Standards and
 6    Practices for Professional Appraising.  To the extent he was
 7    offering opinions about what, the so-called USPAP, those
 8    opinions were admitted.
 9         So to the extent that he was testifying about the
10    so-called Yellow Book or the Uniform Standards For Federal
11    Land Acquisition, because he had not done a Yellow Book, she
12    discounted those opinions or struck them in part.
13         But I don't think it would be fair to characterize it
14    as a majority.  But I believe the record would speak for
15    itself.
16              THE COURT:  Ms. Bagnell, if we're going to hear
17    that witness live on Monday, maybe the best thing to do
18    would be just have the entire hearing on that day.
19              MS. BAGNELL:  Your Honor, based on your order, I
20    was -- I checked with my witnesses with regard to this
21    coming week and their availability.  I did not ask them
22    about the following Monday, but I can do so quickly.
23              THE COURT:  Let me ask the availability of
24    everybody else with respect to the witnesses that are
25    anticipated to be offered for either Friday or Monday, or
```

1    both?  That is, a week from today and the following Monday,

2    or both?

3              MR. STONESTREET:  Your Honor, counsel for the

4    three parties that we represent will be not available next

5    Friday.  They will be available the following Monday.

6              THE COURT:  Who will not be available?

7              MR. STONESTREET:  Counsel for the McKenzies,

8    Thomas Keener, and the Lacy Toney Farm Trust.  Counsel will

9    be available on the following Monday, on the 12th, but not

10   on the Friday.

11             THE COURT:  Of whom are you speaking when you say

12   "counsel"?

13             MR. STONESTREET:  Myself and Anna Ziegler, from

14   Ziegler & Ziegler.

15             THE COURT:  Neither of you are available on

16   Friday?

17             MR. STONESTREET:  No, Your Honor.  We are on the

18   12th, on Monday, Your Honor.

19             MS. BAGNELL:  And, Your Honor, just -- this might

20   make it easier for you.  I know that our appraiser is not

21   available on Friday.  He is available -- our witnesses are

22   available Tuesday, Wednesday, Thursday.  And I think other

23   than -- that works for almost everyone.  We discussed it

24   prior, with a few exceptions, and, of course, Mr. Teaney's

25   appraiser.

```
 1              THE COURT:  When you say Tuesday, Wednesday,
 2    Thursday, of what week?
 3              MS. BAGNELL:  This coming week, Your Honor.
 4              MR. STONESTREET:  Counsel would be available on
 5    Tuesday and Wednesday of next week, Your Honor.
 6              MR. STEVENS:  If I may, Judge.  I will not be
 7    available on Tuesday, the 6th.  I would be available on
 8    Wednesday.
 9              THE COURT:  We're down to Wednesday.  Is everybody
10    available that day?
11              MR. TEANEY:  With the exception of our appraiser,
12    Mr. Russ Rice.
13              THE COURT:  Yes, with that exception.
14              MR. TEANEY:  Yes.
15              THE COURT:  That may work.  Just one moment.
16         (Pause.)
17              THE COURT:  We'll be just a moment.
18              MR. TEANEY:  While we're waiting, Your Honor, may
19    I note something?
20              THE COURT:  Yes.
21              MR. TEANEY:  I am not an appraiser, so I do not
22    understand all of their guidelines and principles.  I do
23    recall something that an appraiser told me once that
24    suggested that a written statement of a review may require
25    some -- may require some sort of further certification or --
```

```
 1    there is a difference between a written review and an oral

 2    review of someone else's work.  And I need to clarify that

 3    to understand what -- whether a request that a written

 4    declaration or affidavit be provided by our expert would

 5    somehow run afoul of his ethical rules.  I need to

 6    understand that concept.

 7                  THE COURT:  Thank you.

 8         From what's been stated, Wednesday seems to be the one

 9    date when everyone's available.  And so we're going to

10    proceed on Wednesday.  And I would suggest that we begin at

11    9:30, so that we can be sure to get finished.

12         And I would ask the parties whether or not you can be

13    here at 9:30 on Wednesday for the day?

14                  MS. BAGNELL:  Yes, Your Honor.

15                  MR. TEANEY:  I can attend at 9:30, yes, sir.

16                  MR. STONESTREET:  Yes, Your Honor.

17                  MR. CLARKE:  Yes.

18                  MR. STEVENS:  Yes, Your Honor.

19                  MS. KIRTLEY:  Yes.

20                  MR. PERSINGER:  Yes, Your Honor.

21                  MR. PATTERSON:  Yes, Your Honor.

22                  THE COURT:  Thank you.  I believe that covers that

23    aspect of it then.  So we'll proceed on Wednesday, instead.

