```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                       AT CHARLESTON

 3   _____x
                                    :
 4   MOUNTAIN VALLEY PIPELINE, L.L.C.:
                                    :
 5                   Plaintiff,     :  CIVIL ACTION NO.
                                    :  2:17-cv-04214
 6             -vs-                 :
                                    :
 7   AN EASEMENT TO CONSTRUCT,      :
     OPERATE AND MAINTAIN A 42-INCH :
 8   GAS TRANSMISSION LINE ACROSS   :
     PROPERTIES IN THE COUNTIES OF  :
 9   NICHOLAS, GREENBRIER, MONROE,  :
     SUMMERS, BRAXTON, HARRISON,    :
10   LEWIS, WEBSTER, AND WETZEL,    :
     WEST VIRGINIA, et. al.,        :
11                                  :
                     Defendants.    :
12   _____x  **EXCERPT**

13          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
            BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
14                 UNITED STATES DISTRICT JUDGE
                        FEBRUARY 7, 2018
15
     APPEARANCES:
16   FOR THE PLAINTIFF:        NICOLLE R. SNYDER BAGNELL, ESQ.
                               Reed Smith LLP
17                             Reed Smith Centre
                               225 Fifth Avenue
18                             Pittsburgh, PA 15222

19

20   FOR THE DEFENDANTS:       DEREK O. TEANEY, ESQ.
                               Appalachian Mountain Advocates
21                             P.O. Box 507
                               Lewisburg, WV  24901
22

23   FOR THE DEFENDANTS:       ISAK JORDAN HOWELL, ESQ.
                               117 East Washington Street
24                             Suite 1
                               Lewisburg, WV  24901
25
```

```
 1    CONTINUED APPEARANCES:

 2    FOR THE DEFENDANTS:          ANNA RUTH ZIEGLER, ESQ.
                                   Ziegler & Ziegler
 3                                 110 James Street
                                   Hinton, WV 25951
 4

 5

 6    FOR THE DEFENDANTS:          C. JOSEPH STEVENS, ESQ.
                                   Stevens & Stevens
 7                                 P.O. Box 635
                                   8137 Court Avenue
 8                                 Hamlin, WV 25523

 9

10    FOR THE DEFENDANTS:          HOWARD M. PERSINGER, III, ESQ.
                                   Persinger & Persinger
11                                 237 Capitol Street
                                   Charleston, WV 25301
12

13

14    FOR THE DEFENDANTS:          COURTNEY A. KIRTLEY, ESQ.
                                   Kay Casto & Chaney
15                                 103 Fayette Avenue
                                   Fayetteville, WV 25840
16

17

18    FOR THE DEFENDANTS:          GEORGE A. PATTERSON, III, ESQ.
                                   Bowles Rice
19                                 600 Quarrier Street
                                   Charleston, WV 25301
20

21

22

23

24

25
```

```
 1    CONTINUED APPEARANCES:

 2    FOR THE DEFENDANTS:        ERIC M. JOHNSON, ESQ.
                                 Flaherty Sensabaugh & Bonasso
 3                               P.O. Box 3843
                                 200 Capitol Street
 4                               Charleston, WV 25338-3843

 5

 6    FOR THE DEFENDANTS:        STEPHEN J. CLARKE, ESQ.
                                 Waldo & Lyle
 7                               301 West Freemason Street
                                 Norfolk, VA 25338-3843
 8

 9

10    FOR THE DEFENDANTS:        CHARLES M. LOLLAR, ESQ.
                                 Lollar Law
11                               109 East Main Street
                                 Norfolk, VA 25310
12

13

14

15

16

17

18

19

20

21

22         Proceedings recorded by mechanical stenography,
      transcript produced by computer.
23
                          _____
24                        CATHERINE SCHUTTE-STANT, RDR, CRR
                               Federal Official Court Reporter
25                        300 Virginia Street, East, Room 6009
                               Charleston, WV 25301
```

```
 1                              INDEX

 2  PLAINTIFF'S
    WITNESSES        DIRECT      CROSS
 3
    TODD GOLDMAN       5      24, 50, 58, 70,76
 4

 5


 6
    DEFENDANT'S
 7  WITNESSES       DIRECT  CROSS  REDIRECT RECROSS  EXAMINATION

 8  (NONE)            ^        ^        ^        ^          ^

 9

10

11
    PLAINTIFF'S
12  EXHIBITS            ADMITTED

13  (NONE)

14

15
    DEFENDANT'S
16  EXHIBITS            ADMITTED

17
    3 -                59
18

19

20

21

22

23

24

25
```

GOLDMAN - DIRECT - BAGNELL

```
 1                    (Excerpt of proceedings.  Proceedings preceded and
 2       followed the excerpt but were not transcribed.)
 3                    THE COURT:  And I would ask whether or not your
 4       next witness is ready?
 5                    MS. BAGNELL:  Yes, Your Honor.
 6                    Your Honor, we would like to call Todd Goldman.
 7                 TODD GOLDMAN, PLAINTIFF'S WITNESS, SWORN
 8                            DIRECT EXAMINATION
 9       BY MS. BAGNELL:
10       Q.   Good afternoon, Mr. Goldman.  Could you please state
11       your full name for the record.
12       A.   My name is Todd Goldman.
13       Q.   And what is your occupation?
14       A.   I'm in the real estate business.  So I do real estate
15       appraisals, brokerage work, and I also handle investment
16       property and management.
17       Q.   How long have you been an appraiser?
18       A.   24 years.
19       Q.   And where do you work?
20       A.   Goldman Associates.
21       Q.   Could you briefly summarize your educational background
22       and tell us about any licenses or professional
23       certifications you have?
24       A.   Yes, ma'am.  My college education is a bachelor's of
25       science in finance from Virginia Tech.  I have an MBA from
```

 1   Marshall University.  As soon as I graduated from college, I

 2   started with my real estate licensing, which included sales

 3   license in Virginia, and West Virginia.  I immediately

 4   started my appraisal apprentice courses, which takes about

 5   two years of supervised work.  And then I obtained the

 6   Certified General Appraiser License in West Virginia.  I

 7   currently hold an Appraisal License in Virginia, as well.

 8       And as part of the real estate brokerage business, I

 9   obtained a CCIM, and that's a designation which is an

10   experienced-based designation in brokerage work.

11       As far as the appraisal work, I'm an MAI, which is a

12   part of the appraisal institute.  And it's a higher level of

13   education, peer review, that is voluntary, but shows the

14   credentials associated with years of experience in

15   peer-reviewed work.

16   **Q.**   Have you ever prepared appraisals for condemnations

17   before?

18   **A.**   Yes, ma'am.

19   **Q.**   Have you appraised properties with pipelines before?

20   **A.**   Yes, ma'am.

21   **Q.**   And do you typically work for landowners or condemnors?

22   **A.**   I've worked for both.  And in the process as I sit here

23   today, working for both.

24   **Q.**   Have you ever testified in a condemnation case before?

25   **A.**   Yes, ma'am.

GOLDMAN - DIRECT - BAGNELL

1   **Q.**   Who hired you to complete work on this project?

2   **A.**   Your firm, Reed Smith.

3   **Q.**   What was the purpose of your work?

4   **A.**   The purpose was to provide preliminary value estimates

5   of the properties that were un-acquired tracts so that the

6   client could use that work to submit to the Court in the

7   event that it got to a condemnation hearing so that there

8   was a baseline for what the value of the properties or the

9   value of the property that was going to be used for the

10  project is.

11  **Q.**   And in what counties were the properties that you were

12  asked to appraise?

13  **A.**   Nicholas, Greenbrier, Summers, and Monroe.

14  **Q.**   Can you briefly or generally describe the properties

15  you reviewed; for example, were they rural or urban?

16  **A.**   Sure.  The properties are spread over a pretty lengthy

17  geographic area, Lindside is kind of southern boundary;

18  Craigsville is the northern boundary.  So the southern part

19  of that area is generally farmland.  It's all fairly rural.

20  And when I say rural, I'm referring to things like

21  population density, access to utilities, access to roads,

22  density of development.

23       As you proceed north, particularly once you get into

24  Summers County, and then in Greenbrier and also Nicholas, it

25  becomes more mountainous terrain, steeper release, and more

GOLDMAN - DIRECT - BAGNELL

1    woodland.

2    **Q.**   Does the appraisal profession have a set of standards

3    they comply with?

4    **A.**   Yes, ma'am.

5    **Q.**   Can you tell us about those.

6    **A.**   Well, it's the Uniform Standards of Professional

7    Appraisal Practice.  And I may refer to it as USPAP.  That's

8    a common acronym that people will use.  And those are the

9    standards that must be applied -- or I must adhere to,

10   regardless of the appraisal assignment.  Any time that I as

11   an appraiser assign a value to a parcel of property, that's

12   the standard that we go by.

13   **Q.**   And did you comply with USPAP here?

14   **A.**   Yes, ma'am.

15   **Q.**   Are there other standards that you're familiar with for

16   performing appraisals?

17   **A.**   There is a wide range, depending on specific projects.

18   If you give me an example, I could --

19   **Q.**   Sure.  Are you familiar with the Uniform Standards for

20   Federal Land Acquisitions?

21   **A.**   Yes, frequently called the Yellow Book.

22   **Q.**   Can you tell us, what is the difference between USPAP

23   and the Yellow Book?

24   **A.**   Well, USPAP is going to be something that all

25   appraisers must abide by.  The Yellow Book standards,

1    Uniform Appraisal Standards for Federal Land Acquisitions,

2    are just that, it is for federal land acquisitions.  And

3    it's generally for when properties are going to be acquired

4    by a government agency, whether by private barter or by

5    condemnation.  And it has a unique set of criteria that are

6    required that are over and above USPAP, to some extent, but

7    they will result in the same value.

8    **Q.**    Is the Yellow Book required to be used here?

9    **A.**    No.

10   **Q.**    Why not?

11   **A.**    This is not a federal entity acquiring private

12   property.

13   **Q.**    Is that true even though it's federally regulated, the

14   entity that's acquiring the property?

15   **A.**    That's true.  And the best example that I can give is

16   for an interstate construction project.  Those are funded by

17   federal funds, are overseen by the local Department of

18   Highways, and Yellow Book standards are not required in

19   those instances.

20   **Q.**    Did you prepare a report for the work that you did?

21   **A.**    Yes, I did.

22          MS. BAGNELL:  If I may approach, Your Honor?

23   BY MS. BAGNELL:

24   **Q.**    Mr. Goldman, I've marked the document as Exhibit 7.

25   Can you tell me what this document is.

GOLDMAN - DIRECT - BAGNELL

1    **A.**   This is a report that I prepared titled "Mountain

2    Valley Pipeline Un-Acquired Tracts Property Valuations."

3    **Q.**   And does this report summarize the work that you did in

4    coming to your opinion of value?

5    **A.**   Yes, ma'am.

6         MS. BAGNELL:  Your Honor, in the interest of time,

7    rather than going through each of the specifics of this 69

8    parcels, I would offer Exhibit 7 for admission and then will

9    ask Mr. Goldman to summarize the testimony.

10        MR. CLARKE:  Your Honor, I do object to it.  I

11   don't think the witness has been recognized as an expert at

12   this point, but I also object more generally because I don't

13   think the document that has been offered is appropriate

14   evidence for the proceeding that we're here today before the

15   Court.

16     I do think the Yellow Book does apply, Your Honor.  I

17   have a number of questions that I'd like to ask him on

18   cross-examination.

19        THE COURT:  Why would the Yellow Book apply?

20        MR. CLARKE:  I think it's -- we're in federal

21   court.  It's a condemnation under the Fifth Amendment, Your

22   Honor.

23        THE COURT:  Well, it's not federal property

24   involved.  And are you serious in thinking that the Yellow

25   Book applies to something other than a federal condemnation

GOLDMAN - DIRECT - BAGNELL

1    proceeding?

2            MR. CLARKE:  Your Honor, from the Yellow Book

3    itself, it says, "These standards explain the valuation

4    requirements that apply to all federal acquisitions

5    involving, quote, 'the measure of compensation grounded upon

6    the Constitution of the United States.'"

7            THE COURT:  That says "Federal acquisitions,"

8    doesn't it?

9            MR. CLARKE:  It does, Your Honor.  But --

10           THE COURT:  Well, this is not a federal

11   acquisition.

12           MR. CLARKE:  Well, Your Honor, I believe it is.

13           THE COURT:  Well, it isn't, of course, but you can

14   make the objection.