24    And it's with the understanding that we may have this

25    addendum to come in through Mr. Teaney.  And I am going to
```

```
 1    ask you to work with Ms. Bagnell on that, if you would, as
 2    well.
 3              MR. TEANEY:  We certainly will, Your Honor.  I
 4    guess I can sort this out afterwards, to inquire with the
 5    court reporter about the timing about how quickly we can get
 6    a transcript of Mr. Goldman's testimony for the review of
 7    Mr. Rice following the hearing.
 8              THE COURT:  And then I'd like for you to speak to
 9    Ms. Bagnell and see whether or not the statement of that
10    individual is one that could be produced by affidavit for
11    entry into the record.
12              MR. TEANEY:  Certainly, Your Honor.  We will
13    investigate that possibility and strive to achieve it.
14              THE COURT:  If not, there is no alternative than
15    simply hearing it.  So see what you can do in that regard.
16       I suppose a further alternative would be a deposition,
17    but that's something we can speak further about when you've
18    had a chance to develop it further with Ms. Bagnell.
19              MR. TEANEY:  Yes, Your Honor.
20              THE COURT:  And so with that, do the parties have
21    anything further at this time?
22              MR. PATTERSON:  I'd just like to note my exception
23    to the Court's rulings.  As I understand it, you've excluded
24    evidence of coal or evidence with respect to the Plum Creek
25    Timberlands deed, and I wanted to except to that ruling.
```

```
 1              THE COURT:  Indeed.  And the Court, of course,

 2    understands that, in your case, what has been condemned is

 3    the surface of certain lands for which you want to present

 4    evidence as to coal, and the Court has excluded that from

 5    this hearing.

 6              MR. PATTERSON:  Thank you, Your Honor.

 7              MR. PERSINGER:  Same objection for me, Your Honor.

 8              THE COURT:  With the same result.

 9              MR. PERSINGER:  Exactly.  But I would note that we

10    would like the opportunity to present evidence from the

11    landowner, who is also the surface owner, as well.  We could

12    probably do that by affidavit, as the others have, as well,

13    if that would be more convenient.

14              THE COURT:  Well, I suppose that if you have

15    evidence as to value of land being taken in this proceeding,

16    that the Court would be amenable to hearing the landowner.

17              MR. PERSINGER:  Right.

18              THE COURT:  But the affidavit that we're getting

19    is coming from an appraiser who is undertaking to rebut Mr.

20    Goldman, and that one exception has been made; although, it

21    has not been finalized yet, it's still for Ms. Bagnell and

22    Mr. Teaney to work out, but I don't want to extend that

23    further than that point.  So if you have a live witness who

24    wants to come in and testify on Wednesday, you may do so.

25              MR. PERSINGER:  Very good.
```

1          THE COURT:  And, of course, that has to do with

2     property that is in this case being taken.

3          Yes.

4          MS. BAGNELL:  One further point -- one further

5     question, Your Honor, as to the landowner affidavits.  I

6     think now it sounds like there will be four or five.  And I

7     was just wondering if we could see those by at least Tuesday

8     morning prior to the -- so I have an opportunity to review

9     them.  We can perhaps come to an agreement before the

10    hearing on Wednesday.

11         THE COURT:  You're speaking then about any of

12    these where the Court has allowed a witness and it comes in

13    the form of a declaration, you want to see those beforehand?

14         MS. BAGNELL:  Yes, Your Honor.

15         THE COURT:  And so, can those who would be

16    providing, not live testimony, but a declaration with

17    respect to a landowner only, be in a position to furnish

18    them by Tuesday, noon, to Ms. Bagnell?

19         MR. HOWELL:  For our part, yes, sir.

20         THE COURT:  Thank you.

21         MR. STONESTREET:  Yes, Your Honor.

22         MR. CLARKE:  Yes, Your Honor.

23         MS. KIRTLEY:  And, Your Honor, I don't know if I

24    will or if my client will want to, but may I reserve the

25    right for my client, Paco Land, to also submit to the

```
 1    Court--
 2              THE COURT:  Indeed.
 3              MR. PERSINGER:  Your Honor, that's what I was
 4    referring to, as well.
 5              THE COURT:  Well, I think we are back to
 6    permitting you to do that now.
 7              MR. PERSINGER:  Okay, thank you.
 8              MR. STEVENS:  Judge, on behalf of my clients, I
 9    move that we be permitted to file one declaration in
10    accordance with the Court's rulings.
11              THE COURT:  I think we're up to about six now.
12              MR. STEVENS:  I am sorry.  Thank you.
13              THE COURT:  So it's going to be a busy afternoon
14    of reading, Ms. Bagnell, on Tuesday.
15              MS. BAGNELL:  Yes, Your Honor.
16              MR. PATTERSON:  I do not -- I do not know if my
17    clients would like to file an affidavit with respect to the
18    surface, but, if they do, I would appreciate the Court
19    entertaining it.
20              THE COURT:  Very good.  And so I think then we've
21    streamlined this about as much as can be.
22         And would there be any other comment or suggestion by
23    any of you?
24         If not, thank you for being here today, and we'll see
25    you at 9:30 on Wednesday.
```

1            MR. TEANEY:  Thank you, Your Honor.

2            MS. BAGNELL:  Thank you, Your Honor.

3            THE CLERK:  All rise.

4       (Proceedings concluded at 1:03 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2        I, Catherine Schutte-Stant, Federal Official Realtime

 3   Court Reporter, in and for the United States District Court

 4   for the Southern District of West Virginia, do hereby

 5   certify that, pursuant to Section 753, Title 28, United

 6   States Code, the foregoing is a true and correct transcript

 7   of the stenographically reported proceedings held in the

 8   above-entitled matter and that the transcript page format is

 9   in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12            s/Catherine Schutte-Stant, RDR, CRR

13            _____   February 5, 2018

14            Catherine Schutte-Stant, RDR, CRR
              Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```