15           MR. CLARKE:  I will make the objection.  We're

16   here in federal court under a federal statute.  They've been

17   delegated the federal power of eminent domain under the

18   Fifth Amendment pursuant to the Natural Gas Act.

19           THE COURT:  This doesn't work that way.  But,

20   nevertheless, the point has been made.  The initial

21   objection that you made, aside from the fact that it's not

22   Yellow Book, would you restate it?

23           MR. CLARKE:  I don't think this gentleman has been

24   qualified as an expert at this point.

25           THE COURT:  Do you wish to voir dire?

1            MR. CLARKE:  Well, I have extensive

2     cross-examination on that, Your Honor.

3            THE COURT:  I'm not asking you to go into the

4     merits.  I'm asking if you wish to voir dire the witness?

5            MR. CLARKE:  Your Honor, I'd like to reserve it

6     for cross is what I'm saying.

7            THE COURT:  You may proceed.

8            MS. BAGNELL:  So, Your Honor, I move for the

9     admission of Exhibit 7.

10            THE COURT:  And so, again, is there any objection

11     besides that posed by Mr. Clarke to this exhibit?

12            MR. LOLLAR:  Your Honor, I would object to the

13     report as being based on hearsay, and I don't think the

14     report should be admitted.

15            THE COURT:  The Court's going to provisionally

16     admit Plaintiff's 7 so that you may proceed with your

17     examination.

18     BY MS. BAGNELL:

19     **Q.**   Mr. Goldman, because this is a condemnation, can you

20     generally explain what method you followed to formulate your

21     opinion of the value of the properties being taken?

22     **A.**   Well, the methodology that was used in this case was a

23     federal process, which is to value the whole and value the

24     take -- or value the residue, and the difference is the

25     value that is taken, or the just compensation for the

GOLDMAN - DIRECT - BAGNELL

1    property owner.

2    Q.    And can you generally talk about the methodology you

3    used.  Are there different approaches to valuing property?

4    A.    Yes, ma'am.  There is three approaches that are -- and

5    variations of each, but the sales comparison, the cost, and

6    the income approaches are the three approaches that are the

7    fundamentals of appraising property.  In this particular

8    case, the properties that I worked on did not have the

9    improvements that were impacted by the project, so there was

10   no improvements to deal with in regards to Cost Approach.

11   So the Cost Approach is not relevant.

12        The Income Approach is only relevant if the property

13   type that's being appraised is the type that would be sought

14   out by investors with the expectation of creating enough

15   revenue on an annual basis to repay them for their

16   investment.  And that's not the case for the types of uses

17   that these properties -- the highest and best uses of these

18   particular properties.

19        So it leaves the Sales Comparison Approach is the only

20   methodology that is proper.

21   Q.    And so did you look at comparable sales to reach your

22   opinion of value?

23   A.    I did.

24   Q.    And is it typical for appraisers to use comparable

25   sales to form an opinion of value?

1    **A.**    Yes, ma'am.

2    **Q.**    Can you explain for us generally the comparable sales

3    you used and how you came about choosing those comparable

4    sales?

5    **A.**    Yes.  There is multiple sources that we have, and it's

6    all based on courthouse research and confirming sales that

7    are actual arm's length transactions between willing buyers

8    and sellers.  So these particular areas, there is quite a

9    bit of information available through the Greenbrier Valley

10   Multiple Listing Service, the Beckley area Multiple Listing

11   Service, the Fayette-Nicholas Multiple Listing Services.

12   These are also areas I'm working in on a regular basis.  So

13   we maintain a database of transactions that encompass these

14   areas anyway.  So that is the primary sources that I used.

15        Again, it's all based on verification through brokers,

16   property owners, courthouse records.  And those were the

17   sources of data.

18        As far as the types of comparable sales, it all depends

19   on the highest and best uses of the individual properties

20   that were appraised.  In some cases, they might have been

21   along the river.  There was some -- an attribute, like, a

22   river, or proximity to a road that needed to be taken into

23   consideration.  In other cases, they were woodland.  So, of

24   course, we sought out the woodland tracts for comparison.

25   **Q.**    In your opinion, are the properties you used as

1    comparable sales actually comparable to the properties at

2    issue in this litigation?

3    **A.**   Yes, ma'am.

4    **Q.**   How did you value the take?

5    **A.**   The value of the take is a component of the -- what the

6    property rights were given up by the owner.  And so in this

7    case, the take is the main line route, which is -- I use 125

8    feet of width, which is the permanent and the temporary

9    components.  I treated it all as permanent.  So that there

10   was maximum benefit for the property owners as far as the

11   property that was going to be impacted.  And then a unit

12   value that was consistent with the fee-simple value of the

13   surface was applied to that component.

14   **Q.**   And is this method generally accepted and used in the

15   appraisal community?

16   **A.**   Yes, ma'am.

17   **Q.**   Other than this comparable sales you've already

18   discussed, are there any other materials that you relied

19   upon in coming to your opinion of value?

20   **A.**   Yes, ma'am.  Well, one of the biggest things is the

21   fact that this is an area that I know well because I work in

22   it on a daily basis.  Secondly, we look at economic data.

23   We subscribe to local newspapers to know the changes that

24   might be occurring, population, census information.  All of

25   those are components that, while I may not have looked at a

GOLDMAN - DIRECT - BAGNELL

1    specific document when preparing this, as part of my regular

2    course of business, I'm doing that on a daily basis.

3    Q.   Is it typical for appraisers in the industry to rely on

4    these type of records?

5    A.   Yes, ma'am.

6    Q.   Are there other materials or information that an

7    appraiser would typically rely on to complete an appraisal

8    that you considered here?

9    A.   I'm not sure what you're referring to.

10   Q.   Did you look at any maps or drawings or do any court

11   record, recorded document search?

12   A.   Well, initially, once I know the property that's being

13   appraised, we develop a work file.  And so that work file is

14   going to have a copy of the deed, it's going to have tax

15   information.  And in this case, the client or the client

16   through one of their agents, or their clients provided the

17   alignment sheets, any maps that were available, title pins

18   that might have been available.  Those are all components

19   that were gathered as part of the work file that I have put

20   together on each of these properties.

21   Q.   Are there any other materials or information an

22   appraiser would typically rely on to complete an appraisal

23   that you did not consider?

24   A.   Well, we did not have access to walk onto the

25   properties.  So everything that I did from an inspection

1    perspective was from a public road.  And so we did not have

2    access onto the property.  We did not walk any of the

3    right-of-ways, and I did not have access to speak with any

4    of the property owners.

5    **Q.**   Are those steps required?

6    **A.**   Not in USPAP, no, ma'am.

7    **Q.**   Had you taken those steps, would your opinion of the

8    value of the property necessarily have changed?

9    **A.**   I don't know.

10   **Q.**   Are all the steps that you have described up until this

11   point typical for an appraiser to rely on under these

12   circumstances?

13   **A.**   Yes.

14   **Q.**   Based on your education and experience, are you able to

15   give an opinion as to the estimate of the change in value of

16   the property resulting from the rights condemned by MVP on

17   the properties?

18   **A.**   Yes, ma'am.

19   **Q.**   Based on what you described, is it common for an

20   appraiser to give this type of information?

21   **A.**   Yes, ma'am.

22   **Q.**   With respect to the easements on the property, did you

23   make any assumptions in coming to an opinion on the

24   diminution of value?

25   **A.**   There were several assumptions, one of which I stated,

1    and I think is important, is the 125 feet of width was

2    treated as a permanent right-of-way, even though part of it

3    is temporary.  The other factor is that at the point in time

4    we did our work, the survey only showed the length of the

5    right-of-way, and in some cases meandering across property

6    lines.  And the way that the information was provided to me,

7    was that the length of that right-of-way that meandered

8    across two different properties was valued to each party's

9    benefit at 100 percent.  So if they shared a right-of-way

10   that was 125 feet in width, they each got the full benefit

11   of it, even though some may not have been on their property.

12        As far as the temporary roads were concerned -- or

13   the -- some of those overlaid existing roads, I disregarded

14   that.  I assumed that they would all be newly developed in

15   terms of how they were valued.

16   **Q.**   So in all of these instances, would it result in your

17   opinion of the value being overinclusive or underinclusive?

18   **A.**   It would be overinclusive, based on the information

19   that I have today as in this report because the sizes were

20   overstated.

21   **Q.**   In preparing your estimate of the diminution of value

22   of the properties, did you consider any hypothetical

23   concerns, such as potential damages?

24   **A.**   Not hypotheticals.

25   **Q.**   Why not?

1    A.    There is certain things that you couldn't speculate

2    about.  And then there is other things that are going to be

3    part of the project that have to be returned to a level of

4    normalcy, and I have to use that assumption as part of the

5    work that I do.

6    Q.    And is it typical for appraisers to use the assumptions

7    that you made?

8    A.    Yes.

9    Q.    Did you factor in trees in the comparable sales that

10   you looked at?

11   A.    I did, to the extent that if a property was a wooded

12   tract of land, that the comparable sales were wooded tracts

13   of land.

14   Q.    You mentioned a few times in your testimony the highest

15   and best use.  Can you tell us what that means?

16   A.    Sure.  The highest and best use is really the hinging

17   point of an appraisal assignment.  It has four components to

18   it.  It has to be legally permissible, which usually relates

19   to land use regulations; it has to be physically possible,

20   and that relates to what utilities it has, what road service

21   it might have, the terrain, the activity around it; and then

22   it has to be financially feasible.  It has to be something

23   that can create a return for the property owner.  And then

24   it has to be maximally productive.  And that is the ultimate

25   highest and best use.  And so that is an important part of

GOLDMAN - DIRECT - BAGNELL

1    an appraisal assignment, because it dictates the type of

2    comparable sales that are appropriate for comparison.

3    Q.   And did you consider the highest and best use?

4    A.   Yes.

5    Q.   So with respect to the permanent easements on the

6    properties, have you reached an opinion of the change in

7    fair market value for purposes of setting a bond?

8    A.   Yes.

9    Q.   And with respect to the temporary easements on the

10   properties, have you reached an opinion as to the same?

11   A.   Yes.

12   Q.   Is it your opinion that for purposes of setting a bond

13   in this case that would cover the value of the easements,

14   your analysis is sufficient and accurate for the properties

15   you've viewed?

16   A.   Yes.

17   Q.   I'd like to show you a document I'll mark as

18   Plaintiff's Exhibit 8.

19            MS. BAGNELL:  Your Honor, before I ask Mr. Goldman

20   for his opinion as to the value, I'd like to move for him to

21   be qualified as an expert in this case.

22            THE COURT:  Once again, I'd like counsel to take

23   the witness on voir dire, if you wish.

24            MR. CLARKE:  I'm going to reserve for cross, Your

25   Honor.

GOLDMAN - DIRECT - BAGNELL

```
 1              THE COURT:  Now is the time.

 2              MR. CLARKE:  Well, if I understand the Court, am I

 3    allowed to begin a line of questioning that would be part of

 4    my cross-examination?

 5              THE COURT:  The only thing you'd be permitted to

 6    do at the moment with the witness is voir dire him on his

 7    qualifications.  If you wish to do that, you may come to the

 8    podium and do so.

 9              MR. CLARKE:  All right, that's fine.  Thank you,

10    Your Honor.

11              THE COURT:  You may proceed with the witness.

12    BY MS. BAGNELL:

13    Q.   Mr. Goldman, can you tell me what this document is?

14    A.   This is a summary of, I believe, 69 parcels, identified

15    by parcel ID, tax assessor numbers, landowners, and the

16    appraised value that was reported in my report.

17    Q.   And does it appear to be an accurate summary of the

18    conclusions you came to in doing your expert appraisal work?

19    A.   Yes, it does.

20              MS. BAGNELL:  Your Honor, I'd like to move for

21    admission of Exhibit 8.

22              THE COURT:  Let me ask, Mr. Goldman, is this a

23    summary of what's in Plaintiff's 7?

24              THE WITNESS:  It is.

25              THE COURT:  This pulls out the 69?
```

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  That are at issue?

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Thank you.  Any objection to

 5    Plaintiff's 8?

 6              MR. TEANEY:  We have the same objection to it as

 7    we had to the report itself, but nothing other than that.

 8              THE COURT:  Very good.  You may proceed.

 9         I must apologize.  I'm going to have to be excused for

10    a few moments.  Thank you.

11              MS. BAGNELL:  Yes, Your Honor.

12              THE CLERK:  All rise.

13         (A recess was taken at 3:51 p.m. until 4:04 p.m.)

14              THE CLERK:  All rise.

15              THE COURT:  Please be seated.  Again, my

16    apologies.  I hope I haven't given everyone in the courtroom

17    this cold.  And there is no assurance that that won't

18    flare-up again, but I would like to see if we can complete

19    the hearing.  And if you would proceed.

20              MS. BAGNELL:  Thank you, Your Honor.

21    Before the break, we had just introduced Exhibit 8, Your

22    Honor.  And I would offer that into evidence.

23              THE COURT:  It's received on a provisional basis

24    as was the prior exhibit.

25              MS. BAGNELL:  Your Honor, rather than going

1    through each and every parcel, I was planning on just asking

2    Mr. Goldman for the total cumulative value, in the interest

3    of time, unless the Court would prefer to hear testimony as

4    to each parcel.

5              THE COURT:  I suppose if Mr. Goldman is not going

6    to tell us anything more than what he already has.  As I

7    understand, he says that he's visited each one of these

8    properties.

9              MS. BAGNELL:  Yes, Your Honor.

10              THE COURT:  He has not walked the land on the

11    properties.  So he hasn't been over the entirety of the

12    easement, but he has been at the locale of the property, and

13    has used comparables to reach these figures.

14              MS. BAGNELL:  Yes, Your Honor.

15              THE COURT:  And it seems to me it's just as well

16    for you to go ahead and proceed on a summation basis.

17    BY MS. BAGNELL:

18    **Q.**   Mr. Goldman, what would you estimate is the total

19    cumulative amount in the diminution in property value for

20    the remaining tracts?

21    **A.**   It's $413,800.

22    **Q.**   And do you give this opinion to a reasonable degree of

23    certainty?

24    **A.**   Yes, ma'am.

25              MS. BAGNELL:  I have nothing further, Your Honor.

1                              **CROSS-EXAMINATION**

2        **BY MR. CLARKE:**

3        **Q.**   Good afternoon, Mr. Goldman.

4        **A.**   Good afternoon.

5        **Q.**   I'm Stephen Clarke, and we met just briefly before, but

6        I represent Mountain Lair, LLC.

7                    THE COURT:  Well, let me ask you, what's the

8        status of that matter now?  I had hoped that it was going to

9        be worked out.

10                   MR. CLARKE:  With regard to my client, Your Honor?

11                   THE COURT:  Yes.

12                   MR. CLARKE:  We have entered into negotiations

13       with MVP, but, as yet, have not reached an agreement with

14       them.

15                   THE COURT:  And those negotiations were for the

16       purpose of rerouting the easement or --

17                   MR. CLARKE:  No.  My understanding, and I think

18       what Ms. Bagnell told the Court on Friday, is that the route

19       is as proposed and as approved by FERC.  So that's my

20       understanding of the route.

21                   THE COURT:  Thank you.  You understand that

22       Mountain Valley wishes to take the easement as it appears in

23       the FERC approval?

24                   MR. CLARKE:  That's correct.

25                   THE COURT:  And you, I think, on behalf of

1    Mountain Lair inquired of them about rerouting it?

2           MR. CLARKE:  My client had concerns about the

3    pipeline route as proposed, and as approved by FERC going

4    through some sinkholes on his property.  But Mountain Valley

5    Pipeline says that that's constructable, so --

6           THE COURT:  So it looks as though, then, there is

7    no likely resolution by agreement on that locale?

8           MR. CLARKE:  No, Your Honor.  I think we've moved

9    on to monetary negotiations.

10          THE COURT:  Very good.  Please go ahead.

11          MR. CLARKE:  Thank you, Your Honor.

12   BY MR. CLARKE:

13   **Q.**   Mr. Goldman, you were contacted by MVP's attorney

14   sometime in the summer of 2017; is that right?

15   **A.**   Yes.

16   **Q.**   And at that time, you were asked to prepare appraisals,

17   correct?

18   **A.**   Yes.

19   **Q.**   And, specifically, you were asked to appraise over a

20   hundred different properties which were potentially to be

21   acquired by MVP for this pipeline; isn't that right?

22   **A.**   Yes.

23   **Q.**   And, in fact, you ultimately valued, I think, over 120

24   properties; is that right?

25   **A.**   Yes.

GOLDMAN - CROSS- CLARKE

1   **Q.**   And you did that for a fee of $1,200 per property,

2   correct?

3   **A.**   Yes.

4   **Q.**   So that works out -- if my math is right -- to $144,000

5   in fees just for the appraisal work for MVP; is that

6   correct?

7   **A.**   Yes.

8   **Q.**   Now, when you began your assignment, what was your

9   scope of work?

10   **A.**   The scope of work was to conduct an appraisal of the

11   individual properties, with some limitations as far as

12   access to the property owner and access to the property

13   itself, but, otherwise, the normal scope of work that would

14   be used for any appraisal assignment.

15   **Q.**   And did you come up with that scope of work or was that

16   given to you by MVP?

17   **A.**   I defined the scope of work.

18   **Q.**   Now -- and I think you testified to this, but just to

19   confirm -- for each of those 120-plus properties you

20   appraised, you maintained a work file; is that correct?

21   **A.**   Yes.

22   **Q.**   And I think you testified to this, as well, but you

23   didn't actually set foot on any of those properties that you

24   appraised for this case; isn't that right?

25   **A.**   That's correct.

GOLDMAN - CROSS- CLARKE

1    **Q.**   And, in fact, on some of them, you didn't -- some of

2    them you viewed from the public road, correct?

3    **A.**   All of them would have been from a public road, and, in

4    some cases, they were removed from the public road.

5    **Q.**   So your testimony is you viewed all of the properties

6    from a public road?

7    **A.**   As close as I could.

8    **Q.**   Okay.  Do you have your report in front of you now?

9             THE COURT:  Before you go on, what do you mean by

10   "as close as I could"?

11            THE WITNESS:  In some instances, the property that

12   was subject to the pipeline was up on a ridgetop and never

13   crossed a public road, so I couldn't physically see the

14   section for a specific property, because it was on a

15   ridgetop that might have been several hundred yards away

16   from where the public road was.

17            THE COURT:  Do you know how many properties of

18   these you didn't see?

19            THE WITNESS:  I do not.

20            THE COURT:  Well, don't your records or notes show

21   that?

22            THE WITNESS:  Yes.  I could give you that answer.

23   I don't know it while I am here.  Because some of these

24   properties that I couldn't see may have been acquired since

25   I did the initial work.

GOLDMAN - CROSS- CLARKE

1           THE COURT:  You don't have a file with you today

2     that would tell you which properties you couldn't see?

3           THE WITNESS:  No, sir.

4           THE COURT:  Please go ahead.

5           MR. CLARKE:  Thank you, Your Honor.

6     BY MR. CLARKE:

7     **Q.**   Mr. Goldman, do you have your copy of the report?  I

8     think it's been introduced as MVP Exhibit Number 7.  Do you

9     have that in front of you?

10    **A.**   I do.

11    **Q.**   I'm going to ask you to turn to page 5 of that

12    document, page 5 of your report.

13    **A.**   (Witness complies.)

14    **Q.**   Are you there?

15    **A.**   I am.

16    **Q.**   In the first column on the left-hand side, about

17    two-thirds of the way down there is a sentence that says,

18    "The site observations were conducted by Todd Goldman."

19          Do you see that?

20    **A.**   Yes.

21    **Q.**   All right.  And it says, continuing on, "The site

22    observations were conducted by Todd Goldman during June and

23    July 2017, to the extent possible, from public access

24    points.  In many cases, properties cannot be thoroughly

25    reviewed from public access points and the right-of-way may

1    be somewhat removed from the public roads."

2        And then it goes on to say, "Google Earth and software

3    package provided by the client were instrumental in

4    understanding the location of the right-of-ways relative to

5    the parcel boundaries and important parcel characteristics."

6        Did I read that correctly?

7    **A.**   You did.

8    **Q.**   And I think you just answered the Court's question.

9    But there were some amount of parcels you can't say today

10   you didn't actually view from the right-of-way, correct?

11   **A.**   I could see the properties, but I was not in close

12   proximity to them is probably the best way to characterize

13   it.

14   **Q.**   Okay.  And for those properties, you put maybe some

15   more reliance, I take it, on the alignment sheets that MVP

16   provided to you; is that correct?

17   **A.**   I would have had the alignment sheets, Google Earth,

18   topographical maps, things of that nature.

19   **Q.**   And those alignment sheets are the kind of overhead

20   plan view of the proposed improvements that are sort of

21   superimposed on an aerial or a satellite image; isn't that

22   correct?

23   **A.**   Yes.

24   **Q.**   And it also has parcel boundaries, I guess, may be

25   taken from tax records or something; isn't that right?

1    **A.**   Yes.  I also had access to what is called a KMZ file,

2    which is a Google Earth file.  So in that case they have the

3    shake files for the parcels that were impacted superimposed

4    on satellite imagery, with the route superimposed on top of

5    that.

6    **Q.**   And those Google Earth files, they don't show the

7    topography for the properties; isn't that right?

8    **A.**   That's true.

9    **Q.**   Now, did you get a legal description of the properties

10   that you were appraising from MVP?

11   **A.**   For the actual routes?

12   **Q.**   For the 120 properties you testified you appraised, did

13   you get from MVP a legal description of those parcels?

14   **A.**   We got legal descriptions on a number of them, but we

15   also pulled deed references that were referenced in the tax

16   records.  So those would have been the legal descriptions

17   for those particular tracts.

18   **Q.**   And did you get those for all of the 120-plus parcels

19   you were appraising?

20   **A.**   Yes.

21   **Q.**   And you didn't, I take it, meet with the owners of any

22   of these properties, correct?

23   **A.**   That's correct.

24   **Q.**   You didn't contact the owners of any of these

25   properties, correct?

 1    **A.**    That's correct.

 2    **Q.**    Did MVP ask you not to do that?

 3    **A.**    Yes.

 4    **Q.**    And you agreed to not do that, correct?

 5    **A.**    Yes.

 6    **Q.**    Would you agree with me, though, that the owner is a

 7    lot of times a chief source of information when you're

 8    appraising real property, right?

 9    **A.**    Yes.

10    **Q.**    The owner knows a lot about how the property's been

11    used, correct?

12    **A.**    Yes.

13    **Q.**    The owner knows about maybe some planned improvements

14    or changes that may be in the works for the properties,

15    correct?

16    **A.**    Yes.

17    **Q.**    The owner may know some of the sales history or rental

18    history or things like that about his or her property,

19    correct?

20    **A.**    Yes.

21    **Q.**    And you didn't get any of that information, because you

22    didn't meet or talk to any of the landowners, correct?

23    **A.**    That's correct.

24    **Q.**    And I think you testified that you didn't -- you didn't

25    walk on the area of the proposed pipeline on these

GOLDMAN - CROSS- CLARKE

1    properties, correct?

2    **A.**   That's correct.  I didn't trespass.

3    **Q.**   You didn't ask anyone's permission to walk on their

4    properties, correct?

5    **A.**   That's correct.

6    **Q.**   And in your report, did you specifically identify the

7    topography of each of the properties that you were

8    appraising?

9    **A.**   I believe I did.  I'd have to look at each write-up to

10   tell you with certainty, but that's something that was part

11   of the general write-up, because it's part of the highest

12   and best use.

13   **Q.**   When you talk about the write-ups, you're talking about

14   the sort of one-paragraph summaries that you provided in

15   this report, I think, basically, beginning on page 28; is

16   that right?

17   **A.**   Yes.

18   **Q.**   And so your testimony is that in those one paragraphs

19   that you wrote up for each of these properties at issue,

20   that you identified the topography of those properties?

21   **A.**   I would have to go property-by-property to say for sure

22   that the topography is addressed.  But it is definitely

23   something that was used as part of the determination of

24   which comparable sales were appropriate.

25   **Q.**   Well, let's look at the, at these -- I want you to

GOLDMAN - CROSS- CLARKE

1   maybe look at a few and tell me if it addresses the

2   topography.  And let's start with the first one on page 28.

3   Do you see that?

4   **A.**   Yes.

5   **Q.**   Looks like the owner is C. L. Keener.  Would you tell

6   me whether the description of the paragraph you've written

7   with regard to that property describes the topography?

8   **A.**   It does not describe the topography.

9   **Q.**   The next paragraph -- or the next property down, does

10   that write-up describe the topography of that property?

11   **A.**   It does not.

12   **Q.**   Okay.  Can you point to me, to any of these write-ups

13   that do describe the topography of the properties you're

14   appraising?

15   **A.**   The next one does.  It says, "Where the terrain is

16   steeper."

17   **Q.**   Okay.  So it's fair to say --

18           THE COURT:  I missed that.  Which one are you

19   referring to?

20           THE WITNESS:  On Bates stamp 10556, which is the

21   Silas Steven Tucker property.

22           THE COURT:  Yes.  What did you call that?

23           THE WITNESS:  About eight lines down, it says,

24   "Where the terrain is steeper."

25           THE COURT:  Thank you.

1    BY MR. CLARKE:

2    **Q.**    It's accurate to say that you may have described

3    topography on some of these, and you certainly didn't

4    describe it on all of these write-ups; isn't that correct?

5    **A.**    From our sample of three, that's correct.

6    **Q.**    Well, I mean, if you want to go through all of them, we

7    can go through all of them.  I don't want to belabor the

8    point, but I'm trying to understand what you've done here.

9    And it seems like there is some that have no description,

10   and some that have a limited description.  Would you agree

11   with me on that?

12   **A.**    As far as topography goes, yes.

13   **Q.**    All right.  And you didn't identify the soils on the

14   properties, did you?

15   **A.**    No.

16   **Q.**    You didn't include specific vegetation, timber, or

17   crops in your valuation, did you?

18   **A.**    In the discussions, generally, I would call it woodland

19   if it were wooded, but not by species, and if there was

20   pastureland, it was generally hayfields, and I probably

21   referred to it as such.

22   **Q.**    But you would agree with me that timber is a crop and

23   has value, correct?

24   **A.**    I don't know that it's a crop in the legal real estate

25   terminology, but it does have value if it's merchantable.

GOLDMAN - CROSS- CLARKE

1    Q.    Well, sometimes there are properties that are sold in

2    this area for their timber; isn't that right?

3    A.    That's true.

4    Q.    Now, I think you testified earlier that you did include

5    a value of the timber in your valuation by using comparable

6    sales that also had timber on them; is that correct?

7    A.    Yes.

8    Q.    All right.  Would you turn with me to page 7 of your

9    report, Exhibit 7.  And the, I guess, the third item --

10   excuse me -- the fourth item down says, "Some properties

11   include timberland."  Do you see that?

12   A.    Yes.

13   Q.    Would you read that section for the Court?

14   A.    "Some properties include timberland and there is no way

15   for the appraiser to analyze the contributory value of the

16   timber.  A Registered Professional Forester will have to

17   opine regarding the contributory value of any timber,

18   particularly if it has significant merchantable value."

19   Q.    Thank you.  And you didn't consult with a Registered

20   Professional Forester about timber value, correct?

21   A.    I did not.

22   Q.    You didn't analyze the potential value of mineral

23   deposits on these properties; isn't that right?

24   A.    That's correct.

25   Q.    And it's true, also, that for many of these properties,

GOLDMAN - CROSS- CLARKE

1   you did not even identify the improvements that are on those

2   properties; isn't that right?

3   A.   If they were in -- or in near the right-of-way, then I

4   would have discussed them.  If they were removed from the

5   right-of-way, I would not have.

6   Q.   How far -- or, excuse me -- how close to the pipeline

7   right-of-way did an improvement have to be for you to

8   warrant discussion of it in your report?

9   A.   It's case-by-case, because the proximity to the

10  pipeline right-of-way would have impacted whether it was

11  included or not.  Probably 200 feet would be a reasonable

12  distance, if I had to choose.

13  Q.   But is that what you actually applied, or are you

14  saying you just sort of -- you looked at each individual

15  property on a case-by-case basis?

16  A.   It was case-by-case.  I didn't measure anything to

17  determine which improvements needed to be discussed and

18  which ones did not.

19  Q.   And you really chose to value land for the vast

20  majority of these properties, land only; isn't that correct?

21  A.   Yes.

22  Q.   And, in fact, you explained that you didn't use the

23  Cost Approach to valuing properties, because it was only

24  useful or would only be useful in valuing improved

25  properties that included improvements that existed for less

GOLDMAN - CROSS- CLARKE

1    than half of their original economic life, correct?

2    **A.**    Yes.

3    **Q.**    And so you had, I think, over a hundred comparable

4    sales in your -- in your report in one of the addenda,

5    correct?

6    **A.**    Yes.

7    **Q.**    And of those, how many were improved sales?

8    **A.**    I do not recall.

9    **Q.**    Does three sound right?

10   **A.**    Yes.  There was a particular property that had a

11   structure on it that needed to be dealt with as far as

12   valuation, and that's why those three sales are there.

13   **Q.**    And even when you found that properties did have

14   improvements, you didn't value them; isn't that correct?

15   **A.**    It depends.  In the one example that we were just

16   talking about, there was a house that was very close to the

17   pipeline that I felt was impacted by the pipeline, and

18   that's why those comparable sales are there.  But,

19   otherwise, it's common appraisal practice, if an improvement

20   is not impacted by the project, and it's going to have the

21   same before and after value, that it's not valued.

22   **Q.**    But there is no way for you to know whether it will

23   have the same before and after value without valuing it,

24   correct?

25   **A.**    Well, sure there is.  It's all based on highest and

GOLDMAN - CROSS- CLARKE

1    best use.

2    **Q.**   Okay.  Well, let's talk about highest and best use.

3    Where in your report did you state your determination of the

4    highest and best use of these properties you were

5    appraising?

6    **A.**   There is not a specific section that's going to address

7    the highest and best use of each tract.  But within that

8    write-up, there is an inferred highest and best use as to

9    the maximum value that the property would create based on

10   the use -- or there is the comparable sales that are

11   appropriate based on the highest and best use that creates a

12   maximum value.

13   **Q.**   So there is not a specific reference to the highest and

14   best use of any of the properties you appraised, but you're

15   saying that it can be inferred from the report; is that

16   right?

17   **A.**   Based on the property types.  And in this write-up or

18   in the write-ups, when there is discussion about cropland,

19   woodland, these properties have the same highest and best

20   use before and after the project.  So the woodland -- the

21   woodland subject properties have the highest and best use to

22   continue to be used for woodland.

23   **Q.**   Well, you would agree with me that the highest and best

24   usage analysis is really one of the most important factors

25   in appraising property, correct?

GOLDMAN - CROSS- CLARKE

1    **A.**   It is.

2    **Q.**   I mean, if you get the highest and best use wrong, then

3    your value's probably going to be wrong, unless you just get

4    lucky, correct?

5    **A.**   Yes.

6    **Q.**   And the highest and best use test is -- and you talked

7    about it -- there is four factors, correct?

8    **A.**   Yes.

9    **Q.**   And it's sort of an exclusionary test, correct, you

10   start with sort of the whole universe of possible uses and

11   then you refine it down, refine it down, refine it down to

12   the maximally productive use, correct?

13   **A.**   Correct.

14   **Q.**   And so that analysis for any of these properties did

15   not find its way into your report, correct?

16   **A.**   It's not written in the report, that's true.

17   **Q.**   So somebody coming along and trying to understand your

18   report would not be able to understand your highest and best

19   usage without looking at your work file; isn't that correct?

20   **A.**   Yes.

21   **Q.**   And your work file wasn't turned over to MVP for

22   disclosure in this case, was it?

23   **A.**   No one ever requested it, but, no.

24   **Q.**   I want to ask you to turn to page 47, and that is of

25   exhibit, Plaintiff's Exhibit Number 7.  And that includes a

1   write-up about the property that's owned by my clients,

2   Mountain Lair LLC.  Do you see that?

3   **A.**   I do.

4   **Q.**   And in your write-up there, you state -- and this is

5   probably about five lines from the bottom -- "There is

6   reported to be a single-family dwelling containing 2,272

7   square feet."  Correct?

8   **A.**   Correct.

9   **Q.**   So that was something that somebody told you or you

10  read somewhere?

11  **A.**   It would have been from public records from the

12  assessor.

13  **Q.**   You didn't actually see that residence?

14  **A.**   I don't recall.

15  **Q.**   And you don't know anything about the construction of

16  that residence, if it does exist, correct?

17  **A.**   That's true.

18  **Q.**   You didn't -- it goes to say you didn't take any

19  measurements of it, correct?

20  **A.**   That's true.

21  **Q.**   You didn't go inside it, right?

22  **A.**   That's correct.

23  **Q.**   You didn't try to determine the actual or the effective

24  age of the improvements there, correct?

25  **A.**   That's correct.

GOLDMAN - CROSS- CLARKE

1    **Q.**   You didn't try to determine the type or the quality of

2    the construction of it, correct?

3    **A.**   Correct.

4    **Q.**   You didn't determine its present use or occupancy,

5    correct?

6    **A.**   Correct.

7    **Q.**   You didn't consider the interior finishes, right?

8    **A.**   That's correct.

9    **Q.**   You didn't consider the type and condition of the roof,

10   correct?

11   **A.**   Yes.

12   **Q.**   And you also didn't value any of the site improvements

13   on that property; isn't that correct?

14   **A.**   That's correct.

15   **Q.**   You didn't determine whether there was fencing that

16   contributed value to the property, correct?

17   **A.**   There was fencing on the property -- I do happen to

18   recall that piece of property.  The comparable sales that

19   would have been used in that example would have had similar

20   site improvements.

21   **Q.**   Now, talking about your comparable sales, you -- what

22   appears to me from your report for each of these write-ups

23   that you made, you selected a handful of comparable sales

24   from your addenda that you said you would use, I guess, to

25   value them; is that correct?

GOLDMAN - CROSS- CLARKE

1      **A.**    Yes.

2      **Q.**    And you didn't do any sort of adjustments to those

3      comparable sales, or at least you didn't report any of those

4      in your appraisal; isn't that right?

5      **A.**    That is correct.

6      **Q.**    Did you prepare an adjustment grid for these comparable

7      sales?

8      **A.**    No.

9      **Q.**    Did you adjust the sales at all?

10     **A.**    If there were adjustments, they would have been

11     qualitative rather than quantitative.

12     **Q.**    And did you report those qualitative adjustments in

13     your appraisal report?

14     **A.**    No.

15     **Q.**    So I take it you got information on the parcel's size

16     with the acreage of the parcels that you were appraising,

17     correct?

18     **A.**    Yes.

19     **Q.**    Did you also analyze the concept of the larger parcel

20     of the parent tract?

21     **A.**    Not on these particular parcels, no.

22     **Q.**    And you know what I mean when I say that, I'm talking

23     about additional parcels, separate tax parcels that are

24     owned by the same owner and have the same highest and best

25     use, and are adjacent to these parcels, correct?

GOLDMAN - CROSS- CLARKE

1    **A.**    Yes, I understand the concept of larger parcel.

2    **Q.**    And you didn't do that analysis for these properties?

3    **A.**    I did not.  It's usually detrimental to the property

4    owner's valuation of the property.

5    **Q.**    And now, did you form opinions of highest and best use

6    for these properties you were appraising both as vacants

7    and as improved -- or as if vacant?

8    **A.**    They are frequently the same.  These properties by the

9    nature of their location are used for very few options,

10   which are residential, agricultural, and recreational.  And

11   so they would be the same before and after.  The only reason

12   -- I'm sorry -- before, improved or unimproved, the only

13   difference between being the improvements, if they're

14   liveable residences, then they would have the highest and

15   best use that would include single-family residential.  But

16   these large tracts of land frequently have multiple or

17   comingled, is what I usually refer to as, highest and best

18   uses.

19   **Q.**    You agree with me that there can be properties that are

20   not being put to their highest and best use by their current

21   owners, correct?

22   **A.**    On occasions, there are.

23   **Q.**    And that's part of the reason you appraise using the

24   highest and best use test; it's not the current use, it's

25   the highest and best use that's to be appraised, correct?

1   **A.**   Yes.

2   **Q.**   And you didn't consider that as a possibility in any of

3   the properties you valued in this appraisal, correct?

4   **A.**   Well, I did, to the extent that these properties have

5   very few options as far as what their maximally productive

6   uses can be.  And if you're referring to some type of

7   speculative project, as far as a subdivision or something

8   like that, I did not consider that, because that's not, in

9   my opinion, a highest and best use of properties that are in

10  this -- these areas.

11  **Q.**   Well, some of the properties could have had the highest

12  and best use for some sort of mining purposes; isn't that

13  right?

14  **A.**   They could.  I mean, that's a mineral component that I

15  would not have considered.

16  **Q.**   So you didn't investigate that as a potential highest

17  and best use, right?

18  **A.**   Mining, in particular?  No, sir, I didn't.

19  **Q.**   Now, you said in your report -- you testified earlier

20  that you complied with the Uniform Standards of Professional

21  Appraisal Practice, correct?

22  **A.**   Yes.

23  **Q.**   And that you called it USPAP, and I'll probably call it

24  USPAP, too.  And you complied with Standards 1 and 2 of

25  USPAP, correct?

1   **A.**   Correct.

2   **Q.**   And Standard 1 deals with the development of a real

3   property appraisal, correct?

4   **A.**   Right.

5   **Q.**   And Standard 2 deals with the reporting of a real

6   property appraisal, right?

7   **A.**   Yes.

8   **Q.**   Now, one of the things that's required by Standard 1 is

9   for you to look at all sales of the properties you are

10  appraising within, I think, three years prior to the

11  effective date of the appraisal; isn't that right?

12  **A.**   Yes.

13  **Q.**   And is that reported in your appraisal report, the

14  sales history of these parcels?

15  **A.**   It's not in the report.  It would be in my work file.

16  **Q.**   But you did that?

17  **A.**   Yes.

18  **Q.**   And you're also supposed to look at all the listings of

19  those properties, correct?

20  **A.**   Yes.

21  **Q.**   And that also was not in your report, correct?

22  **A.**   It would be in my work file if a property were listed.

23  **Q.**   It's not in your report, though, right?

24  **A.**   That's correct.

25  **Q.**   Now, there are -- Standard 2 allows you -- says there

1    are basically two different ways to report it; there is an

2    oral report and a written report, correct?

3    **A.**    Yes.

4    **Q.**    And you did a written report, right?

5    **A.**    Yes.

6    **Q.**    And within a written report, you can either do just an

7    appraisal report or a restricted appraisal report, correct?

8    **A.**    Yes.

9    **Q.**    And you did an appraisal report, correct?

10   **A.**    Yes.

11                MR. CLARKE:  May I approach, Your Honor?

12                THE COURT:  Yes.

13                MR. CLARKE:  I'd ask these be marked.  I'm not

14   sure what number we are on at this point for defendants for

15   identification purposes.

16                THE COURT:  3, if we go consecutively.

17        Mr. Teaney, you had 1 and 2?

18                MR. TEANEY:  That's correct, Your Honor.

19                THE COURT:  So it is Exhibit 3 okay.

20                MR. CLARKE:  That's okay with me, Your Honor.

21                THE CLERK:  It's 3.

22                MR. CLARKE:  Can I show the witness a copy of

23   this?

24   BY MR. CLARKE:

25   **Q.**    Mr. Goldman, I've given you a document that's been

1    marked for identification purposes Landowner's Exhibit

2    No. 3.  And it appears to be, the cover page or the title

3    page, I guess, of the 2016-2017 USPAP, correct?

4    **A.**   Yes.

5    **Q.**   And then within it -- it's not the entire document, but

6    what I've tried to do is put a Standard 1 and Standard 2

7    together there.  Do you see that?

8    **A.**   Yes.

9    **Q.**   All right.  And I think you said earlier, but you agree

10   with me that you consider USPAP to be authoritative in your

11   field, correct?

12   **A.**   Yes.

13   **Q.**   Now, if you'll turn with me to -- excuse me -- I'm

14   sorry, I've lost my place here, Your Honor.  To page 24, of

15   this document.  Mr. Goldman, it appears that part of the

16   Standard 2, Standards Rule 2-2, and subsection VIII, Roman

17   Numeral VIII.  Do you see that?

18   **A.**   Yes.

19   **Q.**   And if you actually go back to page 22, the beginning

20   of that talks about -- excuse me -- the top of page 23, it

21   says, "The content of an Appraisal Report must be consistent

22   with the intended use of the appraisal and, at a

23   minimum," -- and then it lists a number of different

24   subsections, correct?

25   **A.**   Yes.

1    **Q.**   So subsection VIII, Roman Numeral VIII, would you read

2    what it says there?

3    **A.**   "Summarize the information analyzed, the appraisal

4    methods and techniques employed, and the reasoning that

5    supports the analyses, opinions, and conclusions; exclusion

6    of the sales comparison approach, cost approach, or income

7    approach must be explained."

8    **Q.**   All right.  In the comments underneath that, the VIII,

9    the third paragraph in that comments says, "When reporting

10   an opinion of market value, a summary of the results of

11   analyzing the subject sales, agreements of sales, options,

12   and listings in accordance with Standards Rule 1-5 is

13   required."  Do you see that?

14   **A.**   I do.

15   **Q.**   So that's required to be part of your appraisal report,

16   correct?

17   **A.**   Yes.

18   **Q.**   And then it goes on to say in the comments, "If such

19   information is unobtainable, a statement on the efforts

20   undertaken by the appraiser to obtain the information is

21   required."  Correct?

22   **A.**   Yes.

23   **Q.**   And then it says, "If such information is irrelevant, a

24   statement acknowledging the existence of the information and

25   citing its lack of relevance is required."  Correct?

1    **A.**    Yes.

2    **Q.**    You didn't do that in your report, correct?

3    **A.**    No, I did not.

4    **Q.**    And if you'll turn with me to the next page, page 25.

5    Roman Numeral X at the top of that page.  Again, this is

6    talking about what needs to be in the appraisal report,

7    correct?

8    **A.**    Yes.

9    **Q.**    And that says -- Roman Numeral X says, "When an opinion

10   of highest and best use was developed by the appraiser,

11   summarize the support and rationale for that opinion."

12   Correct?

13   **A.**    Yes.

14   **Q.**    Again, that summary and rationale for that opinion as

15   to these individual properties is not in your report?

16   **A.**    It is not.

17   **Q.**    If you'll turn with me back to page 17, looking at

18   Standard 1.  And Standards Rule 1-1, says, "In developing a

19   real property appraisal, an appraiser must," -- and then

20   subsection (b) says, "not commit a substantial error of

21   omission or commission that significantly affects an

22   appraisal."

23        Do you see that?

24   **A.**    Yes.

25   **Q.**    So that's a requirement of performing the appraisal

GOLDMAN - CROSS- LOLLAR

1    that you not commit any substantial error of omission or

2    commission, correct?

3    A.    Yes.

4    Q.    And subsection (c) says that you must not render

5    appraisal services in a careless or negligent manner, such

6    as by making a series of errors that, although individually

7    might not significantly affect the results of an appraisal,

8    in the aggregate affects the credibility of those results.

9         Do you see that?

10   A.    I do.

11   Q.    And it's your testimony today that you complied with

12   that Standard under USPAP?

13   A.    That information is in my work file, so it's not as if

14   it was omitted.  It's not in the report.

15   Q.    But you admitted that some of the information that

16   USPAP says has to be in the report was not in your report,

17   correct?

18   A.    That's true.

19        MR. CLARKE:  That's all the questions I have.

20   Thank you.

21                      **CROSS-EXAMINATION**

22   BY MR. LOLLAR:

23   Q.    Good afternoon, Mr. Goldman.

24   A.    Good afternoon.

25   Q.    Or good evening, I should say, rather.  Getting to that

GOLDMAN - CROSS- LOLLAR

1   time here.  When did you first begin on this appraisal

2   assignment?

3   **A.**   It would have been May, possibly.  The work -- the

4   information I was getting kind of trickled in at the

5   beginning.  I couldn't give you a specific date.

6   **Q.**   Well, so you think you started in May?

7   **A.**   I think that would be a reasonable estimate.

8   **Q.**   When did you finish?

9   **A.**   The report was sent out in September.

10  **Q.**   I am trying to do the math here.  Four to five months?

11  **A.**   Yes.

12  **Q.**   In your -- I know you said you've been an appraiser for

13  20 years, correct?

14  **A.**   24.

15  **Q.**   And in your experience as an appraiser for 24 years,

16  have you ever had to appraise this many properties in such a

17  short period of time?

18  **A.**   No.

19  **Q.**   So this would be a first for you?

20  **A.**   As far as the volume, yes.

21  **Q.**   And you would agree that sometimes typical appraisals

22  can take months on their own to appraise one piece of

23  property, right?

24  **A.**   Not months, but maybe a week or two.

25  **Q.**   Well, maybe I need to talk to your office, because I

1    can never get my appraisers to finish their appraisals in

2    more than a few months -- or less than a few months, rather.

3        Mr. Goldman, I want to ask you, what is -- as far as an

4    eminent domain case, what is your idea of what just

5    compensation would be?

6    **A.**   The rights that the property owner has given up.

7    **Q.**   And isn't it true that you also have to factor in

8    damages or diminution in value?  I know it's a lot of

9    different terms for that, but damages to the remainder of

10   the property?

11           MS. BAGNELL:  Objection to the extent he's seeking

12   a legal conclusion.

13           MR. LOLLAR:  Your Honor, may I respond?

14           THE COURT:  You may inquire.

15           MR. LOLLAR:  Damages to the remainder, that is a

16   complete appraisal concept.  It is completely within his

17   purview.

18           THE COURT:  You've already won the point.

19   BY MR. LOLLAR:

20   **Q.**   So you would agree that determining damages is an

21   integral part of the appraisal process?

22   **A.**   Yes.

23   **Q.**   And in some cases, actually, the just compensation can

24   be a lot more in damages than actually in the easement

25   taken; isn't that true?

GOLDMAN - CROSS- LOLLAR

1    **A.**   Could be.

2    **Q.**   And you appraised as part of this assignment 120

3    different properties?

4    **A.**   Yes.

5    **Q.**   And isn't it true out of those 120, you came to the

6    conclusion that there were only damages or diminution in

7    value to only -- to the remainder to only four properties?

8    **A.**   Yes.

9    **Q.**   So four out of 120?

10   **A.**   Yes.

11   **Q.**   That's not a lot?  You would agree with me on that?

12   **A.**   True.

13   **Q.**   I want to turn specifically to a few different of my

14   clients in this case, Mr. Goldman.  Are you familiar with

15   the Miller property?

16   **A.**   Can you refer me to a page?

17   **Q.**   I don't think it's actually -- I don't have the -- I'm

18   referring to the plat right now.  It would be WV-MO-012.265.

19   I can bring you all these if you would like to look at them.

20   **A.**   Tell me the parcel ID again.

21   **Q.**   Sure.  WV-MO-012.265.

22        MR. LOLLAR:  Your Honor, I apologize, I don't have

23   copies for opposing counsel, but these are all in the plats

24   that they provided to the landowners as part of the lawsuit,

25   so I do believe that they would have a copy.

1           THE COURT:  Are you aware of what's being spoken

2     about?

3           MS. BAGNELL:  I'm not sure exactly what you're

4     talking about.

5           MR. LOLLAR:  Three parcels relating to some of my

6     clients.

7           MS. BAGNELL:  The exhibits from the complaint.

8     That's fine.  I'm sorry, can you -- C-48 and it's Norvel

9     Mann?

10          MR. LOLLAR:  Just for the record, Your Honor,

11    Norvel Mann, and then there's multiple parcels, James Gore,

12    and then also Stephen and Melanie Miller.

13       Take as much time to look at that as you need.

14          MS. BAGNELL:  Okay.  Thank you.

15          MR. LOLLAR:  Your Honor, may I approach the

16    witness?

17          THE COURT:  Yes, you may.

18    BY MR. LOLLAR:

19    Q.   Mr. Goldman, I'm handing you a copy of three different

20    plats.

21          THE COURT:  If you would, let me see a copy of

22    that.

23          MR. LOLLAR:  I apologize.  I don't have any

24    additional copies.

25          THE COURT:  Just one moment.

1          MR. LOLLAR:  Those are all the plats that MVP

2    provided as part of the lawsuit in this case.  And I just

3    chose three different properties -- three different parcels

4    of some of the clients that I have in this case.

5          Your Honor, actually I was thinking if we could publish

6    those for the Court, then maybe that would help opposing

7    counsel, as well as the witness, as well as myself.  I don't

8    know if that's possible.

9          THE COURT:  Do you want to exhibit these to your

10    fellow landowner attorneys?

11          MR. LOLLAR:  I think they have copies.  I was

12    wondering if there was any way to publish those exhibits?  I

13    don't know if there is.  If not, I'll just have the witness

14    refer to them.

15          THE COURT:  You may proceed with the witness.

16    BY MR. LOLLAR:

17    Q.   Mr. Goldman, let me know when you've had an opportunity

18    to finish reviewing those.

19    A.   I'm not sure what you want me to look at them.

20    Q.   Just become familiar with them.

21    A.   Okay.

22    Q.   Those are three large parcels of property; correct?

23    One of them is 66 acres; I think the other one might be over

24    a hundred acres?

25    A.   There is 67, 20, and 37.

GOLDMAN - CROSS- LOLLAR

1    **Q.**    Okay.  You would consider those to be larger parcels

2    than your typical appraisal?

3    **A.**    Not for this area.  These are down in Lindside.  That's

4    pretty common.

5    **Q.**    Fair enough.  And in all of those cases, the pipeline

6    is going directly through the middle of the property; isn't

7    that correct?

8    **A.**    They don't show the entirety of the property, so I

9    don't know.

10   **Q.**    Well, from what you can gather on those plats?

11   **A.**    I can't -- it's not a whole map of the property.

12   **Q.**    So then -- but you reviewed those plats in coming to

13   your determination in this case, correct?

14   **A.**    I would have used the KMZ file, which is a digital

15   version, which has the entire parcel overlaid, Google Earth

16   overlaid with the pipeline.

17   **Q.**    And you would agree that for some of our clients, they

18   had multiple parcels; is that correct?

19   **A.**    That's true.

20   **Q.**    But in those particular -- those pipelines -- on those

21   parcels, the pipeline is going directly through the middle

22   of the property, according to those plats that you have

23   before you?

24   **A.**    These plats are incomplete for me to answer that

25   question.  They don't show the entire parcel.

GOLDMAN - CROSS- LOLLAR

1   **Q.**   Okay.  So you're saying that the plats that you relied

2   on that are provided to you by MVP are inaccurate?

3   **A.**   No.

4   **Q.**   They don't show the entire parcel?

5   **A.**   The KMZ file, the Google Earth files do.  That's what I

6   relied on.

7   **Q.**   So in none of those cases did you determine that there

8   were damages to the remainder of the property?

9   **A.**   That's correct.

10  **Q.**   And you talked about Google Earth, and I use Google

11  Earth a lot, and I really appreciate it, because you can go

12  on from your desktop and see the property, but one of the

13  things I'm always very surprised about is when I get onto

14  the property how much different, like Mr. Clarke talked

15  about, as far as the topography of the property can be.

16  You would agree with that, right?

17  **A.**   Yes.

18  **Q.**   And as he mentioned, you wouldn't be able to test out

19  the soil unless you got on the property, right?

20  **A.**   That's correct.

21  **Q.**   You wouldn't be able to see if there is any trenches?

22  **A.**   That's correct.

23  **Q.**   You wouldn't be able to examine the Karst topography?

24  **A.**   That's true.

25  **Q.**   You wouldn't be able to really understand what kind of

1    timber is on the property?

2    **A.**    That's true.

3    **Q.**    And you wouldn't be able to really -- you might not

4    know there is any improvements on the property, but, if

5    there were, you wouldn't be able to get inside and inspect

6    those improvements, would you?

7    **A.**    That's true.

8    **Q.**    And you -- I know you testified earlier that you never

9    spoke to the owners and you didn't -- I actually want to

10   clarify one point.  Did you personally go and visit all

11   these properties or were there other people at your firm

12   that did that?

13   **A.**    I did all of the site work or inspection work.

14   **Q.**    And as Ms. Bagnell pointed out, while that may not be

15   required, you would agree that speaking with the owner and

16   visiting the property would be good practice as an

17   appraiser?

18   **A.**    That's my common practice, yes.

19            MR. LOLLAR:  Nothing further.  Thank you, Mr.

20   Goldman.

21            THE WITNESS:  Yes, sir.

22                        **CROSS-EXAMINATION**

23   **BY MR. TEANEY:**

24   **Q.**   Good afternoon, Mr. Goldman.

25   **A.**   Hi, Mr. Teaney.

1          MR. TEANEY:  Your Honor, a quick housekeeping

2     matter on behalf of Mr. Clarke, as well as my client.  I'd

3     like to move for admission of Defendant's 3, which was the

4     uniform standards, the USPAP document that was offered

5     earlier.

6          THE COURT:  Any objection?

7          MS. BAGNELL:  Your Honor, I would object to the

8     extent that the rules are not evidence.  They were used to

9     cross-examine Mr. Goldman, but I don't think they need to be

10    admitted as an exhibit in this case.

11         THE COURT:  Anything further on that?

12         MR. TEANEY:  Mr. Goldman testified that this is

13    a -- that he's an expert.  He testified that this is

14    something that's commonly relied on in his field.  I think

15    it's admissible.

16         THE COURT:  Exhibit 3 is admitted.

17    **Defendant's Exhibit No. 3 admitted**

18    BY MR. TEANEY:

19    **Q.**   Who were intended users of your appraisal report?

20    **A.**   It was my client, which was Reed Smith, as well as EQT,

21    MVP, or related entities.

22    **Q.**   Okay.  Any other intended users?

23    **A.**   I'd have to look to tell you for certain.  I'm not sure

24    if you're referring to something in particular.  But I may

25    have said that part of the regulatory process, that this

GOLDMAN - CROSS- TEANEY

1   would have been available to jurisdictional groups for

2   approval process.

3   **Q.**   Right.  And I apologize for leaving you hanging there.

4   If you look to page 4 on your scope of work.  In the second

5   column there under "Scope of Work," the report says, "This

6   report is intended to be used by the FERC and the

7   jurisdiction controlled by the Federal Court System that

8   will oversee any condemnations filed on behalf of MVP."

9   Is that correct?

10  **A.**   Yes.

11  **Q.**   If you're going to have more than one intended user of

12  an appraisal report, it has to be an appraisal report,

13  right?

14  **A.**   Yes.

15  **Q.**   And is that the different -- one of the differences

16  between a restricted report and an appraisal report?

17  **A.**   Yes.

18  **Q.**   And another difference is that the restricted report

19  will often have things in your work file that's supplemented

20  that the client is familiar with and that's why that's okay

21  to have those separately; is that correct?

22  **A.**   Yes.

23  **Q.**   So some of the things that are required to be presented

24  and summarized, such as those under 2-2-8 that you and Mr.

25  Clarke discussed, can be in the work file if it's a

1    restricted report, correct?

2    **A.**   Yes.

3    **Q.**   So would this be more of the nature of a restricted

4    report or an appraisal report?

5    **A.**   I think it's an appraisal report.

6    **Q.**   Notwithstanding the fact that it fails to summarize all

7    of the information required by Standard 2-2?

8    **A.**   I think that it still adheres in the sense that it --

9    the information that is needed to make a decision about

10   highest and best use, in particular, is within the report.

11   **Q.**   Okay.  Do you summarize the reconciliations of

12   adjustments, qualitative or quantitative, that you made to

13   be indicators of value?

14   **A.**   I did not.

15   **Q.**   That's also a requirement under 2-2 for an appraisal

16   report, isn't it?

17   **A.**   I'll take your word for it.  I don't know the verbiage

18   that's in that requirement, but I will take your word for

19   it.

20   **Q.**   Okay.  And the Standard 2-2 also requires you to

21   clearly label whether it is -- what type of report it is,

22   correct?

23   **A.**   Yes.

24   **Q.**   And how many options do you have?

25   **A.**   Two.

GOLDMAN - CROSS- TEANEY

1    **Q.**    Two.  Where in your appraisal report do you comply with

2    2-2 and identify the type of report it is?

3    **A.**    Page 6.

4    **Q.**    Can you read for us --

5    **A.**    The first bullet point?

6    **Q.**    Yes.  What does it say there?

7    **A.**    "This is a preliminary appraisal report."

8    **Q.**    Is a preliminary appraisal report something that is

9    recognized by USPAP as a type of report?

10   **A.**    You can use any qualifier you want, as long as you use

11   the appraisal report.

12   **Q.**    I understand.  Why did you qualify this one as

13   preliminary?

14   **A.**    Because I knew that there was going to have to be

15   additional work conducted as the project moved along.

16   **Q.**    Okay.  And that additional work would include those

17   site visits, conversations with the owners, et cetera?

18   **A.**    That's correct.

19   **Q.**    Did you consult the Yellow Book before you undertook

20   this effort?

21   **A.**    Yes.

22   **Q.**    Yes.  And is that the reason that you determined the

23   Yellow Book was not required to be used?

24   **A.**    Yes.

25   **Q.**    Okay.  I only have one copy of this as well.  I'm in

GOLDMAN - CROSS- TEANEY

```
 1   the same boat as Mr. Lollar.  If you'll give me just a
 2   moment.
 3              MR. TEANEY:  May I approach, Your Honor?
 4   Thank you.
 5   BY MR. TEANEY:
 6   Q.   Mr. Goldman, if I proffered to you that these are
 7   excerpts from the Yellow Book, as we've called it, does that
 8   seem to be what you have in front of you?
 9   A.   Yes.
10   Q.   If I could direct your attention to the second page
11   that I handed you, Footnote 186.  If you'd take a minute to
12   read that.
13   A.   (Witness complies.)  Okay.
14   Q.   Did you read that footnote when you consulted the
15   Yellow Book prior to undertaking this exercise?
16   A.   No.
17   Q.   No.  Now this footnote contemplates determining whether
18   or not Yellow Book applies when a natural gas pipeline is
19   taking a property, doesn't it?
20   A.   That's what it refers to.
21   Q.   Right.  And it refers to that there may be a split in
22   the jurisdictions.  Is that your understanding of what it
23   says there?
24   A.   Yes.
25   Q.   Okay.  Did you consult with your client, Reed Smith, to
```

1    determine whether or not this was a jurisdiction that

2    followed the Federal Rule for Natural Gas Act condemnations?

3    **A.**   We discussed the use of Yellow Book in the context of

4    the appraisal, and it was determined, based on the research

5    that I did and conversations with them, that this was not a

6    Yellow Book requirement -- or it was not required to follow

7    the Yellow Book.

8    **Q.**   Did they direct you not to use the Yellow Book?

9    **A.**   No.

10   **Q.**   Now, you based that on your own review of the Yellow

11   Book?

12   **A.**   Yes.

13   **Q.**   And you did not see this footnote; is that correct?

14   **A.**   Correct.

15   **Q.**   Okay.   Thank you.

16            MR. TEANEY:   May I approach?   I'll take the

17   document.   Thank you.

18   BY MR. TEANEY:

19   **Q.**   I'd like to talk about one of the subject properties

20   that belongs to one of my clients.   This is -- well, let me

21   take a step back.

22            Do you appraise riverfront properties in your -- in

23   your course of business?

24   **A.**   Yes.

25   **Q.**   Do you believe that they have certain attributes,

1      including recreational use, that may affect their value?

2      **A.**    Yes.

3      **Q.**    And do certain aspects or nature of water access, if

4      you're on the river, if you have a sandy beach, is that

5      better than having a steep bank right up against the river,

6      as far as value?

7      **A.**    Yes.

8      **Q.**    Okay.  I direct you to page 67 of your report, which I

9      believe is Exhibit 7.  This is the property belonging to

10     Tammy Calpado and Caitlyn Gragg.

11     **A.**    I'm here.

12     **Q.**    You're there, okay.  Were you able to view this

13     property from the public roads, if you recall?

14     **A.**    Yes.

15     **Q.**    Yes.  Do you know where on the property this pipeline

16     crosses?

17     **A.**    It is at the riverfront.  This is -- this property, as

18     I recall, has kind of an odd configuration, because it's

19     wider at the road frontage and it may have a dogleg and then

20     it kind of skinnies down and goes all the way to the river.

21     **Q.**    Right.  So the pipeline emerges from the river crossing

22     on a riverfront access point; is that correct?

23     **A.**    Yes.

24     **Q.**    Were you able to see the rest of the riverbank from

25     your vantage point?

GOLDMAN - CROSS- TEANEY

1   **A.**   I don't recall.  I don't remember.

2   **Q.**   If someone told you that that was the sole access to

3   the river or convenient access for kayaks or recreational

4   use, that would be important in determining your valuation,

5   right?

6   **A.**   Yes.

7   **Q.**   Do you know whether that's the case on this property or

8   not?

9   **A.**   That that's their only means to access the river is

10   that section of frontage?

11   **Q.**   Yes.

12   **A.**   Yes, that would be the case.

13   **Q.**   That's the case.  So you knew that when you did your

14   valuation?

15   **A.**   Yes.

16   **Q.**   Okay.  And you were aware that this property had been

17   sold in the previous three years, correct?

18   **A.**   I think that's what I reported in this write-up, yes.

19   **Q.**   And then how did you take into account the prior sale

20   when you calculated your valuation of the easement or the

21   take?

22   **A.**   It was an improved property, and the improvement that's

23   on the property is removed from where the project will

24   occur.  So it's a situation where that structure would have

25   the same before and after, so the contributory value of the

GOLDMAN - CROSS- TEANEY

1    structure was not analyzed.

2    **Q.**   Okay.  So did the prior sale not go into your

3    calculation of value at all?

4    **A.**   That is correct.  The reason being is that it was a

5    package property that had both land and the structure.  And

6    my analysis of the right-of-way was that the structure was

7    not going to be impacted, so it did not need to be valued.

8    I was strictly valuing the site.

9    **Q.**   So you were valuing the site.  So you were concerned

10   about the price per acre of vacant land, right?

11   **A.**   That's correct.

12   **Q.**   Could you have analyzed the sale and determined how

13   much to reduce that sale amount or how much the structure

14   contributed to the sale amount?

15   **A.**   You could.

16   **Q.**   Did you?

17   **A.**   No.  It's not the preferred method when you have

18   comparable sales.

19   **Q.**   Okay.  Let's talk about the comparable sales.  You

20   indicate here, I think, that the comparable sales for this

21   property were S23117, F06116, and G261015.  Correct?

22   **A.**   Yes.

23   **Q.**   And are any of those riverfront properties?

24   **A.**   I will have to look.

25   **Q.**   Sure.  If it's assistance to you, I think you can find

GOLDMAN - CROSS- TEANEY

1    them at pages 115, 142, and 217.

2    **A.**   Tell me the page numbers again.

3    **Q.**   Yes, sir.  Page 115 would be F06116.

4    **A.**   Okay.  And then what were the other page numbers?

5    **Q.**   Sure.  Page 142 is G261015.

6    **A.**   Okay.

7    **Q.**   And then the final page 217, and that would be S23117.

8    **A.**   Okay.

9    **Q.**   Are any of those riverfront properties?

10   **A.**   They are not.

11   **Q.**   They are not.  You do have comparable sales in your

12   addenda that are riverfront properties, correct?

13   **A.**   Yes.

14   **Q.**   There are also riverfront properties on the Greenbrier

15   River in the vicinity of Ms. Capaldo's property, correct?

16   **A.**   Yes.

17   **Q.**   How come those were not selected as comparable sales?

18   **A.**   Because of the size.  Those were much smaller tracts of

19   land.  And the Capaldo property was 3.66 acres, and those

20   were in an established subdivision across the river, and

21   they were, I believe, a half-acre in size each.

22   **Q.**   Okay.  I direct you to -- to page 218 of your report.

23   This is a comparable S27-8-16.

24   **A.**   Yes.

25   **Q.**   This is not one of those half-acre properties.  It's

GOLDMAN - CROSS- TEANEY

1   about 7.8 acres on the riverfront.  How come this wasn't a

2   comparable sale for the Capaldo property?

3   **A.**   This property was used for a commercial development.

4   That was a recreational vehicle park where they had

5   installed utilities and subdivided it.

6   **Q.**   Okay.

7   **A.**   The Capaldo property is not of a configuration that you

8   could subdivide it and sell individual parcels, because of

9   the weird configuration.

10   **Q.**   Do you think it could be used for a recreational

11   vehicle park even if it weren't subdivided and sold?

12   **A.**   You could.  But not as easily.  This particular

13   property was almost rectangular.  It had a long section of

14   frontage on the river instead of a little snippet of

15   frontage.

16   **Q.**   Okay.  Is there anything in your report that would help

17   the reader understand how you arrived at the price per acre

18   for the Capaldo property based on the comparables that you

19   did identify?

20   **A.**   Other than the comparable sales themselves, there is

21   not a discussion about sale one is to be more, sale two

22   should be less.  That type of discussion is not the report.

23   **Q.**   Are those the things that are typically in an appraisal

24   report?

25   **A.**   Usually yes.

GOLDMAN - CROSS- ZIEGLER

```
 1   Q.    Usually, yes.  Thank you.
 2            MR. TEANEY:  No further questions, Your Honor.
 3                       CROSS-EXAMINATION
 4   BY MS. ZIEGLER:
 5   Q.    Good afternoon, Mr. Goldman.  My name is Anna Ziegler.
 6   I represent some of the property owners affected by this
 7   pipeline.  You stated earlier that you used the comparable
 8   method to come up with a value on the pipeline -- on the
 9   easements; is that correct?
10   A.    Yes.
11   Q.    So in laymen's terms, a comparable method would be, by
12   way of example, if a person were purchasing a residential
13   house, you would look to other residential houses to find
14   the comparable sales price; is that correct?
15   A.    Yes.
16   Q.    Similarly, if someone were purchasing a shopping
17   center, you would look to other shopping centers; is that
18   correct?
19   A.    Yes.
20   Q.    If someone were purchasing a pipeline easement, would
21   you not look to other pipeline easements?
22   A.    That's not the methodology that's commonly used for
23   right-of-way condemnation appraisals.  You appraise the
24   before, and you appraise the after, and the difference is
25   the just compensation.
```

GOLDMAN - CROSS- ZIEGLER

1    **Q.**   If there are right-of-ways which have been purchased in

2    the area, would it not make sense to look to those for the

3    comparables?

4    **A.**   That's not the methodology that's adopted for

5    appraisal purposes.

6    **Q.**   So is it different than the comparable approach that

7    you just said you used?

8    **A.**   No.  The methodology that I use in this report is

9    what's been adopted for condemning right-of-ways.  The

10   description that you are -- I have no idea of the

11   circumstances and the terms of those sales in regards to

12   what type of compensation might have been paid to avoid

13   legal costs and things that were unique to a specific

14   project that were unrelated to the real property.

15   **Q.**   But those are required, would you agree, that in West

16   Virginia, the Declaration of Consideration is required to be

17   included on a deed?

18   **A.**   Yes.

19   **Q.**   So you would have the consideration available to you;

20   is that correct?

21   **A.**   I would have what was stated in the deed.

22   **Q.**   So you appraised these properties, basically, we've got

23   three acres that are being impacted on this property, and

24   I'm going to look to see what three acres sold for on

25   another piece of property; is that accurate?

GOLDMAN - CROSS- ZIEGLER

1   **A.**   That's correct.

2   **Q.**   But you did not assess the value of the actual -- what

3   Easement A might sell for on one piece of property, you did

4   not use that at all?

5   **A.**   I did not use as what you're referencing, no.

6   **Q.**   Okay.  Did you account for -- we've talked a little bit

7   about a diminished value.  Did you account for any future

8   marketability of title issue, diminishment of future

9   marketability of title?

10  **A.**   No.  I have no way to make a judgement about that.

11  **Q.**   You also stated earlier that you used the Multiple

12  Listings Services or the MLS listing systems in several

13  counties.  I notice you did not include Summers County in

14  that list.  Is that correct?

15  **A.**   That's correct.  There is no Multiple Listings Service

16  in Summers County.

17  **Q.**   Is that a key component in determining -- is that a key

18  component in determining value when you're doing appraisals,

19  using an MLS, an accurate MLS system?

20  **A.**   An accurate MLS is important, but the caveat is that

21  brokers that work in Summers County will subscribe to

22  Beckley and also Greenbrier Valley.  I belong to those, so I

23  had the benefit of that information.

24  **Q.**   Do all of the brokers who work in Summers County

25  subscribe to those?

GOLDMAN - CROSS- ZIEGLER

1   **A.**   No.  And they don't in Charleston either.  That's

2   case-by-case.

3   **Q.**   So you did not have the benefit of the Multiple Listing

4   Service specific to Summers County?

5   **A.**   Because there isn't one, that's correct.

6   **Q.**   Last but not least, did you assess values that came in

7   at less than $3,000?  Were there property values that came

8   in at less than $3,000?

9   **A.**   Of the just compensation?

10  **Q.**   Yes.

11  **A.**   Yes.

12  **Q.**   Yes, just compensation.  Do you know approximately how

13  many?

14  **A.**   That were less than a thousand?

15  **Q.**   Three-thousand?

16  **A.**   Less than three-thousand?  I do not know the number,

17  no.

18  **Q.**   If I told you 20, does that seem about accurate to you?

19  **A.**   I really just don't know.  If you've counted them, I

20  would agree with you.

21  **Q.**   It's actually 21 but --

22          **MS. ZIEGLER:**  I have no further questions.

23          Thank you.

24

25

GOLDMAN - CROSS- KIRTLEY

|   |   |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | **BY MS. KIRTLEY:** |
| 3 | **Q.**   Hi, Mr. Goldman.  My name is Courtney Kirtley.  I just |
| 4 | have a few questions.  I represent Paco Land, which is in |
| 5 | Nicholas County.  Just to start you out, for reference, on |
| 6 | page 55 is your summary of that property.  I'll let you look |
| 7 | at it and then tell me if you're familiar with it. |
| 8 | **A.**   Yes. |
| 9 | **Q.**   Okay.  You stated early on that the Income Approach is |
| 10 | not applicable to these properties.  Would you briefly |
| 11 | explain to me what the Income Approach is and why it would |
| 12 | not be applicable? |
| 13 | **A.**   Okay.  The Income Approach is used when investors are |
| 14 | actively seeking out a particular property type with the |
| 15 | anticipation of creating revenue from leasing the real |
| 16 | property to a third party based on an arm's length |
| 17 | transaction and generate enough net operating income to |
| 18 | justify the original purchase price or whatever their |
| 19 | investment might be. |
| 20 | **Q.**   Okay.  When you went out to visit this property -- and |
| 21 | you state here it had good road frontage.  Do you recall |
| 22 | that it's along Route 55? |
| 23 | **A.**   I do. |
| 24 | **Q.**   And are you aware that's the main state road between |
| 25 | Summersville and Richwood and Summersville and Webster |

GOLDMAN - CROSS- KIRTLEY

1   Springs?

2   **A.**   Yes.

3   **Q.**   And do you recall if this property -- and you say it

4   was located, oh, borders an access road to Columbia Forest

5   Products.  And do you recall on page 27 of your report, I

6   believe it's page 27 -- no, excuse me, page 21.  And you

7   have listed the top employers in Nicholas County.  Do you

8   see there that Columbia was Number 5 of the employers in

9   Nicholas County?

10  **A.**   Yes.

11  **Q.**   Do you recall there was another plant located beside of

12  Columbia?

13  **A.**   Yes.

14  **Q.**   A Jeld-Wen plant?

15  **A.**   Yes.

16  **Q.**   And, also, you state that it is just north of

17  Craigsville, this piece of property.  Do you recall that it

18  was kind of between these two plants and Craigsville on the

19  state highway?

20  **A.**   That's true.

21  **Q.**   You mentioned that it has some development

22  opportunities.  And I don't know, if you weren't on the

23  property and didn't speak to the owner, were you aware that

24  this particular property has high-powered electric and all

25  utilities because of the plants located behind it?

GOLDMAN - CROSS- KIRTLEY

1    **A.**    I knew from the infrastructure that was along the road

2    that those were available.

3    **Q.**    When you visited this property, did you have with you

4    or did you see staked out where the pipeline would be?

5    Like, when you were looking at the property and driving

6    along the road, could you see where the pipeline would be on

7    the property?

8    **A.**    My recollection is that I was using Google Earth with

9    the pipeline overlaid.  So as I was approaching it, it was

10   showing my location relative to where the pipeline would

11   cross the property.  I don't recall stakes, but maybe they

12   were there.

13   **Q.**    Okay.  Something of concern to my clients is the exit

14   point of the pipeline is on -- you know, if you recall, the

15   land is kind of hilly and the pipeline is exiting sort of on

16   a rise in the land where it meets the road, which would be

17   kind of a prime entrance to the property.  Would something

18   like that affect the value of the property, if it's, you

19   know, the main entrance to it?  Actually, excuse me.  Let me

20   step back.

21        You say you've appraised properties in pipeline cases

22   before.  So -- is that correct?

23   **A.**    Yes.

24   **Q.**    Are you aware that when -- once the pipeline is in,

25   structures cannot be built on the pipeline and, you know,

1   parking lots and such, and developments can't be placed over

2   top of the pipeline?

3   **A.**   Yes, I am aware of that.

4   **Q.**   With this particular piece of property -- you said you

5   haven't spoken to the landowners.  Were you aware of what

6   this property was -- the intent of the property or what, you

7   know, why the owner had the property?

8   **A.**   No.

9   **Q.**   And you stated earlier that if you had the chance to go

10  on the property and talk to the landowners, that that could

11  change your opinion as to the value of it.  If you were

12  aware that this landowner had carefully considered all of

13  the utilities on the property and had topographical maps

14  drawn up, had talked to tenants about development of the

15  property and made plans for how to level out the property

16  and develop it, would that -- would that change your opinion

17  as to, like, the effect on the residual value of the

18  property?

19  **A.**   I would certainly take those opinions into

20  consideration, but they have to be weighed against market

21  realities about the economics in the area and the

22  possibility that there would be any sizable development of

23  the property that would generate revenue.  So, sure, that

24  would be helpful information to know.  It doesn't mean I

25  would adopt those opinions.

GOLDMAN - CROSS - KIRTLEY

1    **Q.**   And one last question.  I believe it was the Exhibit 8

2    where you had -- which was a summary of the appraised value

3    of these properties.  Was the value listed there what the

4    value you considered the property before the taking and

5    after the taking, the difference in value of the entire

6    tract, or was that a per-acreage value for the easement?

7    **A.**   For Paco -- well, for any of these property owners on

8    Exhibit 8, it is the just compensation, which encompasses

9    the value of whatever is going to be used for the project

10   and also any impact to the residue.  It's not a unit value.

11   **Q.**   Okay.  But in looking at the comparable sales, were you

12   looking at the per-acreage value?

13   **A.**   Yes.

14           MS. KIRTLEY:  I believe that's all I have.

15           THE COURT:  Are there other questions of Mr.

16   Goldman?  If not, Ms. Bagnell.

17           MS. BAGNELL:  Nothing, Your Honor.

18           THE COURT:  And with that, Mr. Goldman, thank you,

19   sir.

20           THE WITNESS:  Thank you.

21           THE COURT:  I don't think we're going to need you

22   further, but I would like for you to remain until we finish

23   the hearing.

24           THE WITNESS:  Yes, sir.

25           MR. CLARKE:  Your Honor, I would move to strike

1    Mr. Goldman's testimony.

2              THE COURT:  Pardon?

3              MR. CLARKE:  Your Honor, may I make a motion to

4    strike at this point?

5              THE COURT:  Sure.

6              MR. CLARKE:  Your Honor, I would just briefly move

7    to strike Mr. Goldman's testimony.  I think it's unreliable,

8    inherently unreliable.  I think he has admitted to multiple

9    violations of USPAP, which he acknowledged are the standards

10   that govern his practice.

11        He said he followed USPAP, but he also admitted on

12   cross-examination that he didn't include in his report the

13   sales, listings, options, and agreements; he didn't include

14   the reasoning that supports his analysis.  He didn't have

15   any adjustment grids for his comparable sales.  And I think,

16   most importantly, Your Honor, he doesn't report his

17   conclusions of highest and best use.

18        He admitted that's one of the most important attributes

19   in the appraisal; yet, he left it out of his appraisal.

20        Your Honor, he also admitted he didn't do a lot of

21   things; he didn't go on the properties; he didn't talk to

22   the owners; he didn't inspect improvements; he didn't assess

23   the value of timber; he didn't assess minerals.  He didn't

24   even try to contact the owners.

25        Your Honor, the report does not meet USPAP standards,

1    and I think, frankly, it violates Standards Rule 1-1(b) and

2    (c), either one of those, which talk about substantial

3    errors of omission or commission, or rendering appraisal

4    services in a careless or negligent manner, such as by

5    making a series of errors.

6         I think that's been his testimony is that he hasn't

7    complied with USPAP; he's made a series of errors.  And I

8    think he said he -- it was unusual for him to have this many

9    properties under appraisal.

10        So for those reasons, Your Honor, we don't think it's

11   reliable testimony, and we ask this Court to strike it.

12             THE COURT:  Thank you.

13             MR. CLARKE:  Thank you.

14             THE COURT:  Anyone else in support of the motion?

15             MR. TEANEY:  On behalf of my clients and I believe

16   Mr. Howell's clients, we would join the motion, and

17   emphasize to the Court that the purpose of this evidence was

18   presented to set a bond, which under the *Sage* case, is very,

19   very important.  It has a constitutional component to it.

20   And the *Sage* Court allowed Rule 65, allowed immediate

21   possession under Rule 65, because it saw enough comparable

22   provisions between Rule 65 and the Declaration of Taking

23   Act, which is a quick-take act by which federal agencies

24   take land to be assured that it would be constitutional.

25             Under the Declaration of Taking Act, when the

1    government comes to the Court to do a quick-act --

2    quick-take, it has to come in under the Relocation Act with

3    a USPAP compliant appraiser.

4        So to be comparable to the DTA in a *Sage* type case

5    under the Natural Gas Act, the condemnor, the natural gas

6    company should at least have to do the same as the federal

7    government would do under the Declaration of Taking Act.

8    Otherwise, the underpinnings of *Sage*, which found the

9    comparability of Rule 65 and the DTA to be sufficient to

10   protect the landowners, it falls apart.

11       The Rule 65 bond is to provide reasonable, certain and

12   adequate assurance of just compensation.  And under the DTA,

13   the Declaration of Taking Act, that is done with a USPAP

14   compliant report.

15       Here, we do not have a USPAP compliant appraisal on

16   which the Court can base the bond, so we don't believe that

17   this evidence would be admissible for the purposes of

18   setting a bond.

19           THE COURT:  Thank you.

20           MR. LOLLAR:  Your Honor, me and Mr. Stevens'

21   clients both would also join that motion.  I think the fact

22   that Mr. Goldman appraised 120 parcels, and only on four of

23   those parcels he determined that there was damage to the

24   residue, now you have giant tracts of land where there will

25   no doubt be restricted development for at least 50 feet of

1    the permanent easement, and then temporarily another 75

2    feet.  But Mr. Goldman doesn't think that that affects the

3    damage to the residue at all.

4         So I think, you know, the fact that four out of 120,

5    that really shows you the depth of where he went in his

6    appraisal work.

7              MS. ZIEGLER:  On behalf of my clients, I also join

8    in the motion.

9              MR. PATTERSON:  Western Pocahontas Properties also

10   joins the motion.

11             MS. KIRTLEY:  On behalf of Paco Land, we join as

12   well.

13             THE COURT:  Thank you.  I think that covers it.

14   Ms. Bagnell.

15             MS. BAGNELL:  Yes, Your Honor.  I think that Mr.

16   Clarke's description of the testimony mischaracterizes it.

17   Mr. Goldman was clear that he took into account the highest

18   and best use of the properties; that he analyzed market data

19   and comparable sales; that he looked at sales of the

20   properties over the last three years, and then in coming to

21   his opinion of value, which he orally gave in this matter,

22   that he had considered all of those in coming to that

23   conclusion.

24        He's clearly well-qualified as an expert appraiser.

25   There is no requirement for a bond hearing or for the Court

1    to set a bond that an appraisal be done.

2         In fact, the courts that have analyzed this have not

3    required an appraisal.  It's not the time for a final

4    determination of just compensation.  That occurs at trial.

5         And it is actually the burden of the landowner to

6    present evidence of just compensation.

7         Your Honor, I would argue that it is their burden

8    today, as well, for purposes of the bond, but, regardless of

9    that, the evidence presented by Mr. Goldman is certainly

10   sufficient and admissible for the purposes we're here today,

11   to provide the Court in its discretion information relevant

12   to setting a bond.

13        And I strongly disagree that the testimony should be

14   stricken.

15             THE COURT:  Thank you.

16        Mr. Clarke.

17             MR. CLARKE:  Thank you, Your Honor.  Just briefly.

18             Your Honor, I think what Mr. Teaney said is

19   correct in that this is actually a constitutional

20   requirement.  That is the finding of Judge Dillon in the

21   Western District of Virginia in the companion case there.

22   It's a constitutional requirement that the condemnor ensure

23   that the owner be provided with reasonable, certain and

24   adequate provision for obtaining compensation before his

25   occupancy is disturbed.

1          And that's a quote from the *Cherokee Nation* case, Your

2     Honor, which is in our materials.  It's an 1890 Supreme

3     Court case.  And that quote itself is cited by the Fourth

4     Circuit in the *Sage* opinion.

5          We don't have evidence from MVP that they have certain

6     assets that we could attach against or obtain some sort of a

7     judgment against them if for some reason they were unable to

8     pay an award of compensation.  That was a factor in the *Sage*

9     case that the Fourth Circuit considered.  Specifically,

10    referencing that ETNG parent company had reported earnings

11    of $1.17 billion in 2002.

12         We don't have that evidence, Your Honor.  MVP has

13    closely held that evidence and has not disclosed that in

14    discovery.  So the Court is left with MVP's evidence as to

15    what the just compensation should be.

16         And I agree with Ms. Bagnell, this is not a just

17    compensation trial.  But, at the same time, that

18    constitutional requirement is there to ensure that private

19    property owners, these owners in this case, are not left

20    holding the bag if something goes wrong or MVP is unable to

21    pay some amount of just compensation.

22         In cases in which it's the United States Government,

23    the courts have said -- or an entity of the government, the

24    courts have said, well, that's sufficient.  We have the full

25    faith and credit of the U.S. Treasury behind the taking

1   here.

2        Here, we have MVP, an LLC that was formed, apparently,

3   for the sole purpose of constructing this pipeline, and we

4   don't know what their assets or liabilities are.  Because

5   the appraisal -- because the testimony of Mr. Goldman relied

6   upon an appraisal that in and of itself did not meet the

7   standards of USPAP, we don't think it's reliable evidence on

8   which this Court can base any determination of a bond or a

9   determination that there is reasonable, certain and adequate

10  provision for obtaining compensation before these property

11  owners' possession is disturbed.  Thank you.

12        THE COURT:  Thank you.  Anyone else?

13        MR. TEANEY:  If I may address briefly, Your Honor,

14  the burden question.  Because it is a constitutional

15  requirement, the burden is on MVP -- or should be on MVP.

16  That was Judge Dillon's conclusion in the Western District

17  of Virginia.  The cases that might be cited that suggest

18  that the proponent of the bond in a run-of-the-mill 65(c)

19  case, that the burden should be on the proponent of the

20  bond, those cases are not eminent domain proceedings, so the

21  constitution is not at play, and those cases are typically

22  prohibitory injunctions.

23        This is a case where a private party is seeking to

24  condemn private property.  The Constitution requires just

25  compensation.  They are seeking to disturb the status quo

```
 1    before a trial on the merits.  This is a mandatory

 2    injunction.  Because strict scrutiny is given to all the

 3    elements, they've got to show them.  The burden should be

 4    placed on the proponents of the injunction.

 5             THE COURT:  Thank you.  I believe no one's rising,

 6    and so that concludes that matter.

 7         The Court will treat the motion to strike as under

 8    advisement.

 9             I would ask whether or not, Ms. Bagnell, you have any

10    further evidence?

11             MS. BAGNELL:  No, Your Honor.

12             THE COURT:  And do the defendants?

13             MR. HOWELL:  Yes, Your Honor.  We'd like to call a

14    landowner and submit a landowner affidavit.  I believe other

15    attorneys plan to do the same.

16             THE COURT:  And you may do so.

17         (End of excerpt, testimony of Todd Goldman.

18    Proceedings followed but were not transcribed.)

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2          I, Catherine Schutte-Stant, Federal Official Realtime

3    Court Reporter, in and for the United States District Court

4    for the Southern District of West Virginia, do hereby

5    certify that, pursuant to Section 753, Title 28, United

6    States Code, the foregoing is a true and correct transcript

7    of the stenographically reported proceedings held in the

8    above-entitled matter and that the transcript page format is

9    in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12           s/Catherine Schutte-Stant, RDR, CRR

13           _____   February 9, 2018

14           Catherine Schutte-Stant, RDR, CRR
             Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*